IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SPSS Inc., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | No. 08 C 66 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| Norman H. Nie and C. Hadlai Hull, | ) | |
| | ) | Magistrate Judge Arlander Keys |
| Defendants/Counterplaintiffs. | ) | |

## ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT

Defendants Norman H. Nie and C. Hadlai Hull (collectively "Defendants")

answer SPSS Inc.'s ("Plaintiff's") Complaint as follows:

### I.    THE PARTIES

1.    Plaintiff SPSS is a leading worldwide provider of predictive analytics
software and solutions.  It is incorporated under the laws of the State of
Delaware and its principal place of business is Chicago, Illinois.

**ANSWER:**

Admitted.

2.    Defendant Norman H. Nie ("Nie") was Chairman of the Board of
Directors of SPSS.  He resigned from SPSS's board of directors on
January 3, 2008.  He resides in California.

**ANSWER:**

Defendants deny that Professor Nie is a resident of California, but admit the

remaining allegations of paragraph 2.  Defendants further state that Professor Nie resides in

Idaho.

3.    Defendant C. Hadlai (Tex) Hull ("Hull") is an employee of SPSS.  He
resides in Illinois.

**ANSWER:**

        Admitted.

## II.      VENUE AND JURISDICTION

4.      Jurisdiction is proper in this court because this litigation arises under federal law, namely 17 U.S.C. §1051 et seq. (Lanham Act). The Court has jurisdiction over this action under 28 U.S.C. §1331 (federal question), 28 U.S.C. §1338(a) (trademarks), and 28 U.S.C. §2201 (Declaratory Judgment Act). In addition, to the extent that aspects of the claim are governed by state law, jurisdiction is proper based on 28 U.S.C. §1367 (Supplemental Jurisdiction) because the state law claims are so related to the claims arising under federal law as to form part of the same case and/or controversy.

**ANSWER:**

        Admitted.

5.      The Court has personal jurisdiction over defendant Nie because he regularly attends meetings of the Board of Directors of SPSS in this district and the subject matter of this suit arises from conduct of Nie and Hull that took place in this district. In addition, the Court has personal jurisdiction over defendant Hull because he resides in this district.

**ANSWER:**

        Admitted.

6.      Venue is proper in this district under 28 U.S.C. §§1391(b) in that defendant Hull resides in this district and a substantial part of the events giving rise to the claim occurred in this district.

**ANSWER:**

        Admitted.

## III.      FACTS

7.      SPSS uses the trademarks "SPSS" and "Statistical Package for the Social Sciences" (the "Trademarks") in its business. SPSS has brought this action for declaratory judgment because an actual, justiciable controversy of sufficient immediacy exists between it and defendants as to the parties' respective rights and obligations under a purported trademark license agreement. Defendants did not disclose the existence of the purported trademark license agreement to the other directors or officers of the Company or prospective shareholders at the time the Company became a

public company in 1993 and did not assert any rights under the purported trademark license agreement from 1993 until very recently. Nevertheless, defendants are now claiming to have the right to control SPSS's product design, development, marketing and sales through the trademark license agreement and are threatening to terminate the license agreement, to the detriment of the Company, if the Company does not accede to their directions or pay them $20 million for their purported trademark rights. The Company is compelled to bring this action to protect the business interests of the Company and to meet the expectations of its shareholders who reasonably understood, based upon defendants' conduct, as described below, that the Company would be managed by its duly elected directors and officers approved by the directors, and not the two defendants through the operation of an undisclosed trademark license agreement.

**ANSWER:**

Defendants admit that Plaintiff uses the trademarks "SPSS" and "Statistical Package for the Social Sciences" in its business, and that an actual, justiciable controversy of sufficient immediacy exists between it and defendants as to the parties' respective rights and obligations under a trademark license agreement, which the Company has now repudiated. Defendants deny any and all allegations of paragraph 7 in addition to or inconsistent with the foregoing. Answering further, Defendants state that they are the owners of the Trademarks (Registration No. 2,864,243) and have been so consistently since 1968.

8.      The Trademarks were initially used beginning in 1968 by a de facto partnership composed of Nie, Hull and an associate named Dale H. Bent ("Bent"). The business of the partnership was the development of computer programs to perform statistical analysis. Bent left the business in1969. On information and belief, Nie and Hull never used the Trademarks as individuals, but only as part of a business enterprise in which they were partners.

**ANSWER:**

Defendants admit that Professor Nie, Mr. Hull and Mr. Bent, working through a de facto partnership, developed and used in their business a set of software programs known as the Statistical Package for the Social Sciences or SPSS for use in the analysis of social sciences

data.  Defendants also admit the Mr. Bent left the business in 1969.  Defendants deny any and all

allegations of paragraph 8 in addition to or inconsistent with the foregoing.

> 9.    In January 1975, Nie and Hull continued their business by forming SPSS,
> Inc. an Illinois corporation.  SPSS, Inc. immediately used the Trademarks
> in its business without a license from Nie or Hull.

