## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SPSS Inc., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | No. 08 C 66 |
| | ) | |
| v. | ) | Judge John W. Darrah |
| | ) | |
| Norman H. Nie and C. Hadlai Hull, | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendants/Counterplaintiffs. | ) | |

## SPSS INC.'S ANSWER TO COUNTERCLAIM
## FOR TRADEMARK INFRINGEMENT

Plaintiff/counterdefendant SPSS Inc. ("SPSS") answers the counterclaim for trademark infringement of defendant/counterplaintiffs Norman H. Nie ("Nie") and C. Hadlai Hull ("Hull") as follows:

1.     Counterplaintiff Norman H. Nie is a Research Professor in the Department of Political Science at Stanford University, Director of the Stanford Institute for the Quantitative Study of Society, and Professor Emeritus of Political Science at the University of Chicago. Professor Nie co-founded defendant SPSS Inc. in 1975, serving as its Chief Executive Officer until 1992, and as Chairman of its Board of Directors until he tendered his resignation on January 3, 2008.  He remains a substantial shareholder in SPSS Inc., owning approximately 200,000 shares of SPSS Inc. common stock as well as options to purchase additional common stock of the Company.  Professor Nie resides in Idaho, but lives and works much of each year in California.

**ANSWER:** SPSS lacks information sufficient to admit or deny the truth or falsity of the first sentence of paragraph 1, and, therefore, denies same.  SPSS admits that Nie was one of the founders of SPSS, that SPSS was incorporated in 1975, that Nie served as SPSS's Chief Executive Officer until 1992 and that he served as Chairman of its Board of Directors until he tendered his resignation on January 3, 2008.  SPSS admits that, based on the most recent public records, Nie owns approximately 200,000 shares of SPSS common stock and that he holds SPSS

stock options. SPSS lacks information sufficient to admit or deny the truth or falsity of the fourth sentence of paragraph 1, and, therefore, denies same. SPSS denies all other allegations of paragraph 1.

2.    Counterplaintiff C. Hadlai Hull co-founded SPSS Inc. in 1975. Mr. Hull served as an officer and member of the Company's board of directors until he sold the last of his stock in the Company in 1990. Mr. Hull has remained with the Company as an employee, but not an officer or director, since that time. He now owns roughly 1500 shares of Company stock as a result of his participation in the Company's employee stock ownership plan. Although Mr. Hull is not a software engineer by training (he has an economics degree from Yale University and an MBA from Stanford University), he is in fact an accomplished software engineer and is currently employed by SPSS Inc. as Principal Software Engineer. Mr. Hull resides in Chicago, Illinois.

**ANSWER:**  SPSS admits that Hull was a founder of SPSS and that SPSS was incorporated in 1975. SPSS admits that Hull served as an officer and director until 1990. SPSS admits that Hull is an employee of SPSS and is currently employed by SPSS as a Principal Software Engineer. SPSS lacks information sufficient to admit or deny the truth or falsity of the fourth sentence of paragraph 2, and, therefore, denies same. SPSS admits that Hull is not a software engineer by training and that he is a software engineer. SPSS admits that Hull resides in Chicago, Illinois. SPSS denies all other allegations of paragraph 2 in addition to or inconsistent with the foregoing.

3.    Counterdefendant SPSS Inc. is a Delaware Corporation, with its principal place of business at Sears Tower in Chicago, Illinois.

**ANSWER:**  Admitted.

4.    This Court has jurisdiction over this counterclaim under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) in that this case arises under the Trademark Laws of the United States.

**ANSWER:**  SPSS admits that the Court has jurisdiction over the counterclaim but denies the remaining allegations of paragraph 4.

5.    Venue is proper in this District in that Counterdefendant SPSS Inc. is located here.

**ANSWER:** Admitted.

6.    In 1968, Professor Nie, Mr. Hull and Dale H. Bent, all then graduate students or recent graduates of Stanford University, developed a set of software programs known as the Statistical Package for the Social Sciences (SPSS) for use in the analysis of social sciences data. These programs use statistics to turn raw data into information useful for scientific evaluation and business and government decision-making.

**ANSWER:** Admitted, except SPSS lacks information sufficient to admit or deny the truth or falsity of all allegations concerning the use made of the "SPSS" and "Statistical Package for the Social Sciences" trademarks.

