# IN THE UNITED STATES DISTRICT COURT FOR THE
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SPSS Inc., ) | |
| ) | |
| Plaintiff/Counterdefendant, ) | |
| ) | No. 08 C 66 |
| v. ) | |
| ) | Judge John W. Darrah |
| Norman H. Nie, ) | |
| ) | Magistrate Judge Arlander Keys |
| Defendant/Counterplaintiff, ) | |
| ) | |
| and C. Hadlai Hull, ) | |
| ) | |
| Defendant. ) | |

## AMENDED COUNTERCLAIM FOR TRADEMARK INFRINGEMENT

Counterplaintiff Norman H. Nie counterclaims against Counterdefendant SPSS Inc. (the "Company"), as follows:

## THE PARTIES

1.  Counterplaintiff Norman H. Nie is a Research Professor in the Department of Political Science at Stanford University, Director of the Stanford Institute for the Quantitative Study of Society, and Professor Emeritus of Political Science at the University of Chicago. Professor Nie co-founded defendant SPSS Inc. in 1975, serving as its Chief Executive Officer until 1992, and as Chairman of its Board of Directors until he tendered his resignation on January 3, 2008. He remains a substantial shareholder in SPSS Inc., owning approximately 200,000 shares of SPSS Inc. common stock as well as options to purchase additional common stock of the Company. Professor Nie resides in Idaho, but lives and works much of each year in California.

2.  Counterdefendant SPSS Inc. is a Delaware Corporation, with its principal place of business at Sears Tower in Chicago, Illinois.

## VENUE AND JURISDICTION

3. This Court has jurisdiction over this counterclaim under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) in that this case arises under the Trademark Laws of the United States.

4. Venue is proper in this District in that Counterdefendant SPSS Inc. is located here.

## THE FACTS

**I.   THE ORIGIN AND EVOLUTION OF SPSS INC.**

5. In 1968, Professor Nie, C. Hadlai Hull and Dale H. Bent, all then graduate students or recent graduates of Stanford University, developed a set of software programs known as the Statistical Package for the Social Sciences (SPSS) for use in the analysis of social sciences data. These programs use statistics to turn raw data into information useful for scientific evaluation and business and government decision-making.

6. After leaving Stanford in 1968, Professor Nie joined the Political Science faculty at the University of Chicago (where he remained on the active faculty for 30 years until he became Emeritus Professor in 1998).

7. With the University's encouragement, and operating within the National Opinion Research Center where Professor Nie was a senior faculty study director, Professor Nie and Mr. Hull continued to develop and refine SPSS and to promote use of the software at other academic institutions. The SPSS software package proved to be a valuable tool, gained widespread use and recognition, and became a source of sufficient revenues to fully fund the on-going SPSS development effort within the University's National Opinion Research Center.

8. On February 1, 1975 — again with the University of Chicago's encouragement (the Internal Revenue Service had raised questions about the conduct of the SPSS business within a tax exempt entity associated with the University) — Messrs. Nie and

2

Hull formed SPSS Inc., becoming its sole shareholders and executive officers. Professor Nie became Chief Executive Officer of the Company (while continuing on the faculty at the University of Chicago).

9. In addition to its increasing popularity in academic circles, SPSS gained a following in government and commercial markets as well, with agencies such as NASA and the National Forest Service finding useful applications for the software, and businesses such as Procter & Gamble and Anheuser-Busch exploiting SPSS's capabilities to analyze marketing research data.

10. Professor Nie juggled his academic and Company responsibilities for nearly seventeen years (from 1975 until 1992), until it became clear that the Company had grown to the point that full time, professional executive management and an infusion of capital from a public offering of the Company's stock had become necessary.

11. In 1992, Professor Nie gave up his position as Chief Executive officer of SPSS Inc. and turned over management of the Company to Jack Noonan ("Noonan"). Mr. Noonan became President and Chief Executive Officer while Professor Nie stayed on in a non-executive capacity as Chairman of the Board of Directors. Mr. Noonan remains President and Chief Executive Officer and became Chairman of the Company in January of this year when Professor Nie resigned.

12. Under Mr. Noonan's management, SPSS Inc. made an initial public offering of its common stock in 1993, had a follow on offering in 1994, and has had additional public and private financings since that time - all subject to Mr. Noonan's oversight and supervision.

13. In the years after Professor Nie stepped down as CEO, Mr. Noonan also

increasingly set the Company's course with respect to strategies, operations, investments, acquisitions, product development priorities and product quality control.