**ANSWER:**

Defendants admit that Professor Nie and Mr. Hull formed SPSS Inc. in February

1975, and became its sole shareholders and officers.  Defendants admit that they did not execute

a written license in 1975 to allow SPSS Inc. to use the Trademarks, but deny any and all

allegations of paragraph 9 in addition to or inconsistent with the foregoing.

> 10.    At some time between August 1976 and September 1977, Nie and Hull
> arranged for the execution of a document that purported to be a license
> agreement between them as individual owners of the Trademarks and
> SPSS, Inc. as licensee, even though SPSS, Inc. had been using the
> Trademarks for nearly two years without any purported license.  At the
> time the document was executed, Nie and Hull each owned 50% of the
> stock of SPSS, Inc.  A copy of the purported license agreement is attached
> hereto as Exhibit 1.

**ANSWER:**

Defendants admit that in September 1976, Messrs. Nie and Hull executed a

written License Agreement (effective February 1, 1975) and that the License Agreement granted

SPSS Inc. the exclusive right to use the SPSS and Statistical Package for the Social Sciences

trademarks and tradenames owned by Nie and Hull, subject to the terms and conditions of the

License Agreement.  Defendants admit that at the time the License Agreement was executed,

Professor Nie and Mr. Hull each owned 50% of the stock of SPSS Inc.  Defendants deny any and

all allegations of paragraph 10 in addition to or inconsistent with the foregoing.

> 11.    On October 7, 1976, Nie and Hull applied for resignation of the
> Trademarks with the U.S. Patent and Trademark Office ("PTO") and
> represented that "the applicants control, by written license, the nature and

4

quality of the goods to which the mark is applied." The application was
signed by Nie and Hull and was dated September 30, 1976.

**ANSWER:**

Defendants admit that within days of signing the License Agreement in 1976,
Messrs. Nie and Hull applied to register the SPSS trademark in their names as owners with the
United States Patent and Trademark Office ("USPTO") and that, in so doing, they disclosed the
existence and terms of the written license by which they could protect their trademark by
controlling the nature and quality of goods to which the trademark would be applied.

12.    The purported trademark license agreement was not approved by the
Board of Directors of SPSS, Inc. until September 14, 1977. At that time,
Nie and Hull each continued to own 50% of the stock of SPSS, Inc. The
license agreement was placed in the files of SPSS, Inc. at some point
during 1976 or 1977.

**ANSWER:**

Defendants lack knowledge at this point of when the Board of Directors of SPSS
Inc. formally recorded the approval of the License Agreement, but state that, after the execution
of the License Agreement, the Company at all times knew of the License Agreement and
maintained a copy in its files.

13.    On April 11, 1978, based upon the representations made by Nie and Hull,
the PTO granted registration of the Trademarks to Nie and Hull as
individuals.

**ANSWER:**

Admitted; Registration No. 1,089,094.

14.    In May 1993, SPSS Inc., an Illinois corporation, was merged into R&H
Delaware Shelf Corporation I, a Delaware corporation, and the surviving
entity later changed its name to "SPSS Inc."

**ANSWER:**

Defendants lack information sufficient to sufficient to admit or deny the truth or
falsity of the allegations of Paragraph 14, and, therefore, deny same.

15.    In August 1993, SPSS Inc. made an initial public offering of common stock ("IPO"). Immediately prior to the IPO, Nie beneficially owned 46% of the common stock of SPSS. Immediately after the IPO, Nie beneficially owned 31% of the Company's common stock. Nie was Chairman of the Board and a principal stockholder of the Company as of the IPO. As a director of SPSS, he signed the registration statement for the IPO, which included the prospectus.

**ANSWER:**

Professor Nie admits that SPSS Inc. made an initial public offering of common stock in about 1993 at a time when he was chairman and a principal stockholder of the Company. Professor Nie lacks information sufficient to admit or deny the truth or falsity of the remaining allegations of paragraph 15 and, therefore, denies same. Mr. Hull lacks information sufficient to sufficient to admit or deny the truth or falsity of the allegations of Paragraph 15, and, therefore, denies same.

16.    The IPO prospectus states in pertinent part: "SPSS® and Categories® are registered trademarks of the Company." Also, in the prospectus there is a section entitled "Reliance on Third Parties," which purports to list all material license agreements in which the Company is licensee, and section entitled "Transactions with Norman Nie," which lists material transactions and contracts between Nie and the Company. Neither of these sections of the prospectus discloses the existence of the purported trademark license agreement or describes its terms. Nie and Hull received millions of dollars from the proceeds of the IPO in payment of certain subordinated notes that Nie held through a trust and certain deferred royalties owing to Hull.

**ANSWER:**

Defendants state that the terms of the IPO Prospectus speak for themselves, and admit that they received proceeds as a result of the IPO, and deny any and all allegations of paragraph 16 inconsistent with or in addition to the foregoing.