7.    After leaving Stanford in 1968, Professor Nie joined the Political Science faculty at the University of Chicago (where he remained on the active faculty for 30 years until he became Emeritus Professor in 1998). Shortly after moving to Chicago, Professor Nie persuaded Mr. Hull to join him there as assistant director of the University of Chicago's Computation Center.

**ANSWER:** Admitted.

8.    With the University's encouragement, and operating within the National Opinion Research Center where Professor Nie was a senior faculty study director, Professor Nie and Mr. Hull continued to develop and refine SPSS and to promote use of the software at other academic institutions. The SPSS software package proved to be a valuable tool, gained widespread use and recognition, and became a source of sufficient revenues to fully fund the ongoing SPSS development effort within the University's National Opinion Research Center.

**ANSWER:** Admitted, except SPSS lacks information sufficient to admit or deny the truth or falsity of all allegations concerning the use made of the "SPSS" and "Statistical Package for the Social Sciences" trademarks.

9.    On February 1, 1975 — again with the University of Chicago's encouragement (the Internal Revenue Service had raised questions about the conduct of the SPSS business within a tax exempt entity associated with the University) — Messrs. Nie and Hull formed SPSS Inc., becoming its sole shareholders and executive officers. Professor Nie became Chief Executive Officer of the Company (while continuing on the faculty at the University of Chicago). Mr. Hull also became an officer of the Company and the Company's chief software designer.

**ANSWER:** SPSS admits that SPSS was incorporated in 1975 and that Nie and Hull were the sole shareholders and officers at the time of incorporation. SPSS admits that Nie

3

became the Chief Executive Officer of SPSS and that Hull became an officer of SPSS and its

chief software designer.  SPSS lacks information sufficient to admit or deny the truth or falsity of

the remaining allegations of paragraph 9, and, therefore, denies same.

10.    In addition to its increasing popularity in academic circles, SPSS gained a following in government and commercial markets as well, with agencies such as NASA and the National Forest Service finding useful applications for the software, and businesses such as Procter & Gamble and Anheuser-Busch exploiting SPSS's capabilities to analyze marketing research data.

**ANSWER:**  Admitted.

11.    Professor Nie juggled his academic and Company responsibilities for nearly seventeen years (from 1975 until 1992), until it became clear that the Company had grown to the point that full time, professional executive management and an infusion of capital from a public offering of the Company's stock had become necessary.

**ANSWER:**  SPSS admits that SPSS made an initial public offering in 1993 seeking an

infusion of capital.  SPSS lacks information sufficient to admit or deny the truth or falsity of the

remaining allegations of paragraph 11, and, therefore, denies same.

12.    In 1992, Professor Nie gave up his position as Chief Executive Officer of SPSS Inc. and turned over management of the Company to Jack Noonan ("Noonan").  Mr. Noonan became President and Chief Executive Officer while Professor Nie stayed on in a non-executive capacity as Chairman of the Board of Directors.  Mr. Noonan remains President and Chief Executive Officer and became Chairman of the Company in January of this year when Professor Nie resigned.

**ANSWER:**  SPSS admits that Nie resigned as Chief Executive Officer of SPSS in 1992

but remained the Chairman of SPSS's Board of Directors until he resigned in January 2008.

SPSS admits that Noonan became the Chief Executive Officer of SPSS in 1992, that Noonan is

currently the President and Chief Executive Officer of SPSS, and that Noonan became Chairman

of SPSS in January 2008 after Nie resigned.  SPSS denies the other allegations of paragraph 12.

13.    Under Mr. Noonan's management, SPSS Inc. made an initial public offering of its common stock in 1993, had a follow on offering in 1994, and has had additional public and private financings since that time - all subject to Mr. Noonan's oversight and supervision.

**ANSWER:** SPSS admits that it made an initial public offering of its common stock in 1993, that it had a follow on offering in 1994, and that it has had additional public and private financings since that time. SPSS admits that during this time period Noonan was the Chief Executive Officer of SPSS. SPSS denies the other allegations of paragraph 13.

14.    In the years after Professor Nie stepped down as CEO, Mr. Noonan also increasingly set the Company's course with respect to strategies, operations, investments, acquisitions, product development priorities and product quality control.

**ANSWER:**   SPSS admits that from 1992 to present Noonan has been the Chief Executive Officer of SPSS. SPSS denies the other allegations of paragraph 14.

15.    In September 1976, Messrs. Nie and Hull executed the License Agreement (effective February 1, 1975). The License Agreement is attached hereto as **Exhibit A.** The License Agreement granted SPSS Inc. the exclusive right to use the SPSS and Statistical Package for the Social Scientists trademarks and tradenames owned by Nie and Hull, subject to the terms and conditions of the License Agreement.