## II. THE TRADEMARK LICENSE AGREEMENT

14. In September 1976, Messrs. Nie and Hull executed the License Agreement (effective February 1, 1975). The License Agreement is attached hereto as **Exhibit A**. The License Agreement granted SPSS Inc. the exclusive right to use the SPSS and Statistical Package for the Social Sciences trademarks and tradenames owned by Nie and Hull, subject to the terms and conditions of the License Agreement.

15. In September 1976, SPSS Inc. also executed the License Agreement. The SPSS Inc. Board of Directors approved the License Agreement at a meeting held on September 14, 1977. The minutes of that meeting are attached hereto as **Exhibit B.**

16. The License Agreement was placed in the Company's files soon thereafter and has been maintained by the Company in its files at all times since then.

17. In the License Agreement, the Company acknowledged that the trademarks were the sole property of Messrs. Nie and Hull and agreed that all uses of the trademarks by the Company or its sub-licensees would inure to their benefit.

18. The license granted by the License Agreement was royalty free and worldwide, but reserved to Messrs. Nie and Hull the power to assure that the trademarks were used only on products that met their standards of quality and to otherwise protect and control the use of the trademarks. Messrs. Nie and Hull reserved the right to terminate the license should the Company fail timely to cure a violation of the Agreement.

19. Professor Nie remained the principal owner of the Company and served as its Chief Executive Officer from 1975 until 1992. There was, therefore, no need or occasion for him to rely on the powers reserved to him under the License Agreement to assure product quality

and proper use of the trademarks. And, under the License Agreement, the Company owed and paid no royalties to him. Eventually, Professor Nie forgot about the License Agreement and the powers it reserved to him as trademark owner, but continued to work to maintain and enhance the quality of SPSS products from their respective positions with the Company.

20. Within days of signing the License Agreement in 1976, Messrs. Nie and Hull applied to register the SPSS trademark in their names as owners with the United States Patent and Trademark Office ("USPTO"). In so doing, they submitted the License Agreement to the USPTO (where it remains part of the public file today), expressly disclosing the existence of the written license by which they could protect their trademark by controlling the nature and quality of goods to which the trademark would be applied. On April 11, 1978, the USPTO granted registration of the SPSS trademark to them. A true and correct copy of the SPSS trademark registration is attached hereto as **Exhibit C** (Registration No. 1,089,094).

21. At all relevant times, the Company and its lawyers have been responsible for the Company's maintenance of its trademark portfolio, including the SPSS trademark licensed exclusively to the Company by Messrs. Nie and Hull. On January 17, 1999, however, the Company failed to renew the registration of the SPSS trademark, and the USPTO declared it expired.

22. On December 6, 2002, the Company arranged for Messrs. Nie and Hull to execute another application to register the SPSS trademark in their names as owners, without saying anything to them about the License Agreement or their rights and powers under it, and, on July 20, 2004, the USPTO granted the registration, a true and correct copy of which is attached hereto as **Exhibit D** (Registration No. 2,864,243). The registration shows the same first use in commerce as did the predecessor registration - June 1968 when they sold the first SPSS product.

23. Thus, at all times since September 1976, the ownership of the SPSS trademark by Messrs. Nie and Hull, as well as the License Agreement by which they could protect the trademark and control the nature and quality of goods to which the mark would be applied, were matters of public record at the USPTO, known to the Company and anyone else sufficiently interested to review the public record.

24. On May 8, 2008, Mr. Hull assigned all his rights to the trademarks registered under Registration Nos. 1,089,094 and 2,864,243 and his rights under the License Agreement to Professor Nie. A true and correct copy of the assignment is attached hereto as **Exhibit E**. Accordingly, Professor Nie is the sole owner of the SPSS trademark and the right to enforce the License Agreement against SPSS Inc.

### III. PROFESSOR NIE'S CONCERN FOR THE COMPANY'S DIRECTION

25. After he gave up his position as Chief Executive Officer of the Company in 1992, Professor Nie found himself increasingly at odds with Company management and other board members on important matters of Company strategies, operations, investments, acquisitions, product development priorities and product quality control. As a result, his powers of persuasion waned over time. Had Professor Nie remembered that the License Agreement empowered him to protect the trademark by insuring that the SPSS trademark was used only on products that met their standards of quality and otherwise controlling the use of the trademarks, Professor Nie could have used these powers in the best interests of the Company and its shareholders to exert his influence more effectively to prevent ill-conceived and unprofitable actions by Company management.