17.    In December 1994, the Company made a follow-on public offering which included the sale of 300,000 shares of SPSS common stock beneficially owned by Nie. Like the prospectus for the IPO, the prospectus for the follow-on offering stated in pertinent part: "SPSS® and Categories® are registered trademarks of the Company." Also, as in the prospectus for the

IPO, the prospectus for this offering included a section entitled "Reliance on Third Parties," which purports to list all material license agreements in which the Company is licensee, and a section entitled "Transactions with Norman Nie," which lists material transactions and contracts between Nie and the Company. Neither of these sections of the prospectus discloses the existence of the purported trademark license agreement or describes its terms. Nie was still Chairman of the Board and a principal shareholder of the Company at the time of the follow-on offering. Nie, as a director of SPSS, signed the registration statement for the follow-on offering which included the prospectus. Nie received millions of dollars of the proceeds of the follow-on offering.

**ANSWER:**

Professor Nie admits that SPSS Inc. made a public offering of common stock in about 1994 at a time when he was chairman and a principal shareholder, states that the terms of the Prospectus relating to the December 1994 public offering speak for themselves, admits that he received certain proceeds as a result of the public offering, and denies any and all allegations of paragraph 17 inconsistent with or in addition to the foregoing. Mr. Hull lacks information sufficient to admit or deny the truth or falsity of the allegations of Paragraph 17, and, therefore, denies same.

18.  Nie and Hull did not disclose to any director or officer of the Company at the time of the IPO or follow-on offering the existence of the purported license agreement or that they believed the license agreement conferred any substantial rights upon them or that they might exercise those rights in the future. At the time of these transactions, the attorney who represented the Company also represented Nie personally.

**ANSWER:**

Defendants lack knowledge at this point of what disclosures they made at the time of the IPO in 1993, and thus lack information sufficient to admit or deny the truth or falsity of the allegations of paragraph 18, and therefore deny same, but state that the Company at all times knew of the License Agreement and maintained a copy in its files. Defendants admit that, at the

time of these transactions, the attorney who represented the Company also represented Professor

Nie.

> 19.    All foreign registrations of the Trademarks have been made in the name of the Company as owner.  All trademark disputes with third parties involving the Trademarks have been addressed and resolved by the Company.

**ANSWER:**

Defendants lack information sufficient to sufficient to admit or deny the truth or

falsity of the allegations of Paragraph 19, and, therefore, deny same.

> 20.    Nie and Hull never asserted any rights under the purported trademark license agreement from August 1993, when the Company first became a public company, to October 2007.  On October 9, 2007, Nie through his attorney, for the first time asserted that he had rights under the purported trademark license agreement.  See copy of letter from Luther Orton to Jack Noonan, President and Chief Executive Officer of the Company, dated October 9, 2007, a copy of which is attached hereto as Exhibit 2.

**ANSWER:**

Defendants admit that they did not expressly assert rights under the License

Agreement until 2007, but state further that the Company at all times knew of the License

Agreement, maintained a copy in its files and acknowledged Defendants' rights under the

License Agreement by asking them to sign papers confirming to the U.S. Patent and Trademark

Office their ownership of the marks in 2002.

> 21.    Since October 9, 2007, Nie has made and continues to make a series of increasingly onerous demands for information and inspection and has threatened and continues to threaten to terminate the purported license agreement if his demands are not met or if he, in his sole discretion, is dissatisfied with any of the Company's products or uses of the Trademarks.

**ANSWER:**

Professor Nie admits that he has made certain requests consistent with his rights

under the License Agreement, and denies any and all allegations of paragraph 21 inconsistent

with or in addition to the foregoing.  Mr. Hull lacks information sufficient to sufficient to admit

or deny the truth or falsity of the allegations of Paragraph 21, and, therefore, denies same.

22.    Responding to Nie's demands and threats have imposed and continue to
imposed significant costs on the Company and have delayed and continue
to delay the delivery of products to customers.  Customers have expressed
dissatisfaction with the delay.

**ANSWER:**

Professor Nie denies that he has issued any "demands and threats," and lacks

information sufficient to sufficient to admit or deny the truth or falsity of the allegations of

Paragraph 22 in addition to or inconsistent with the foregoing, and, therefore, denies same.  Mr.

Hull lacks information sufficient to sufficient to admit or deny the truth or falsity of the

allegations of Paragraph 22, and, therefore, denies same.

23.    Nie and Hull's current interpretation of their rights under the purported
license agreement gives them sole discretion to decide what products the
Company will offer for sale and when products will be delivered.  In
essence, Nie and Hull are attempting to use the purported license
agreement, and the threat to terminate it to the detriment of the Company,
as a means to run the Company and/or extract a payment of millions of
dollars from the Company for the assignment of purported rights to the
Trademarks.  Defendants' conduct is continuing and presents an actual,
justiciable controversy of sufficient immediacy to warrant a declaratory
judgment as requested herein.

**ANSWER:**

Denied.

### IV.    CLAIM FOR RELIEF

24.    SPSS incorporates by reference the allegations contained in paragraphs 1
through 23, inclusive.

**ANSWER:**

Defendants incorporate each and every allegation contained in their answers to

paragraphs 1 through 23 inclusive, as if fully set forth herein.