**ANSWER:** SPSS admits that at some time between August 1976 and September 1977, Nie and Hull executed a document which purports to be a License Agreement, a copy of which is attached to the counterclaim as Exhibit A. SPSS denies the other allegations of paragraph 14. Answering further, SPSS states that SPSS used the trademarks and tradename without a license for more than a year before the purported License Agreement was prepared and executed by Nie and Hull and nearly two years before Nie and Hull caused the Company to create a document purporting to reflect that SPSS agreed to enter into the License Agreement.

16.    The License Agreement was placed in the Company's files soon thereafter and has been maintained by the Company in its files at all times since then.

**ANSWER:** SPSS admits that the License Agreement was placed among its voluminous files by an unknown person at an unknown time. SPSS lacks information sufficient to admit or deny the truth or falsity of the other allegations of paragraph 16, and, therefore, denies same.

17.    In the License Agreement, the Company acknowledged that the trademarks were the sole property of Messrs. Nie and Hull and agreed that all uses of the trademarks by the Company or its sub-licensees would inure to their benefit.

**ANSWER:** SPSS lacks information sufficient to admit or deny the truth or falsity of the allegations of paragraph 17 and, therefore, denies same. SPSS cannot determine who signed the purported License Agreement on behalf of SPSS and whether such person exercised reasonable care or acted in the best interest of SPSS when he/she signed the document. Nie and Hull were the sole shareholders at the time the document was executed.

18.    The license granted by the License Agreement was royalty free and worldwide, but reserved to Messrs. Nie and Hull the power to assure that the trademarks were used only on products that met their standards of quality and to otherwise protect and control the use of the trademarks. Messrs. Nie and Hull reserved the right to terminate the license should the Company fail timely to cure a violation of the Agreement.

**ANSWER:** SPSS admits that it never agreed to pay a royalty to Nie or Hull to use the trademarks and that Nie and Hull never requested royalty payments. SPSS denies the other allegations of paragraph 18.

19.    Professor Nie remained the principal owner of the Company and served as its Chief Executive Officer from 1975 until 1992. Mr. Hull remained a principal owner and officer of the Company until 1990. There was, therefore, no need or occasion for them to rely on the powers reserved to them under the License Agreement to assure product quality and proper use of the trademarks. And, under the License Agreement, the Company owed and paid no royalties to them. Eventually, both Professor Nie and Mr. Hull forgot about the License Agreement and the powers it reserved to them as trademark owners, but have continued to work to maintain and enhance the quality of SPSS products from their respective positions with the Company.

**ANSWER:** SPSS admits that Nie was an SPSS stockholder and served as its Chief Executive Officer from 1975 until 1992. SPSS admits that Hull was an SPSS stockholder and served as an officer until 1990. SPSS denies the third sentence of paragraph 19. SPSS admits that it is not obligated to pay any royalties to Nie and Hull and that it never has. SPSS lacks information sufficient to admit or deny the truth or falsity of the fifth sentence paragraph 19, and, therefore, denies same. SPSS denies all other allegations of paragraph 19. Answering further,

SPSS states that neither Nie nor Hull ever took any steps to enforce any of their alleged rights under Exhibit A until late 2007.

20.      Within days of signing the License Agreement in 1976, Messrs. Nie and Hull applied to register the SPSS trademark in their names as owners with the United States Patent and Trademark Office ("USPTO").  In so doing, they submitted the License Agreement to the USPTO (where it remains part of the public file today), expressly disclosing the existence of the written license by which they could protect their trademark by controlling the nature and quality of goods to which the trademark would be applied.  On April 11, 1978, the USPTO granted registration of the SPSS trademark to them.  A true and correct copy of the SPSS trademark registration is attached hereto as **Exhibit B** (Registration No. 1,089,094).

**ANSWER:**  SPSS admits that in 1976 Nie and Hull applied to register the SPSS trademark in their names as owners with the USPTO.  SPSS admits that Exhibit A was eventually submitted to the USPTO and that a copy of Exhibit A is contained in the USPTO's files.  SPSS admits that, on or around April 11, 1978, the USPTO registered the SPSS trademark in the names of Nie and Hull.  SPSS admits the fourth sentence of paragraph 20.  SPSS denies all other allegations of paragraph 20.