26. The Company has made ill-advised corporate acquisitions since the initial public offering in 1993. Professor Nie opposed many of these acquisitions. Had he remembered at the time of these acquisitions that he had the right under the License Agreement to protect his

6

trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent at least some of the acquisitions.

27. The Company entered into a strategic alliance with AOL in 2001 providing for the purchase of certain AOL assets and the acquisition of the exclusive right to distribute AOL survey data drawn from its members and users. The alliance was an operational failure and produced collateral accounting and regulatory complications that were detrimental to the Company and its shareholders. Professor Nie opposed the alliance when it was proposed for numerous reasons not the least of which was his belief that the AOL sampling methodology was not scientifically valid and that the Company's association with the data would adversely impact the SPSS reputation for quality. Professor Nie also argued that the economic assumptions the Company's management was using to justify the price of the acquisition were unrealistic.

28. Some months later, Professor Nie was retained by the Company as a consultant to close down the AOL alliance when it failed (at a reported loss of $40 million) for all of the reasons Professor Nie had highlighted before the acquisition. He was successful in his efforts to implement an orderly shut down. Had he remembered at the time of the AOL alliance that he had the right under the License Agreement to protect his trademark by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent the Company from entering into the AOL alliance in the first place.

29. Professor Nie also protested for many years the Company's failure to take steps to maintain the quality and feature competitiveness of the SPSS flagship statistical tools family of products and associated revenue losses. Ultimately, when revenues for that family of

products fell for the first time in the history of the Company, Professor Nie was brought back into the Company as a consultant to address these issues. He was successful in this effort. Had he remembered at the times he expressed his concerns that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able exert his influence more effectively to accelerate the process by which the Company addressed these concerns.

30. Professor Nie also expressed with increasing frequency over the years his concerns that pressure on the Company might be leading to the premature release of new products and product features. Had he remembered in the context of these discussions that he had the right under the License Agreement to protect his trademarks by insuring that all of the Company's products met appropriate standards of quality and otherwise controlling the use of the trademarks, he might have been able to exert his influence more effectively to prevent such premature releases.

31. At year end 2005, the Board of Directors terminated Professor Nie's consultant agreement with the Company. After that time, his influence within the Company and ability to influence Company decisions affecting the value of his trademarks steadily diminished, making his rights under the License Agreement, once he realized he had them, all the more important.

## IV.    THE COMPANY'S REQUEST FOR A TRADEMARK ASSIGNMENT

32. In May 2007, without prior notice or explanation of any kind, the Company approached Professor Nie and asked him to execute the Trademark Assignment (attached hereto as **Exhibit F**) transferring to the Company his SPSS and Statistical Package for the Social Sciences trademarks together with the good will symbolized and generated by the

trademarks. The Assignment recited as proposed consideration a payment of ten dollars.

33. At Mr. Noonan's direction, one of the Company's in-house lawyers e-mailed Professor Nie a copy of the Trademark Assignment for him to sign, represented that Messrs. Nie and Hull had already granted the Company "an exclusive, perpetual right" to use the trademarks and told him that the Trademark Assignment would simply make it "cleaner" by actually transferring ownership to SPSS Inc.

34. Although the Trademark Assignment expressly referred to the License Agreement, the Company did not provide Professor Nie with a copy of the License Agreement, nor did the Company acknowledge the important rights reserved to them under the License Agreement, including the power to assure that the trademarks were used only on products that met their standards of quality, to otherwise control the use of the trademarks and to terminate the license should the Company fail timely to cure a violation of the Agreement.

35. The Company expressly acknowledged in the Trademark Assignment — drafted and proposed by the Company — that Messrs. Nie and Hull owned the trademarks and had licensed them to the Company pursuant to the License Agreement. The Company asserted in the Trademark Assignment that the Company's use of the trademarks continually since the date of the License Agreement had been authorized and approved by Messrs. Nie and Hull in accordance with the License Agreement.

36. Professor Nie was surprised by the Company's request that he sign the Trademark Assignment, and did not remember (or even have a copy of) the License Agreement. Only after Professor Nie asked for it, did the Company provide him with a copy.

37. After examining the License Agreement, Professor Nie concluded that the value of the rights reserved to him under the License Agreement, including the right to protect

the trademark by monitoring the nature and quality of goods to which the SPSS trademark would be applied and otherwise controlling the use of the trademark and the right to terminate the license for violations of its terms, was considerable. This was especially the case given Professor Nie's concerns about Company strategies and operations referenced above. Professor Nie was not interested in selling the SPSS trademark (and giving up his rights under the License Agreement) other than for a substantial payment.