25.    Defendants' misrepresentations, omissions and conduct deceived the Company with respect to the existence, meaning and enforceability of the purported trademark license agreement.  The Company reasonably relied upon defendants' misrepresentations, omissions and conduct in deciding to invest millions of dollars into developing SPSS's business and becoming a public company.  Defendants have benefited greatly from these investments and from SPSS becoming a public company.  Among other things, the Company paid millions of dollars owed to the defendants using the proceeds of the transactions described above in paragraph 15, and Nie received millions of dollars from the proceeds of the transaction described above in paragraph 17 and defendants received millions of dollars from subsequent sales of the Company's stock.  Complying with all of defendants' recently asserted demands under the purported trademark license agreement would deprive the Company's board of directors and management of the ability to control the design, development, marketing and sales of the Company's products and would cause significant damage to SPSS and its shareholders.  Furthermore, if SPSS were unable to use the Trademarks, the Company would suffer substantial injury.  Finally, it would injure the Company and inequitable to pay defendants for the rights to use the Trademarks when defendants created the impression that the Trademarks could be sued exclusively by the Company in perpetuity without the conditions they are now asserting.

**ANSWER:**

Denied.

26.    Accordingly, Nie and Hull should be estopped from enforcing any rights under the purported trademark license agreement under the doctrines of estoppel, acquiescence and laches.

**ANSWER:**

Denied.

27.    SPSS seeks a declaratory judgment from this Court that Nie and Hull are estopped from enforcing any rights under the purported trademark license agreement and that SPSS shall be deemed to have an irrevocable, assignable and exclusive license to use the Trademarks.

**ANSWER:**

Defendants admit that Plaintiff seeks a declaratory judgment on the grounds stated, but deny that Plaintiff is entitled to a declaratory judgment.

## DEMAND FOR JURY TRIAL

Defendants demand a trial by jury on all issues that are so triable.

## AFFIRMATIVE DEFENSES

1.      Plaintiff's Complaint fails to state any claim upon which the relief prayed for in the Complaint can be granted.

2.      Plaintiff's Complaint is barred, in whole or in part, by the doctrine of unclean hands.

3.      Plaintiff's Complaint is barred, in whole or in part, by the doctrine of laches.

4.      Plaintiff's Complaint is barred, in whole or in part, by the doctrine of waiver.

5.      Plaintiff's Complaint is barred, in whole or in part, based upon the doctrine of estoppel on the grounds that Plaintiff previously and continuously acknowledged Defendants' ownership of, and rights in, the trademarks at issue in this matter.

6.      Plaintiff's Complaint is barred, in whole or in part, based upon the doctrine of estoppel on the grounds that Plaintiff previously and continuously acknowledged Defendants' rights under the License Agreement at issue in this matter.

7.      Plaintiff's Complaint is barred, in whole or in part, because it has wrongfully repudiated the License Agreement as alleged in Defendants' Counterclaim in this matter.

## COUNTERCLAIM FOR TRADEMARK INFRINGEMENT

Counterplaintiffs Norman H. Nie and C. Hadlai Hull counterclaim against Counterdefendant SPSS Inc. (the "Company"), as follows:

### I.    THE PARTIES

1.    Counterplaintiff Norman H. Nie is a Research Professor in the Department of Political Science at Stanford University, Director of the Stanford Institute for the Quantitative Study of Society, and Professor Emeritus of Political Science at the University of Chicago. Professor Nie co-founded defendant SPSS Inc. in 1975, serving as its Chief Executive Officer until 1992, and as Chairman of its Board of Directors until he tendered his resignation on January 3, 2008.  He remains a substantial shareholder in SPSS Inc., owning approximately 200,000 shares of SPSS Inc. common stock as well as options to purchase additional common stock of the Company.  Professor Nie resides in Idaho, but lives and works much of each year in California.

2.    Counterplaintiff C. Hadlai Hull co-founded SPSS Inc. in 1975.  Mr. Hull served as an officer and member of the Company's board of directors until he sold the last of his stock in the Company in 1990.  Mr. Hull has remained with the Company as an employee, but not an officer or director, since that time.  He now owns roughly 1500 shares of Company stock as a result of his participation in the Company's employee stock ownership plan.  Although Mr. Hull is not a software engineer by training (he has an economics degree from Yale University and an MBA from Stanford University), he is in fact an accomplished software engineer and is currently employed by SPSS Inc. as Principal Software Engineer.  Mr. Hull resides in Chicago, Illinois.

3.    Counterdefendant SPSS Inc. is a Delaware Corporation, with its principal

place of business at Sears Tower in Chicago, Illinois.

## II.    VENUE AND JURISDICTION

4.      This Court has jurisdiction over this counterclaim under 15 U.S.C. § 1121

and 28 U.S.C. § 1338(a) in that this case arises under the Trademark Laws of the United States.

5.      Venue is proper in this District in that Counterdefendant SPSS Inc. is

located here.