21.      At all relevant times, the Company and its lawyers have been responsible for the Company's maintenance of its trademark portfolio, including the SPSS trademark licensed exclusively to the Company by Messrs. Nie and Hull.  On January 17, 1999, however, the Company failed to renew the registration of the SPSS trademark, and the USPTO declared it expired.

**ANSWER:**  Denied, except that SPSS admits the registration in the names of Nie and Hull expired.

22.      On December 6, 2002, the Company arranged for Messrs. Nie and Hull to execute another application to register the SPSS trademark in their names as owners, without saying anything to them about the License Agreement or their rights and powers under it, and, on July 20, 2004, the USPTO granted the registration, a true and correct copy of which is attached hereto as **Exhibit C** (Registration No. 2,864,243).  The registration shows the same first use in commerce as did the predecessor registration - June 1968 when they sold the first SPSS product.

**ANSWER:**  SPSS admits that it facilitated the preparation of an application to register the SPSS trademark in the name of Nie and Hull, that the USPTO granted the registration and that a copy is attached as Exhibit C.      SPSS denies all other allegations of paragraph 22.

Answering further, SPSS states that Nie and Hull did not request any information from SPSS regarding the trademarks or the License Agreement at the time they executed the application to register the trademarks and took no steps to enforce any alleged rights as trademark owners or trademark licensors before, on or after December 6, 2002 until late 2007.

23.    Thus, at all times since September 1976, the ownership of the SPSS trademark by Messrs. Nie and Hull, as well as the License Agreement by which they could protect the trademark and control the nature and quality of goods to which the mark would be applied, were matters of public record at the USPTO, known to the Company and anyone else sufficiently interested to review the public record.

**ANSWER:**  SPSS admits that Exhibits A, B and C were contained in the files of the USPTO.  SPSS denies all other allegations of paragraph 23.

24.    After he gave up his position as Chief Executive Officer of the Company in 1992, Professor Nie found himself increasingly at odds with Company management and other board members on important matters of Company strategies, operations, investments, acquisitions, product development priorities and product quality control.  As a result, his powers of persuasion waned over time. Had Professor Nie remembered that the License Agreement empowered him and Mr. Hull to protect the trademark by insuring that the SPSS trademark was used only on products that met their standards of quality and otherwise controlling the use of the trademarks, Professor Nie could have used these powers in the best interests of the Company and its shareholders to exert his influence more effectively to prevent ill-conceived and unprofitable actions by Company management.

**ANSWER:**  Denied.

25.    The Company has made ill-advised corporate acquisitions since the initial public offering in 1993.  Professor Nie opposed many of these acquisitions.  Had he remembered at the time of these acquisitions that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent at least some of the acquisitions.

**ANSWER:**  Denied.   Answering further, in his capacity as Chairman of the Board, Nie did not vote against any of SPSS's corporate acquisitions since the initial public offering in 1993.

26.    The Company entered into a strategic alliance with AOL in 2001 providing for the purchase of certain AOL assets and the acquisition of the exclusive right to distribute AOL survey data drawn from its members and users.  The alliance was an operational failure and produced collateral accounting and regulatory complications that were detrimental to the Company and its shareholders.  Professor Nie opposed the alliance when it was proposed for

numerous reasons not the least of which was his belief that the AOL sampling methodology was not scientifically valid and that the Company's association with the data would adversely impact the SPSS reputation for quality. Professor Nie also argued that the economic assumptions the Company's management was using to justify the price of the acquisition were unrealistic.

**ANSWER:** SPSS admits that it entered into a transaction with AOL in 2001. SPSS

denies the other allegations of paragraph 26. Answering further, Nie, as director and Chairman

of the Board of SPSS voted to approve the AOL transaction through a unanimous written

consent.

27.    Some months later, Professor Nie was retained by the Company as a consultant to close down the AOL alliance when it failed (at a reported loss of $40 million) for all of the reasons Professor Nie had highlighted before the acquisition. He was successful in his efforts to implement an orderly shut down. Had he remembered at the time of the AOL alliance that he had the right under the License Agreement to protect his trademark by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent the Company from entering into the AOL alliance in the first place.

**ANSWER:** SPSS admits that Nie was periodically retained as a consultant. SPSS denies

the other allegations of paragraph 27.