38. In October 2007, Professor Nie notified the Company that he placed great value on his rights and that he would not sell them to the Company for the ten dollars it had proposed, but that they would consider a fair offer.

## V. COUNTERPLAINTIFF'S EXERCISE OF HIS RIGHTS AND THE COMPANY'S RESPONSE

39. At the same time, having been reminded of the existence of the License Agreement and having come to understand the nature and extent of the rights Professor Nie had under the License Agreement, he began to assert his rights directly and affirmatively.

40. Professor Nie asked the Company for information related to the matters as to which he had authority and responsibility under the License Agreement. For many weeks, the Company acknowledged and did not dispute the rights of Professor Nie under the License Agreement and provided or offered to provide much of the information he requested without limitation or qualification. When Professor Nie followed up, however, asking for, among other things, the identification of sub-licensees of the SPSS trademark and specific information that would allow him (and the technical expert he had engaged) to evaluate the quality of the Company's soon-to-be-announced Dimensions 5.0 product release, the Company backed off. The Company refused to send him a list of sub-licensees (insisting that he travel across the country to inspect the actual sub-licenses at the Company's headquarters) and declined to

provide the materials he requested related to Dimensions 5.0.

  41. On December 19, 2007, Professor Nie asked the Company to send him specific materials he and his technical expert required in order to conduct a quality review of Dimensions 5.0. He separately laid out his position with respect to the standards of quality of SPSS products. He reminded the Company that he had been concerned about the quality of SPSS products for some years, both generally and with particular reference to the company's family of SPSS statistical tools, and that he was now increasingly concerned that pressure on the Company might be leading to the premature release of new products and product features that could impair SPSS's reputation for quality.

  42. That same day, the Company responded by threatening Professor Nie, telling him that unless he was willing to assign his rights under the License Agreement to the Company, the Company would publicize a false allegation that he had concealed the License Agreement in connection with the Company's historic public filings and elsewhere for his own financial benefit.

  43. Professor Nie rebuffed the threat and told the Company that there was no basis for an accusation that he had concealed the License Agreement from anyone. He also pointed out that the Company not only had the License Agreement in its files at all times since its execution in 1976 but also was necessarily aware of the import the License Agreement for some period of time before first reminding Professor Nie of its existence in May 2007.

  44. The Company then offered to pay Messrs. Nie and Hull $500,000 for the trademarks, in response to which Messrs. Nie and Hull offered to transfer the trademarks to the Company for $20 million, which the Company rejected.

  45. On December 31, 2007, within days of rejecting the offer, the Company

filed a Form 8-K with the Securities and Exchange Commission claiming — misleadingly — that it was Professor Nie who had "recently informed the Company that, in his view, the Company's use of the SPSS trademark is subject to" the License Agreement, and referring to the offer by Messrs. Nie and Hull to transfer the SPSS trademark for $20 million.

46. In its Form 8-K the Company failed to disclose that it was the Company that had asked Professor Nie to transfer the trademarks, failed to disclose that the Company had offered to pay $500,000 for the trademarks, and failed to disclose that, in the Trademark Assignment the Company drafted and asked Professor Nie to sign, the Company expressly recited that Messrs. Nie and Hull owned the SPSS trademark, that they had licensed it to the Company pursuant to the License Agreement and that the Company's use of the trademark had been authorized and approved by them in accordance with the License Agreement continually since the date of the License Agreement.

47. On January 3, 2008, Professor Nie tendered his resignation as chairman and member of the SPSS Inc. board of directors.

48. On that same day, without prior notice to Professor Nie, the Company filed this lawsuit falsely accusing Professor Nie and Mr. Hull of having deceived the Company with respect to the existence, meaning and enforceability of the License Agreement. And, on January 4, 2008, the Company publicized these allegations by filing a Form 8-K disclosing the filing of this lawsuit and attaching a copy of the Complaint.

VI. **THE COMPANY'S REPUDIATION OF THE LICENSE AGREEMENT**

49. While previously acknowledging the validity and legal import of the License Agreement, including the rights reserved in that agreement to Professor Nie, the Company has now emphatically retreated from that acknowledgement.

50. The Company first intimated that it might repudiate the License

Agreement in connection with its December 19, 2007 threat to publicize a false allegation that Professor Nie had concealed the License Agreement in connection with the Company's historic public filings and elsewhere for his own financial benefit. In that letter, the Company commented "we do not mean to suggest that Dr. Nie has enforceable rights under the license agreement, or is the proper owner of the trademark" and purported to reserve "all of its claims and defenses in this matter."