## III.    THE FACTS

### A.    The Origin and Evolution of SPSS Inc.

6.      In 1968, Professor Nie, Mr. Hull and Dale H. Bent, all then graduate

students or recent graduates of Stanford University, developed a set of software programs known

as the Statistical Package for the Social Sciences (SPSS) for use in the analysis of social sciences

data.  These programs use statistics to turn raw data into information useful for scientific

evaluation and business and government decision-making.

7.      After leaving Stanford in 1968, Professor Nie joined the Political Science

faculty at the University of Chicago (where he remained on the active faculty for 30 years until

he became Emeritus Professor in 1998).  Shortly after moving to Chicago, Professor Nie

persuaded Mr. Hull to join him there as assistant director of the University of Chicago's

Computation Center.

8.      With the University's encouragement, and operating within the National

Opinion Research Center where Professor Nie was a senior faculty study director, Professor Nie

and Mr. Hull continued to develop and refine SPSS and to promote use of the software at other

academic institutions.  The SPSS software package proved to be a valuable tool, gained

widespread use and recognition, and became a source of sufficient revenues to fully fund the on-

going SPSS development effort within the University's National Opinion Research Center.

9.      On February 1, 1975 — again with the University of Chicago's encouragement (the Internal Revenue Service had raised questions about the conduct of the SPSS business within a tax exempt entity associated with the University) — Messrs. Nie and Hull formed SPSS Inc., becoming its sole shareholders and executive officers. Professor Nie became Chief Executive Officer of the Company (while continuing on the faculty at the University of Chicago). Mr. Hull also became an officer of the Company and the Company's chief software designer.

10.      In addition to its increasing popularity in academic circles, SPSS gained a following in government and commercial markets as well, with agencies such as NASA and the National Forest Service finding useful applications for the software, and businesses such as Procter & Gamble and Anheuser-Busch exploiting SPSS's capabilities to analyze marketing research data.

11.      Professor Nie juggled his academic and Company responsibilities for nearly seventeen years (from 1975 until 1992), until it became clear that the Company had grown to the point that full time, professional executive management and an infusion of capital from a public offering of the Company's stock had become necessary.

12.      In 1992, Professor Nie gave up his position as Chief Executive officer of SPSS Inc. and turned over management of the Company to Jack Noonan ("Noonan"). Mr. Noonan became President and Chief Executive Officer while Professor Nie stayed on in a non-executive capacity as Chairman of the Board of Directors. Mr. Noonan remains President and Chief Executive Officer and became Chairman of the Company in January of this year when Professor Nie resigned.

13.    Under Mr. Noonan's management, SPSS Inc. made an initial public offering of its common stock in 1993, had a follow on offering in 1994, and has had additional public and private financings since that time - all subject to Mr. Noonan's oversight and supervision.

14.    In the years after Professor Nie stepped down as CEO, Mr. Noonan also increasingly set the Company's course with respect to strategies, operations, investments, acquisitions, product development priorities and product quality control.

**B.    The Trademark License Agreement**

15.    In September 1976, Messrs. Nie and Hull executed the License Agreement (effective February 1, 1975).  The License Agreement is attached hereto as **Exhibit A**.  The License Agreement granted SPSS Inc. the exclusive right to use the SPSS and Statistical Package for the Social Scientists trademarks and tradenames owned by Nie and Hull, subject to the terms and conditions of the License Agreement.

16.    The License Agreement was placed in the Company's files soon thereafter and has been maintained by the Company in its files at all times since then.

17.    In the License Agreement, the Company acknowledged that the trademarks were the sole property of Messrs. Nie and Hull and agreed that all uses of the trademarks by the Company or its sub-licensees would inure to their benefit.

18.    The license granted by the License Agreement was royalty free and worldwide, but reserved to Messrs. Nie and Hull the power to assure that the trademarks were used only on products that met their standards of quality and to otherwise protect and control the use of the trademarks.  Messrs. Nie and Hull reserved the right to terminate the license should the Company fail timely to cure a violation of the Agreement.

19.     Professor Nie remained the principal owner of the Company and served as its Chief Executive Officer from 1975 until 1992.  Mr. Hull remained a principal owner and officer of the Company until 1990.  There was, therefore, no need or occasion for them to rely on the powers reserved to them under the License Agreement to assure product quality and proper use of the trademarks.  And, under the License Agreement, the Company owed and paid no royalties to them.  Eventually, both Professor Nie and Mr. Hull forgot about the License Agreement and the powers it reserved to them as trademark owners, but have continued to work to maintain and enhance the quality of SPSS products from their respective positions with the Company.

20.     Within days of signing the License Agreement in 1976, Messrs. Nie and Hull applied to register the SPSS trademark in their names as owners with the United States Patent and Trademark Office ("USPTO").  In so doing, they submitted the License Agreement to the USPTO (where it remains part of the public file today), expressly disclosing the existence of the written license by which they could protect their trademark by controlling the nature and quality of goods to which the trademark would be applied.  On April 11, 1978, the USPTO granted registration of the SPSS trademark to them.  A true and correct copy of the SPSS trademark registration is attached hereto as **Exhibit B** (Registration No. 1,089,094).