28.    Professor Nie also protested for many years the Company's failure to take steps to maintain the quality and feature competitiveness of the SPSS flagship statistical tools family of products and associated revenue losses. Ultimately, when revenues for that family of products fell for the first time in the history of the Company, Professor Nie was brought back into the Company as a consultant to address these issues. He was successful in this effort. Had he remembered at the times he expressed his concerns that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able exert his influence more effectively to accelerate the process by which the Company addressed these concerns.

**ANSWER:** Denied. Answering further, SPSS states that at all relevant times, Hull was

employed by SPSS as a software engineer for the SPSS family of products and never complained

to SPSS's current Chief Executive Officer or its current Chief Financial Officer about the quality

of any SPSS product released by SPSS.

29.    Professor Nie also expressed with increasing frequency over the years his concerns that pressure on the Company might be leading to the premature release of new products and

product features.  Had he remembered in the context of these discussions that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent such premature releases.

**ANSWER:** Denied.

30.    At year end 2005, the Board of Directors terminated Professor Nie's consultant agreement with the Company.  After that time, his influence within the Company and ability to influence Company decisions affecting the value of his trademarks steadily diminished, making his rights under the License Agreement, once he realized he had them, all the more important.

**ANSWER:**  SPSS admits that Nie's consultant agreement was terminated at year end 2005.  SPSS denies the other allegations of paragraph 30.

31.    In May 2007, without prior notice or explanation of any kind, the Company approached Professor Nie and asked him and Mr. Hull to execute the Trademark Assignment (attached hereto as **Exhibit D)** transferring to the Company their SPSS and Statistical Package for the Social Sciences trademarks together with the good will symbolized and generated by the trademarks.  The Assignment recited as proposed consideration a payment of ten dollars.

**ANSWER:**  SPSS admits that it requested Nie and Hull to formally assign the SPSS trademark to SPSS by executing Exhibit D.  SPSS denies the other allegations of paragraph 31.

32.    At Mr. Noonan's direction, one of the Company's in-house lawyers e-mailed Professor Nie a copy of the Trademark Assignment for him and Mr. Hull to sign, represented that Nie and Hull had already granted the Company "an exclusive, perpetual right" to use the trademarks and told him that the Trademark Assignment would simply make it "cleaner" by actually transferring ownership to SPSS Inc.

**ANSWER:**  SPSS admits that Exhibit D was sent to Nie via email and that Noonan approved of asking Nie and Hull to formally assign the SPSS trademark to SPSS.  SPSS denies all other allegations of paragraph 32.

33.    Although the Trademark Assignment expressly referred to the License Agreement, the Company did not provide Messrs. Nie and Hull with a copy of the License Agreement, nor did the Company acknowledge the important rights reserved to them under the License Agreement, including the power to assure that the trademarks were used only on products that met their standards of quality, to otherwise control the use of the trademarks and to terminate the license should the Company fail timely to cure a violation of the Agreement.

**ANSWER:** SPSS admits that Exhibit D was sent to Nie via email. SPSS denies all other allegations of paragraph 33. Answering further, SPSS states that SPSS's seeking a formal assignment of trademark rights from Nie and Hull was consistent with the fact (which they have not disputed in their answer to SPSS's complaint) that they had taken no steps to enforce any alleged rights as trademark owners or licensors since at least 1992, over fifteen years.

34.    The Company expressly acknowledged in the Trademark Assignment — drafted and proposed by the Company — that Messrs. Nie and Hull owned the trademarks and had licensed them to the Company pursuant to the License Agreement. The Company asserted in the Trademark Assignment that the Company's use of the trademarks continually since the date of the License Agreement had been authorized and approved by Messrs. Nie and Hull in accordance with the License Agreement.

**ANSWER:** Denied. Answering further, SPSS states that the language of Exhibit D was based upon limited information and was couched in terms appropriate for an amicable assignment of trademark rights.

35.    Messrs. Nie and Hull were surprised by the Company's request that they sign the Trademark Assignment, and did not remember (or even have a copy of) the License Agreement. Only after Professor Nie asked for it, did the Company provide him with a copy.

**ANSWER:** SPSS denies that Nie and Hull were surprised by SPSS's request that they sign the Trademark Assignment. SPSS admits that it provided a copy of Exhibit A to Nie after he asked for it. SPSS lacks sufficient information to admit or deny the truth or falsity of the other allegations of paragraph 35 and, therefore, denies them. Answering further, in an early response to the request that he sign a formal trademark assignment, Nie indicated that he would sign it.