51.  Then, in its December 31, 2007, Form 8-K, the Company moved closer to repudiating the License Agreement by claiming for the first time that it "disputes the rights recently asserted by Dr. Nie."

52.  Finally, in its Complaint in this action, the Company sealed its repudiation of the License Agreement (a) by alleging that Messrs. "Nie and Hull should be estopped from enforcing any rights under the purported license agreement," (b) by asking for a judgment that "Nie and Hull are estopped from enforcing any rights under the purported license agreement," and (c) by asking for a judgment that "SPSS shall be deemed to have an irrevocable, assignable and exclusive license to use the trademarks," notwithstanding the provisions of the License Agreement to the contrary.

### VII. THE COMPANY'S TRADEMARK INFRINGEMENT

53.  Having repudiated the License Agreement, the Company is no longer licensed to use the SPSS trademark and tradename, and its use of the SPSS trademark and tradename since the repudiation has been and remains unauthorized.

54.  The Company's use of the SPSS trademark in the marketing and sale of products that do not meet the high standards of quality set by Professor Nie would erode the value of the trademark.

55.  The continued use of the SPSS trademark by the Company will mislead

13

the purchasing public to believe that the Company's products are still associated, sponsored, endorsed, or in some other manner affiliated or connected with Professor Nie, the owner of the trademark, all in violation of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. § 1114 and § 1125(a), respectively.

56. The Company has infringed and continues to infringe the SPSS trademark by using the SPSS trademark in connection with the marketing and sale of nearly all of its products and services, including on signs, labels, packaging material, advertising and the like.

57. By reason of the Company's willful infringement of the SPSS trademark as alleged above, the Company has realized, and will continue to realize, profits, and Professor Nie has suffered, and will continue to suffer, damage in an amount not now ascertainable.

58. The Company threatens to continue to infringe the SPSS trademark and tradename, and, unless enjoined, will continue to do so, all to Professor Nie's irreparable damage. As it would be difficult to ascertain the amount of compensation that would afford Professor Nie adequate relief for such continuing acts, Professor Nie's remedy at law is not adequate to compensate them for their injuries.

## **PRAYER FOR RELIEF**

WHERFORE, Professor Nie prays for relief as follows:

1. That the Court grant an injunction pursuant to the powers granted it under 15 USC § 1116, enjoining Counterdefendant SPSS Inc. and its sub-licensees, agents, servants, and employees from directly or indirectly using the name "SPSS" or any mark, word or name similar to "SPSS" which is likely to cause confusion or mistake;

2. That the Court, pursuant to the powers granted it under 15 USC § 1118, order that all labels, signs, prints, packages, wrappers, receptacles, and

advertisements in Counterdefendant's possession bearing the mark "SPSS" and all plates, molds and other means of making the same be delivered and destroyed;

        3.      That Counterdefendant be required to account to Counterplaintiff for any and all profits derived by Counterdefendant from the sale of products using the SPSS mark since its repudiation of the License Agreement and for all damages sustained by Counterplaintiff by reason of the acts of infringement complained of;

        4.      That the Court award Counterplaintiff treble the amount of actual damages suffered by them, pursuant to 15 USC § 1117;

        5.      For the costs of suit and attorneys' fees Counterplaintiff incurs in this action; and

        6.      For such other and further relief as the Court deems appropriate.

Counterplaintiff demands a trial by jury on all issues that are so triable.

Dated: May 21, 2008

                              Respectfully submitted,

                              /s/Jennifer Waters
                              One of the Attorneys for
                              Counterplaintiff/Defendant Norman H. Nie

Peter V. Baugher
William B. Berndt
Jennifer A. Waters
Schopf & Weiss LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
(312) 701-9300

Luther Orton (admitted *pro hac vice*)
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, California 94104
(415) 962-4400

## CERTIFICATE OF SERVICE

I, Jennifer A. Waters, an attorney, state that I caused a copy of the attached **Amended Counterclaim for Trademark Infringement** to be served via the CM/ECF system, which will automatically serve notice of such filing on the following individuals this 21st day of May, 2008:

>Robert J. Kriss
>Edward H. Williams
>Thomas V. Panoff
>Daniel K. Storino
>Mayer Brown LLP
>71 South Wacker Drive
>Chicago, Illinois 60606

>/s/Jennifer Waters
>Jennifer A. Waters

181484_1.DOC