21.     At all relevant times, the Company and its lawyers have been responsible for the Company's maintenance of its trademark portfolio, including the SPSS trademark licensed exclusively to the Company by Messrs. Nie and Hull.  On January 17, 1999, however, the Company failed to renew the registration of the SPSS trademark, and the USPTO declared it expired.

22.     On December 6, 2002, the Company arranged for Messrs. Nie and Hull to execute another application to register the SPSS trademark in their names as owners, without saying anything to them about the License Agreement or their rights and powers under it, and, on July 20, 2004, the USPTO granted the registration, a true and correct copy of which is attached hereto as **Exhibit C** (Registration No. 2,864,243).  The registration shows the same first use in commerce as did the predecessor registration - June 1968 when they sold the first SPSS product.

23.     Thus, at all times since September 1976, the ownership of the SPSS trademark by Messrs. Nie and Hull, as well as the License Agreement by which they could protect the trademark and control the nature and quality of goods to which the mark would be applied, were matters of public record at the USPTO, known to the Company and anyone else sufficiently interested to review the public record.

**C.     Professor Nie's Concern for the Company's Direction**

24.     After he gave up his position as Chief Executive Officer of the Company in 1992, Professor Nie found himself increasingly at odds with Company management and other board members on important matters of Company strategies, operations, investments, acquisitions, product development priorities and product quality control.  As a result, his powers of persuasion waned over time.  Had Professor Nie remembered that the License Agreement empowered him and Mr. Hull to protect the trademark by insuring that the SPSS trademark was used only on products that met their standards of quality and otherwise controlling the use of the trademarks, Professor Nie could have used these powers in the best interests of the Company and its shareholders to exert his influence more effectively to prevent ill-conceived and unprofitable actions by Company management.

25.    The Company has made ill-advised corporate acquisitions since the initial public offering in 1993. Professor Nie opposed many of these acquisitions. Had he remembered at the time of these acquisitions that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent at least some of the acquisitions.

26.    The Company entered into a strategic alliance with AOL in 2001 providing for the purchase of certain AOL assets and the acquisition of the exclusive right to distribute AOL survey data drawn from its members and users. The alliance was an operational failure and produced collateral accounting and regulatory complications that were detrimental to the Company and its shareholders. Professor Nie opposed the alliance when it was proposed for numerous reasons not the least of which was his belief that the AOL sampling methodology was not scientifically valid and that the Company's association with the data would adversely impact the SPSS reputation for quality. Professor Nie also argued that the economic assumptions the Company's management was using to justify the price of the acquisition were unrealistic.

27.    Some months later, Professor Nie was retained by the Company as a consultant to close down the AOL alliance when it failed (at a reported loss of $40 million) for all of the reasons Professor Nie had highlighted before the acquisition. He was successful in his efforts to implement an orderly shut down. Had he remembered at the time of the AOL alliance that he had the right under the License Agreement to protect his trademark by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent the Company from entering into the AOL alliance in the first place.

28. Professor Nie also protested for many years the Company's failure to take steps to maintain the quality and feature competitiveness of the SPSS flagship statistical tools family of products and associated revenue losses. Ultimately, when revenues for that family of products fell for the first time in the history of the Company, Professor Nie was brought back into the Company as a consultant to address these issues. He was successful in this effort. Had he remembered at the times he expressed his concerns that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able exert his influence more effectively to accelerate the process by which the Company addressed these concerns.

29. Professor Nie also expressed with increasing frequency over the years his concerns that pressure on the Company might be leading to the premature release of new products and product features. Had he remembered in the context of these discussions that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent such premature releases.

30. At year end 2005, the Board of Directors terminated Professor Nie's consultant agreement with the Company. After that time, his influence within the Company and ability to influence Company decisions affecting the value of his trademarks steadily diminished, making his rights under the License Agreement, once he realized he had them, all the more important.

### D.    The Company's Request for a Trademark Assignment

31.    In May 2007, without prior notice or explanation of any kind, the Company approached Professor Nie and asked him and Mr. Hull to execute the Trademark Assignment (attached hereto as **Exhibit D**) transferring to the Company their SPSS and Statistical Package for the Social Sciences trademarks together with the good will symbolized and generated by the trademarks.  The Assignment recited as proposed consideration a payment of ten dollars.

32.    At Mr. Noonan's direction, one of the Company's in-house lawyers e-mailed Professor Nie a copy of the Trademark Assignment for him and Mr. Hull to sign, represented that Nie and Hull had already granted the Company "an exclusive, perpetual right" to use the trademarks and told him that the Trademark Assignment would simply make it "cleaner" by actually transferring ownership to SPSS Inc.

33.    Although the Trademark Assignment expressly referred to the License Agreement, the Company did not provide Messrs. Nie and Hull with a copy of the License Agreement, nor did the Company acknowledge the important rights reserved to them under the License Agreement, including the power to assure that the trademarks were used only on products that met their standards of quality, to otherwise control the use of the trademarks and to terminate the license should the Company fail timely to cure a violation of the Agreement.