36.    After examining the License Agreement, Professor Nie concluded that the value of the rights reserved to him and Mr. Hull under the License Agreement, including the right to protect the trademark by monitoring the nature and quality of goods to which the SPSS trademark would be applied and otherwise controlling the use of the trademark and the right to terminate the license for violations of its terms, was considerable. This was especially the case given Professor Nie's concerns about Company strategies and operations referenced above. Professor Nie was not interested in selling the SPSS trademark (and giving up his rights under the License Agreement) other than for a substantial payment. Mr. Hull concurred.

11

**ANSWER:** SPSS admits that Nie and Hull offered to assign their trademark rights to the Company for $20 million. SPSS denies the other allegations of paragraph 36.

37.    In October 2007, Professor Nie notified the Company that he placed great value on his rights and that he and Mr. Hull would not sell them to the Company for the ten dollars it had proposed, but that they would consider a fair offer.

**ANSWER:** SPSS admits that in or around October 2007, Nie informed SPSS that he would not execute Exhibit D and eventually demanded $20 million for a formal assignment. SPSS denies the other allegations of paragraph 37.

38.    At the same time, having been reminded of the existence of the License Agreement and having come to understand the nature and extent of the rights Professor Nie and Mr. Hull had under the License Agreement, they began to assert their rights directly and affirmatively.

**ANSWER:** SPSS admits that, for the first time in the history of SPSS, Nie and Hull attempted to assert purported rights under Exhibit A in or around October 2007. SPSS denies the other allegations of paragraph 38.

39.    Professor Nie asked the Company for information related to the matters as to which he and Mr. Hull had authority and responsibility under the License Agreement. For many weeks, the Company acknowledged and did not dispute the rights of Messrs. Nie and Hull under the License Agreement and provided or offered to provide much of the information he requested without limitation or qualification. When Professor Nie followed up, however, asking for, among other things, the identification of sub-licensees of the SPSS trademark and specific information that would allow him (and the technical expert he had engaged) to evaluate the quality of the Company's soon-to-be-announced Dimensions 5.0 product release, the Company backed off. The Company refused to send him a list of sub-licensees (insisting that he travel across the country to inspect the actual sub-licenses at the Company's headquarters) and declined to provide the materials he requested related to Dimensions 5.0.

**ANSWER:** SPSS admits that in a series of letters beginning in October 2007, Nie began to request certain information from SPSS, and SPSS responded to these requests by providing some, but not all, of the information requested, although it was under no legal obligation to provide any of the information requested. SPSS denies the other allegations of paragraph 39.

40.    On December 19, 2007, Professor Nie asked the Company to send him specific materials he and his technical expert required in order to conduct a quality review of Dimensions

5.0.   He separately laid out his position with respect to the standards of quality of SPSS products.  He reminded the Company that he had been concerned about the quality of SPSS products for some years, both generally and with particular reference to the company's family of SPSS statistical tools, and that he was now increasingly concerned that pressure on the Company might be leading to the premature release of new products and product features that could impair SPSS's reputation for quality.

**ANSWER:**   SPSS admits that Nie's counsel sent a letter to SPSS dated December 19, 2007 that requested certain information.  SPSS denies all other allegations of paragraph 40.

41.    That same day, the Company responded by threatening Professor Nie, telling him that unless he was willing to assign his rights under the License Agreement to the Company, the Company would publicize a false allegation that he had concealed the License Agreement in connection with the Company's historic public filings and elsewhere for his own financial benefit.

**ANSWER:**  Denied.  Answering further, SPSS never threatened to publicize any false allegations regarding Nie.  Instead, SPSS pointed out to Nie in a letter dated December 19, 2007 that he had not disclosed the existence of Exhibit A in connection with public filings as he would have been required to do had he viewed it as an enforceable contract that he might attempt to enforce in the future.  SPSS further stated that if Nie persisted in claiming such rights, SPSS would have no choice but to notify the public of his new position.

42.    Professor Nie rebuffed the threat and told the Company that there was no basis for an accusation that he had concealed the License Agreement from anyone.  He also pointed out that the Company not only had the License Agreement in its files at all times since its execution in 1976 but also was necessarily aware of the import the License Agreement for some period of time before first reminding Messrs. Nie and Hull of its existence in May 2007.

**ANSWER:**  SPSS admits that Nie's counsel sent a letter to the Company on December 20, 2007 responding to the Company's letter of December 19, 2007.  SPSS denies all other allegations of paragraph 42.