34.    The Company expressly acknowledged in the Trademark Assignment — drafted and proposed by the Company — that Messrs. Nie and Hull owned the trademarks and had licensed them to the Company pursuant to the License Agreement.  The Company asserted in the Trademark Assignment that the Company's use of the trademarks continually since the date of the License Agreement had been authorized and approved by Messrs. Nie and Hull in

20

accordance with the License Agreement.

35.    Messrs. Nie and Hull were surprised by the Company's request that they sign the Trademark Assignment, and did not remember (or even have a copy of) the License Agreement.  Only after Professor Nie asked for it, did the Company provide him with a copy.

36.    After examining the License Agreement, Professor Nie concluded that the value of the rights reserved to him and Mr. Hull under the License Agreement, including the right to protect the trademark by monitoring the nature and quality of goods to which the SPSS trademark would be applied and otherwise controlling the use of the trademark and the right to terminate the license for violations of its terms, was considerable.  This was especially the case given Professor Nie's concerns about Company strategies and operations referenced above. Professor Nie was not interested in selling the SPSS trademark (and giving up his rights under the License Agreement) other than for a substantial payment.  Mr. Hull concurred.

37.    In October 2007, Professor Nie notified the Company that he placed great value on his rights and that he and Mr. Hull would not sell them to the Company for the ten dollars it had proposed, but that they would consider a fair offer.

**E.    Counterplaintiffs' Exercise of Their Rights and the Company's Response**

38.    At the same time, having been reminded of the existence of the License Agreement and having come to understand the nature and extent of the rights Professor Nie and Mr. Hull had under the License Agreement, they began to assert their rights directly and affirmatively.

39.    Professor Nie asked the Company for information related to the matters as to which he and Mr. Hull had authority and responsibility under the License Agreement.  For many weeks, the Company acknowledged and did not dispute the rights of Messrs. Nie and Hull under the License Agreement and provided or offered to provide much of the information he

requested without limitation or qualification.  When Professor Nie followed up, however, asking

for, among other things, the identification of sub-licensees of the SPSS trademark and specific

information that would allow him (and the technical expert he had engaged) to evaluate the

quality of the Company's soon-to-be-announced Dimensions 5.0 product release, the Company

backed off.  The Company refused to send him a list of sub-licensees (insisting that he travel

across the country to inspect the actual sub-licenses at the Company's headquarters) and declined

to provide the materials he requested related to Dimensions 5.0.

        40.    On December 19, 2007, Professor Nie asked the Company to send him

specific materials he and his technical expert required in order to conduct a quality review of

Dimensions 5.0.  He separately laid out his position with respect to the standards of quality of

SPSS products.  He reminded the Company that he had been concerned about the quality of

SPSS products for some years, both generally and with particular reference to the company's

family of SPSS statistical tools, and that he was now increasingly concerned that pressure on the

Company might be leading to the premature release of new products and product features that

could impair SPSS's reputation for quality.

        41.    That same day, the Company responded by threatening Professor Nie,

telling him that unless he was willing to assign his rights under the License Agreement to the

Company, the Company would publicize a false allegation that he had concealed the License

Agreement in connection with the Company's historic public filings and elsewhere for his own

financial benefit.

        42.    Professor Nie rebuffed the threat and told the Company that there was no

basis for an accusation that he had concealed the License Agreement from anyone.  He also

pointed out that the Company not only had the License Agreement in its files at all times since its

execution in 1976 but also was necessarily aware of the import the License Agreement for some period of time before first reminding Messrs. Nie and Hull of its existence in May 2007.

43.     The Company then offered to pay Messrs. Nie and Hull $500,000 for the trademarks, in response to which Messr. Nie and Hull offered to transfer the trademarks to the Company for $20 million, which the Company rejected.

44.     On December 31, 2007, within days of rejecting the offer, the Company filed a Form 8-K with the Securities and Exchange Commission claiming — misleadingly — that it was Professor Nie who had "recently informed the Company that, in his view, the Company's use of the SPSS trademark is subject to" the License Agreement, and referring to the offer by Messrs. Nie and Hull to transfer the SPSS trademark for $20 million.

45.     In its Form 8-K the Company failed to disclose that it was the Company that had asked Messrs. Nie and Hull to transfer the trademarks, failed to disclose that the Company had offered to pay $500,000 for the trademarks, and failed to disclose that, in the Trademark Assignment the Company drafted and asked Messrs. Nie and Hull to sign, the Company expressly recited that Messrs. Nie and Hull owned the SPSS trademark, that they had licensed it to the Company pursuant to the License Agreement and that the Company's use of the trademark had been authorized and approved by them in accordance with the License Agreement continually since the date of the License Agreement.

46.     On January 3, 2008, Professor Nie tendered his resignation as chairman and member of the SPSS Inc. board of directors.

47.     On that same day, without prior notice to Messrs. Nie and Hull, the Company filed this lawsuit falsely accusing them of having deceived the Company with respect to the existence, meaning and enforceability of the License Agreement.  And, on January 4,

2008, the Company publicized these allegations by filing a Form 8-K disclosing the filing of this lawsuit and attaching a copy of the Complaint.