43.    The Company then offered to pay Messrs. Nie and Hull $500,000 for the trademarks, in response to which Messrs. Nie and Hull offered to transfer the trademarks to the Company for $20 million, which the Company rejected.

**ANSWER:** Denied. Answering further, SPSS states that it offered Nie and Hull $500,000 to resolve the trademark dispute and avoid litigation and not because it believed that Nie and Hull possessed any enforceable rights with respect to the trademarks.

44.     On December 31, 2007, within days of rejecting the offer, the Company filed a Form 8-K with the Securities and Exchange Commission claiming — misleadingly — that it was Professor Nie who had "recently informed the Company that, in his view, the Company's use of the SPSS trademark is subject to" the License Agreement, and referring to the offer by Messrs. Nie and Hull to transfer the SPSS trademark for $20 million.

**ANSWER:** SPSS admits that it filed a Form 8-K with the Securities and Exchange Commission on December 31, 2007. SPSS denies all other allegations of paragraph 44.

45.     In its Form 8-K the Company failed to disclose that it was the Company that had asked Messrs. Nie and Hull to transfer the trademarks, failed to disclose that the Company had offered to pay $500,000 for the trademarks, and failed to disclose that, in the Trademark Assignment the Company drafted and asked Messrs. Nie and Hull to sign, the Company expressly recited that Messrs. Nie and Hull owned the SPSS trademark, that they had licensed it to the Company pursuant to the License Agreement and that the Company's use of the trademark had been authorized and approved by them in accordance with the License Agreement continually since the date of the License Agreement.

**ANSWER:** SPSS admits that it filed a Form 8-K with the Securities and Exchange Commission on December 31, 2007. SPSS denies all other allegations of paragraph 45.

46.     On January 3, 2008, Professor Nie tendered his resignation as chairman and member of the SPSS Inc. board of directors.

**ANSWER:** Admitted.

47.     On that same day, without prior notice to Messrs. Nie and Hull, the Company filed this lawsuit falsely accusing them of having deceived the Company with respect to the existence, meaning and enforceability of the License Agreement. And, on January 4, 2008, the Company publicized these allegations by filing a Form 8-K disclosing the filing of this lawsuit and attaching a copy of the Complaint.

**ANSWER:** SPSS admits that it filed its complaint in this matter on January 3, 2008 and that it filed a Form 8-K on January 4, 2008. SPSS denies all other allegations of paragraph 47.

48.     While previously acknowledging the validity and legal import of the License Agreement, including the rights reserved in that agreement to Messrs. Nie and Hull, the Company has now emphatically retreated from that acknowledgement.

**ANSWER:** Denied.

49.    The Company first intimated that it might repudiate the License Agreement in connection with its December 19, 2007 threat to publicize a false allegation that Professor Nie had concealed the License Agreement in connection with the Company's historic public filings and elsewhere for his own financial benefit.  In that letter, the Company commented "we do not mean to suggest that Dr. Nie has enforceable rights under the license agreement, or is the proper owner of the trademark" and purported to reserve "all of its claims and defenses in this matter."

**ANSWER:** SPSS admits that it sent a letter to Nie's counsel on or around December 19,

2007.  SPSS denies all other allegations of paragraph 49.

50.    Then, in its December 31, 2007, Form 8-K, the Company moved closer to repudiating the License Agreement by claiming for the first time that it "disputes the rights recently asserted by Dr. Nie."

**ANSWER:** Denied.

51.    Finally, in its Complaint in this action, the Company sealed its repudiation of the License Agreement (a) by alleging that Messrs. "Nie and Hull should be estopped from enforcing any rights under the purported license agreement," (b) by asking for a judgment that "Nie and Hull are estopped from enforcing any rights under the purported license agreement," and (c) by asking for a judgment that "SPSS shall be deemed to have an irrevocable, assignable and exclusive license to use the trademarks," notwithstanding the provisions of the License Agreement to the contrary.

**ANSWER:** Denied.  Answering further, SPSS states that even if the License Agreement

were enforceable by Nie and Hull (which it is not for reasons set forth in SPSS's complaint),

SPSS has performed and continues to perform any obligations described in the License

Agreement during the pendency of this suit.  Among other things, SPSS has offered to allow Nie

and Hull and their authorized agents to inspect SPSS's products.  SPSS made this offer in writing

before and after it filed its complaint.  For example, in its letter to Nie and Hull's counsel dated

January 9, 2008, the Company stated in pertinent part:  "Again, while preserving all rights to

contest Dr. Nie's recently asserted claims, the Company has been and is willing to comply with

what it believes is a reasonable reading of the purported license agreement."  Under the terms of

the License Agreement, even if it were enforceable (which it is not), SPSS has no obligation to

supply Nie and Hall with the information they have requested. SPSS continues to offer Nie and Hull or their authorized agents the opportunity to inspect SPSS products.