      **F.**      **The Company's Repudiation of the License Agreement**

      48.      While previously acknowledging the validity and legal import of the License Agreement, including the rights reserved in that agreement to Messrs. Nie and Hull, the Company has now emphatically retreated from that acknowledgement.

      49.      The Company first intimated that it might repudiate the License Agreement in connection with its December 19, 2007 threat to publicize a false allegation that Professor Nie had concealed the License Agreement in connection with the Company's historic public filings and elsewhere for his own financial benefit.  In that letter, the Company commented "we do not mean to suggest that Dr. Nie has enforceable rights under the license agreement, or is the proper owner of the trademark" and purported to reserve "all of its claims and defenses in this matter."

      50.      Then, in its December 31, 2007, Form 8-K, the Company moved closer to repudiating the License Agreement by claiming for the first time that it "disputes the rights recently asserted by Dr. Nie."

      51.      Finally, in its Complaint in this action, the Company sealed its repudiation of the License Agreement (a) by alleging that Messrs. "Nie and Hull should be estopped from enforcing any rights under the purported license agreement," (b) by asking for a judgment that "Nie and Hull are estopped from enforcing any rights under the purported license agreement," and (c) by asking for a judgment that "SPSS shall be deemed to have an irrevocable, assignable and exclusive license to use the trademarks," notwithstanding the provisions of the License Agreement to the contrary.

## IV.    THE COMPANY'S TRADEMARK INFRINGEMENT

52.    Having repudiated the License Agreement, the Company is no longer licensed to use the SPSS trademark and tradename, and its use of the SPSS trademark and tradename since the repudiation has been and remains unauthorized.

53.    The Company's use of the SPSS trademark in the marketing and sale of products that do not meet the high standards of quality set by Messrs. Nie and Hull would erode the value of the trademark.

54.    The continued use of the SPSS trademark by the Company will mislead the purchasing public to believe that the Company's products are still associated, sponsored, endorsed, or in some other manner affiliated or connected with Messrs. Nie and Hull, the owners of the trademark, all in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. § 1114 and § 1125(a), respectively.

55.    The Company has infringed and continues to infringe the SPSS trademark by using the SPSS trademark in connection with the marketing and sale of nearly all of its products and services, including on signs, labels, packaging material, advertising and the like.

56.    By reason of the Company's willful infringement of the SPSS trademark as alleged above, the Company has realized, and will continue to realize, profits, and Messrs. Nie and Hull have suffered, and will continue to suffer, damage in an amount not now ascertainable.

57.    The Company threatens to continue to infringe the SPSS trademark and tradename, and, unless enjoined, will continue to do so, all to Counterplaintiffs' irreparable damage.  As it would be difficult to ascertain the amount of compensation that would afford Counterplaintiffs adequate relief for such continuing acts, Counterplaintiffs' remedy at law is not adequate to compensate them for their injuries.

## PRAYER FOR RELIEF

WHERFORE, Counterplaintiffs pray for relief as follows:

1.      That the Court grant an injunction pursuant to the powers granted it under 15 USC § 1116, enjoining Counterdefendant SPSS Inc. and its sub-licensees, agents, servants, and employees from directly or indirectly using the name "SPSS" or any mark, word or name similar to "SPSS" which is likely to cause confusion or mistake;

2.      That the Court, pursuant to the powers granted it under 15 USC § 1118, order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in Counterdefendant's possession bearing the mark "SPSS" and all plates, molds and other means of making the same be delivered and destroyed;

3.      That Counterdefendant be required to account to Counterplaintiffs for any and all profits derived by Counterdefendant from the sale of products using the SPSS mark since its repudiation of the License Agreement and for all damages sustained by Counterplaintiffs by reason of the acts of infringement complained of;

4.      That the Court award Counterplaintiffs treble the amount of actual damages suffered by them, pursuant to 15 USC § 1117;

5.      For the costs of suit and attorneys' fees Counterplaintiffs incur in this action; and

6.      For such other and further relief as the Court deems appropriate.

Counterplaintiffs demand a trial by jury on all issues that are so triable.

Dated:  January 28, 2008

Respectfully submitted,

/s/William B. Berndt
One of the Attorneys for
Counterplaintiffs/Defendants Norman H.
Nie and C. Hadlai Hull

Peter V. Baugher
William B. Berndt
Jennifer A. Waters
Schopf & Weiss LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
(312) 701-9300

Luther Orton (*pro hac vice* application pending)
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, California 94104
(415) 962-4400

## <u>CERTIFICATE OF SERVICE</u>

I, William B. Berndt, an attorney, state that I caused a copy of the attached

**Answer to Complaint for Declaratory Judgment** to be served via the CM/ECF system, which

will automatically serve notice of such filing on the following individuals this 28th day of

January, 2008:

> Robert J. Kriss
> Thomas V. Panoff
> Daniel K. Storino
> Edward H. Williams
> Mayer Brown LLP
> 71 South Wacker Drive
> Chicago, Illinois 60606

/s/William B. Berndt
William B. Berndt