52.    Having repudiated the License Agreement, the Company is no longer licensed to use the SPSS trademark and tradename, and its use of the SPSS trademark and tradename since the repudiation has been and remains unauthorized.

**ANSWER:** SPSS denies that it repudiated Exhibit A. SPSS denies the other allegations of paragraph 52.

53.    The Company's use of the SPSS trademark in the marketing and sale of products that do not meet the high standards of quality set by Messrs. Nie and Hull would erode the value of the trademark.

**ANSWER:** Denied. Answering further, SPSS states that Nie and Hull have never set any quality standards under the License Agreement.

54.    The continued use of the SPSS trademark by the Company will mislead the purchasing public to believe that the Company's products are still associated, sponsored, endorsed, or in some other manner affiliated or connected with Messrs. Nie and Hull, the owners of the trademark, all in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. § 1114 and § 1125(a), respectively.

**ANSWER:** Denied.

55.    The Company has infringed and continues to infringe the SPSS trademark by using the SPSS trademark in connection with the marketing and sale of nearly all of its products and services, including on signs, labels, packaging material, advertising and the like.

**ANSWER:** Denied.

56.    By reason of the Company's willful infringement of the SPSS trademark as alleged above, the Company has realized, and will continue to realize, profits, and Messrs. Nie and Hull have suffered, and will continue to suffer, damage in an amount not now ascertainable.

**ANSWER:** Denied.

57.    The Company threatens to continue to infringe the SPSS trademark and tradename, and, unless enjoined, will continue to do so, all to Counterplaintiffs' irreparable damage. As it would be difficult to ascertain the amount of compensation that would afford Counterplaintiffs adequate relief for such continuing acts, Counterplaintiffs' remedy at law is not adequate to compensate them for their injuries.

**ANSWER:** Denied.

## AFFIRMATIVE DEFENSES

1.      The counterclaim fails to state any claim upon which the relief prayed for can be granted.

2.      The counterclaim is barred, in whole or in part, by the doctrine of estoppel.

3.      The counterclaim is barred, in whole or in part, by the doctrine of waiver.

4.      The counterclaim is barred, in whole or in part, by the doctrine of laches and acquiescence.

5.      The counterclaim is barred, in whole or in part, by the doctrine of unclean hands.

6.      Counterplaintiffs failed to perform their obligations under the License Agreement and, as a result, have no right to seek enforcement of the License Agreement against SPSS. Among other things, for over 30 years, Nie and Hull failed "to furnish or direct SPSS or its predecessor in the standards of quality for each of the goods and services on which the Licensed Marks are marked." In addition, Nie and Hull failed to comply with paragraph 8 of Exhibit A by failing to identify any alleged violation of any provision of the alleged agreement and providing SPSS 90 days to cure any such alleged violation.

7.      Counterplaintiffs have no right to a remedy of disgorgement of rights because SPSS has not breached the License Agreement and, in any event, it would be inequitable to award SPSS's profits to counterplaintiffs.

8.      The counterclaim is barred by the statute of limitations.

WHEREFORE, SPSS respectfully requests that judgment be entered in its favor on the entirety of Nie and Hull's counterclaim and that all relief sought be denied. SPSS further denies that any issues in this case are subject to trial by jury.

Dated:  February 15, 2008

Respectfully submitted,

SPSS INC.


By:___/s Robert J. Kriss_____
     *One of its Attorneys*

Robert J. Kriss
Edward H. Williams
Thomas V. Panoff
Daniel K. Storino
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 Facsimile

## CERTIFICATE OF SERVICE

Edward H. Williams, an attorney, certifies that he caused a copy of the foregoing **SPSS**

**INC.'S ANSWER TO COUNTERCLAIM FOR TRADEMARK INFRINGEMENT** to be

served on February 15, 2008 as follows:

**BY ELECTRONIC MAIL**

Peter V. Baugher
William B. Berndt
Jennifer A. Waters
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, Illinois 60606

**BY OVERNIGHT COURIER**

Luther Orton
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, California 94104


/s Edward H. Williams