# Exhibit A

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF COOK       )

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

SPSS Inc.,                          )
                                    )
     Plaintiff/Counterdefendant,    )
                                    )
     vs.                            )  Case No. 08 C 66
                                    )
Norman H. Nie and C. Hadlai Hull,   )  Judge John W.
                                    )  Darrah
     Defendants/Counterplaintiffs.  )
                                    )  Magistrate Judge
                                    )  Arlander Keys

          The deposition of ANTHONY CIRO, called by the
Defendants/Counterplaintiffs for examination, taken
pursuant to notice and pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Monica Kim, Certified Shorthand Reporter, Registered
Professional Reporter, and Notary Public, at One South
Wacker Drive, 28th Floor, Chicago, Illinois, commencing
at 10:03 a.m. on the 30th day of May, A.D., 2008.

7/14/2008 1:44 PM

1                    I N D E X
2  WITNESS                                    PAGE
3  ANTHONY CIRO
4       Direct Examination by Mr. Baugher ........   4
5       Cross-Examination by Mr. Williams ........ 280
6
7                  E X H I B I T S
8  CIRO DEPOSITION EXHIBIT                     PAGE
9       No. 1 ...................................   5
10      No. 2 ...................................  15
11      No. 3 ...................................  30
12      No. 4 ...................................  80
13      No. 5 ................................... 100
14      No. 6 ................................... 113
15      No. 7 ................................... 128
16      No. 8 ................................... 146
17      No. 9 ................................... 165
18      No. 10 .................................. 175
19      No. 11 .................................. 233
20      No. 12 .................................. 255
21
22
23
24

7/14/2008 1:44 PM                                    3

---

1  APPEARANCES:
2       MAYER, BROWN, LLP
        MR. EDWARD H. WILLIAMS
3       71 South Wacker Drive
        Chicago, Illinois 60606-4637
4       Phone:  (312) 701-7405
5            On behalf of the Plaintiff/Counterdefendant.
6
        SCHOPF & WEISS, LLP
7       MR. PETER V. BAUGHER
        One South Wacker Drive
8       28th Floor
        Chicago, Illinois 60606
9       Phone:  (312) 701-9300
10           On behalf of the Defendants/Counterplaintiffs;
11
12  ALSO PRESENT:  Ms. Melissa Robson
13
14                  *   *   *   *   *   *
15
16
17
18
19
20
21
22
23
24

7/14/2008 1:44 PM                    2

---

1            (Witness sworn.)
2   WHEREUPON:
3                ANTHONY CIRO,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6            DIRECT EXAMINATION
7   BY MR. BAUGHER:
8       Q.  Mr. Ciro, could you please state your full
9   name and spell it?
10      A.  Anthony, A N T H O N Y, Gregory,
11  G R E G O R Y, Ciro, C I R O.
12           (Discussion off the record.)
13  BY MR. BAUGHER:
14      Q.  Tell us your address, please, Mr. Ciro.
15      A.  There's one more thing.  I didn't finish.  I'm
16  a Junior.
17      Q.  You look old enough to be deposed.
18           All right.  Mr. Anthony Gregory Ciro, Jr.,
19  where do you live?
20      A.  1704 Waverly, W A V E R L Y, Circle,
21  St. Charles, Illinois 60174.
22      Q.  How long have you lived there?
23      A.  Approximately five years.
24      Q.  And where are you currently employed?

7/14/2008 1:44 PM                    4

1     A.   SPSS, Inc.
2     Q.   What is your position, please?
3     A.   Vice president, associate general counsel,
4  business affairs.
5     Q.   Are you an officer of the company?
6     A.   No.
7     Q.   But you are here -- appearing here today as
8  the corporate representative of SPSS, Inc., the
9  plaintiff in the action?
10    A.   I am.
11    MR. BAUGHER:  Would you mark this, please, as Ciro
12 Deposition Exhibit 1.
13         (Ciro Deposition Exhibit No. 1 marked
14              for identification.)
15 BY MR. BAUGHER:
16    Q.   Mr. Ciro, I'm handing you what has been marked
17 by the court reporter as Ciro Deposition Exhibit 1
18 entitled "License Agreement."  What is this document,
19 please?
20    A.   It's a license agreement that grants SPSS,
21 Inc. the right to use the SPSS trademark and the
22 statistical package for the social sciences trademark.
23    Q.   Is that the SPSS trademark?
24    A.   Correct.

1     Q.   And is this a true and correct copy of the
2  license agreement between SPSS and Norman Nie and Hadlai
3  Hull?
4     MR. WILLIAMS:  Objection, foundation.
5  BY THE WITNESS:
6     A.   Yes, I believe it is.
7     Q.   Is it signed by the company or by an officer
8  of the company?
9     A.   I don't have any knowledge of that.
10    Q.   Well, look at the last page of Deposition
11 Exhibit 1.  Do you see that it's signed by Patrick Bova?
12    A.   I really can't make out the name.
13    Q.   Well, you know who Mr. Bova is from corporate
14 records of SPSS, correct?
15    A.   Correct.
16    Q.   And you know that he was an officer of SPSS
17 back in the 1970s, correct?
18    A.   Through the records, I have seen that.
19    Q.   Yes.
20         And you understand that you are testifying as
21 the corporate representative of SPSS with the knowledge
22 of SPSS, correct?
23    MR. WILLIAMS:  Objection.
24

1  BY THE WITNESS:
2     A.   Yes.
3     MR. WILLIAMS:  Mischaracterizes Rule 30(b)(6).
4  BY MR. BAUGHER:
5     Q.   And your answer was yes?
6     A.   Yes.
7     Q.   And so from the corporate records you know who
8  Mr. Bova is; is that right?
9     A.   I do.
10    Q.   And who is he?
11    A.   At the time I believe he was the corporate
12 secretary.
13    Q.   And the time is what?
14    A.   The contract was dated September 30th, 1976.
15    Q.   Now, do you know any facts that suggest that
16 Ciro Deposition Exhibit 1 is not a valid contract
17 between Nie and Hull and SPSS?
18    MR. WILLIAMS:  Objection.  This is beyond the scope
19 of your 30(b)(6) deposition notice that we've objected
20 to.  What topic does this relate to?
21    MR. BAUGHER:  The license agreement.
22    MR. WILLIAMS:  Which topic?
23    MR. BAUGHER:  The license agreement.
24    MR. WILLIAMS:  There is no topic called "the

1  license agreement."
2     MR. BAUGHER:  Are you directing Mr. Ciro not to
3  answer the question that I just put to him?
4     MR. WILLIAMS:  I'm asking him to -- I want to give
5  you the opportunity to direct me in your 30(b)(6)
6  notice, subject to our objections, as to which topic
7  your question is directed to.
8          We have objected to the topic the
9  enforceability of the license agreement.  That objection
10 was not challenged.  I sent a letter to Mr. Berndt
11 yesterday confirming that.  It seems to me that that
12 actually is the topic that you're asking about and
13 that's improper.
14         Do you have our objections?
15    MR. BAUGHER:  I'm asking the witness --
16         Could we read back the question?
17         And then if you're going to direct him not to
18 answer, then you have to take the consequences for that.
19    MR. WILLIAMS:  Okay.
20    MR. BAUGHER:  If you're not going to direct him not
21 to answer the question, then he can answer the question.
22    MR. WILLIAMS:  And before I direct him not to
23 answer, I am respectfully asking you to identify for me
24 which of the non-objected-to topics of your 30(b)(6)

**Page 9**

1  notice the question relates to.

2       I'm willing to discuss it. I'm willing to

3  move forward with this deposition on the topics noticed.

4  Mr. Berndt represented to the Court that this deposition

5  would only be on the topics noticed. And I believe,

6  based on my understanding of the notice and the

7  objections and the agreements reached, that you're

8  actually asking about a topic, No. 8, which we objected

9  to, which objection was not challenged and, in fact, was

10  accepted by defendants.

11       MR. BAUGHER: Read the question back, please.

12       (Record read as requested.)

13       MR. WILLIAMS: Are you going to identify which

14  topic that question relates to? Are you refusing to do

15  that?

16       MR. BAUGHER: It relates to 1, 2, 3, 8; could

17  relate to 11 and it could relate to 13.

18       MR. WILLIAMS: Number 1 is the 1978 trademark

19  application and registration. I do not believe that

20  your question relates to that --

21       MR. BAUGHER: Well, actually it does because --

22       MR. WILLIAMS: Your question relates directly to

23  Topic No. 8 -- I agree with that -- which has been

24  objected to and is not a topic of discussion for this

**Page 11**

1  goes directly to Topic No. 8 to which we timely

2  objected. And in my Rule 37 meetings with Mr. Berndt,

3  it was agreed that this witness would not be questioned

4  on those -- on that topic. Asking a witness about the

5  validity of the license agreement goes directly to Topic

6  No. 8, which is the enforceability.

7       The reason why we objected to that topic is

8  because it directly implicates attorney-client

9  privilege, and we are not waiving attorney-client

10  privilege. And for that reason as well, I object to

11  it --

12       MR. BAUGHER: If there's attorney-client privilege

13  and he can't answer because it would be subject to

14  attorney-client privilege, that's a different objection.

15  You didn't make that objection.

16       MR. WILLIAMS: No. I'm --

17       MR. BAUGHER: And that's a ground on which

18  theoretically, at least, you could direct him not to

19  answer. So what are you directing him to do?

20       MR. WILLIAMS: I'm glad you give me the opportunity

21  to flesh out my comments and that --

22       MR. BAUGHER: You've been fleshing more than the

23  witness has. I want less of your fleshing and more of

24  the witness's testimony.

**Page 10**

1  deposition.

2       MR. BAUGHER: All right. I suggest that we call

3  Judge Darrah and ask him -- I assume you're directing

4  him not to answer.

5       MR. WILLIAMS: I am -- If you are going to ask him

6  to opine on the enforceability of the license agreement,

7  I'm going to instruct him not to answer --

8       MR. BAUGHER: I'm asking him about the validity of

9  the agreement.

10       MR. WILLIAMS: I'm sorry. Can I finish?

11       MR. BAUGHER: No, because this is a deposition of

12  SPSS, Inc. that we noticed three months ago, and I want

13  to ask the witness and the corporate representative of

14  the company questions. I'm not here to debate you on

15  various points. I'm not here to go over your objections

16  which you can make when I ask questions of the witness.

17       Now, if you're going to direct him not answer,

18  then that's a point that I want to take up directly with

19  Judge Darrah. And I'd like to do that this morning

20  while we have the witness here. If you're not going to

21  direct him, if you'll allow him to answer, we'll see

22  what his answer is and we'll proceed.

23       MR. WILLIAMS: I am not going to allow him to

24  answer that question on two grounds. First of all, it

**Page 12**

1       MR. WILLIAMS: I am going to interpose appropriate

2  objections. And this deposition is limited to the scope

3  of your 30(b)(6) notice.

4       MR. BAUGHER: Are you directing him not to answer

5  the question?

6       MR. WILLIAMS: I am directing him, based upon what

7  you have said in terms of what you think is the basis

8  for these in the topics. I am not going to allow the

9  witness to answer that question because, one, it goes

10  beyond the scope of the 30(b)(6) topics and, in fact,

11  goes directly to Topic No. 8, which was objected to on

12  the attorney-client privilege and work product doctrine

13  among other objections and was agreed would not be a

14  topic --

15       MR. BAUGHER: There was no agreement.

16       MR. WILLIAMS: It was agreed there would be no

17  inquiry into those areas. And I also object on the

18  attorney-client privilege and work product grounds. I

19  instruct the witness not to answer.

20       MR. BAUGHER: On attorney-client and work product

21  doctrine grounds, you're directing him not to answer

22  that question?

23       MR. WILLIAMS: I've stated my objection for the

24  record.

1    MR. BAUGHER:  I want to make sure that the court
2    reporter and I both understand that you are directing --
3    and Mr. Ciro, who has his own obligations, understand
4    that you are directing him not to answer that question.
5         MR. WILLIAMS:  I am directing him not answer to
6    that question for the reasons I stated.  Would you like
7    me to repeat them?
8         MR. BAUGHER:  No.  I think you've already taken up
9    more time than was justified.  And it's too bad because
10    it will unnecessarily extend this deposition.
11         And, Mr. Ciro, I'm telling you that if this
12    question is not answered today, you will have to come
13    back and answer it on another occasion.
14         MR. WILLIAMS:  I thought that Judge Darrah was in
15    charge of making rulings in this case.
16    BY MR. BAUGHER:
17    Q.    Mr. Ciro, let me ask you a different question
18    since you've been directed not to answer the question
19    that I posed a few minutes ago, which is whether you are
20    aware of any facts that suggest to you that Ciro
21    Deposition Exhibit 1 is not an authentic and properly
22    signed and authorized agreement between SPSS and Mr. Nie
23    and Mr. Hull.
24         MR. WILLIAMS:  I object for the reasons previously

1    stated and instruct the witness not to answer.
2    BY MR. BAUGHER:
3    Q.    Do you have any reason to believe or know of
4    any facts, Mr. Ciro, that suggest to you that Ciro
5    Deposition Exhibit 1 is not an authentic and fully
6    executed agreement?
7         MR. WILLIAMS:  Same objections.
8         MR. BAUGHER:  And are you directing him not to
9    answer that question?
10         MR. WILLIAMS:  I am for the same reasons, beyond
11    the scope of 30(b)(6), implicating a topic that it
12    was -- was objected to in advance of this deposition,
13    and attorney-client privilege and work product doctrine.
14    BY MR. BAUGHER:
15    Q.    Now, you understand, Mr. Ciro, that Ciro
16    Deposition Exhibit 1, this license agreement, is the
17    center of the lawsuit that we're here for this
18    deposition on, correct?
19         MR. WILLIAMS:  Objection.  You're asking for his
20    opinion as a lawyer right now?
21         MR. BAUGHER:  I'm asking the question.  If he can
22    answer the question, he should.
23         MR. WILLIAMS:  I think that asking him whether a
24    license agreement is the center of the lawsuit --

1    MR. BAUGHER:  Are you directing him not to answer
2    the question?
3         MR. WILLIAMS:  I am asserting attorney-client
4    privilege and work product doctrine.  His opinions as to
5    what is the center of this lawsuit is beyond the scope
6    of 30(b)(6) and directly implicates attorney-client
7    privilege and work product.  I instruct him not to
8    answer.
9    BY MR. BAUGHER:
10    Q.    You are aware, Mr. Ciro, that the board of
11    directors of SPSS approved Ciro Deposition Exhibit
12    No. 1, the license agreement, correct?
13    A.    I am.
14    Q.    And you're aware of that because you read the
15    board minutes?
16    A.    I am, correct.
17    Q.    The board minutes approving this license
18    agreement, Deposition Exhibit 1, right?
19    A.    Correct.
20         MR. BAUGHER:  Would you mark this as Deposition
21    Exhibit 2.
22         (Ciro Deposition Exhibit No. 2 marked
23         for identification.)
24

1    BY MR. BAUGHER:
2    Q.    Now, I've asked the court reporter to mark as
3    Ciro Deposition Exhibit 2 the special meeting of the
4    board of directors of SPSS, Inc. September 14, 1977
5    minutes.  Can you tell us --
6         MR. WILLIAMS:  Could you identify the Bates range
7    on this, please.
8         MR. BAUGHER:  I could.
9         MR. WILLIAMS:  Well, it's -- This document was
10    produced by Jenner & Block.  It's Jenner 8 through 7 and
11    therefore was not produced from the SPSS files.
12         MR. BAUGHER:  Are you going to direct him not to
13    answer questions about something from Jenner & Block?
14         MR. WILLIAMS:  I am not going -- I am not going to
15    direct him not to answer, but he was here to testify
16    about the location of the license agreement.  And I
17    think, you know, that this is perfectly appropriate.
18         MR. BAUGHER:  Do you want to testify for him and
19    tell him that if documents come or are Bates-stamped
20    from Jenner that he should know that maybe they came
21    from a law firm in Chicago called Jenner and that's --
22    usually known as Jenner & Block?  Would you like to tell
23    him that or shall I do that for you?
24         MR. WILLIAMS:  Well, I wanted to identify the

1  document for the record.

2       And yes, I do object to the extent that you're

3  going to ask him questions that this document came from

4  the files, but, you know, go ahead, ask your questions.

5  BY MR. BAUGHER:

6       Q.  Mr. Ciro, did I ask you whether Ciro

7  Deposition Exhibit 2 came from your files?

8       A.  No.

9       Q.  All right.  What I did ask you is:  What is

10  Ciro Deposition Exhibit 2?  And what's the answer to

11  that, please?

12       A.  According to the title, it's the SPSS, Inc.

13  special meeting of the board of directors from

14  September 14th, 1977.

15       Q.  And what do these minutes reflect in terms of

16  the license agreement, Deposition Exhibit 1?

17       A.  They appear to be a resolution to approve the

18  license agreement dated February 1st, 1975.

19       Q.  Well, you say "appear."  Are they, in fact,

20  the minutes that approve the license agreement dated

21  1975?

22       MR. WILLIAMS:  Objection, foundation.

23  BY THE WITNESS:

24       A.  If they are the same -- If this is the same

---

1  minutes that were in our board meeting, our board books,

2  I would say yes, they would.

3       Q.  Well, Mr. Ciro, look at Deposition Exhibit 2,

4  please, and tell us whether these are minutes of the

5  meeting in 1977 approving the license agreement, which

6  is Deposition Exhibit 1.

7       A.  In reading this document, it does state that

8  it's approving the license agreement from 1975.

9       Q.  And you see the signatures on these minutes of

10  Mr. Nie and Mr. Hull and Mr. Bova, do you?

11       A.  I do.

12       Q.  And those are the three members of the board

13  of directors of SPSS, Inc. as of 1977, correct?

14       A.  Correct.

15       Q.  And what we're looking at is an authentic copy

16  of the minutes of the board of directors of SPSS, Inc.

17  from September 14th of 1977, correct?

18       MR. WILLIAMS:  Objection, foundation.

19  BY THE WITNESS:

20       A.  I do not know if it's authentic.

21       Q.  Well, do you think that the signatures are

22  forged?

23       A.  I have no -- no feeling that they are forged,

24  but this is not a copy that's from our corporate

---

1  records, so no, I don't.  I have no knowledge that

2  they're forged.

3       Q.  Do you have any reason to believe that any of

4  the text in Ciro Deposition Exhibit 2 is inauthentic or

5  was changed or otherwise tampered with?

6       MR. WILLIAMS:  Objection to the form.

7  BY THE WITNESS:

8       A.  I have no direct knowledge that it was.

9       Q.  Well, and you believe it was not, that what

10  we're looking at, Ciro Deposition Exhibit 2, are, in

11  fact, the minutes of the board of directors of

12  SPSS, Inc. as of September 14, 1977, right?

13       MR. WILLIAMS:  Objection, asked and answered.

14  BY THE WITNESS:

15       A.  Again, I believe that -- I have no knowledge

16  that they were modified in any way.

17       Q.  And you believe that these are val-- -- that

18  what we're looking at in Deposition Exhibit 2 are valid

19  minutes of the company from September 1977, right?

20       MR. WILLIAMS:  Objection, asked and answered.

21  BY THE WITNESS:

22       A.  Once again, I have no knowledge that they've

23  been modified at all.

24       MR. BAUGHER:  Could you read back the question for

---

1  the witness, please.

2       (Record read as requested.)

3       MR. WILLIAMS:  Objection, asked and answered.

4  BY THE WITNESS:

5       A.  I have no reason to believe that they are not.

6       Q.  Do you believe that they are valid minutes

7  from September 14th, 1977?

8       MR. WILLIAMS:  Objection, asked and answered

9  repeatedly.

10  BY THE WITNESS:

11       A.  Once again, I have no knowledge and I have no

12  knowledge that they've been modified at all.

13       Q.  Do you believe that they are valid minutes

14  from September 14th, 1977?

15       MR. WILLIAMS:  Objection, asked and answered,

16  argumentative.  The man's answered your question.

17       MR. BAUGHER:  No.  He's really trying to dodge the

18  question.

19  BY MR. BAUGHER:

20       Q.  And I'd like a direct answer to the question I

21  posed, please.

22       MR. WILLIAMS:  I disagree.  You've asked him the

23  question.  He's given you his answer.  You don't like

24  it.  You keep asking the questions and I presume you're

**Page 21**

```
 1   going to keep getting the same answer.  I suggest you
 2   move on.
 3   BY MR. BAUGHER:
 4       Q.  Answer the question, please.
 5       MR. WILLIAMS:  Same objection.
 6   BY THE WITNESS:
 7       A.  I have no knowledge that they've been modified
 8   at all.
 9       Q.  And because of that you believe that they are
10   valid minutes from September 14th, 1977?
11       MR. WILLIAMS:  Objection, asked and answered again.
12   BY THE WITNESS:
13       A.  Once again, I believe -- I have no reason to
14   believe that it's not.
15       Q.  So what is SPSS's conclusion from looking at
16   these minutes of September 14th, 1977?
17       MR. WILLIAMS:  What are you -- I have to object,
18   number one, beyond the scope of Rule 30(b)(6) deposition
19   notice that you issued.  And you're asking him for a
20   legal conclusion with respect to the effect of these
21   and, therefore, it's implicating attorney-client and
22   work product.  I instruct him not to answer.  He's
23   answered your question.
24       MR. BAUGHER:  You're instructing him not to answer
```

7/14/2008 1:44 PM   21

**Page 22**

7/11/2008 CIRO, ANTHONY

```
 1   that question?  That is what you said; I heard you.  But
 2   are you serious about that?
 3       MR. WILLIAMS:  You asked him --
 4       MR. BAUGHER:  I know what I asked him, and the
 5   court reporter can read it back if there's a question.
 6       MR. WILLIAMS:  Right.
 7       MR. BAUGHER:  And you're directing him not to
 8   answer that question on attorney-client privilege?
 9       MR. WILLIAMS:  Yes.
10   BY MR. BAUGHER:
11       Q.  Now, do you see --
12       MR. WILLIAMS:  And the other bases stated --
13       MR. BAUGHER:  Excuse me.
14       MR. WILLIAMS:  And the other bases stated on the
15   record previous.
16   BY MR. BAUGHER:
17       Q.  Now, let's look at page 2 of these minutes in
18   Deposition Exhibit 2.  You see the paragraphs that have
19   to do with the approval of the license agreement,
20   Mr. Ciro, the bottom of the page?
21       A.  Yes.
22       Q.  You read that before?
23       A.  Yes.
24       Q.  This is not a document that you're seeing for
```

7/14/2008 1:44 PM   22

**Page 23**

```
 1   the first time today?
 2                 (Ms. Robson exits.)
 3   BY THE WITNESS:
 4       A.  No.
 5       Q.  You've been aware of these minutes for quite a
 6   while, correct?
 7       MR. WILLIAMS:  Objection, vague.
 8       MR. BAUGHER:  He can answer the question.
 9       MR. WILLIAMS:  I said "Objection, vague" for the
10   record, sir.  I'm not instructing him not to answer the
11   question.
12       MR. BAUGHER:  Good.
13   BY MR. BAUGHER:
14       Q.  What's the answer?
15       MR. WILLIAMS:  You asked him "for quite a while."
16   That's quite vague.
17   BY THE WITNESS:
18       A.  I have known of its existence.  I have read
19   this document before.
20       Q.  When did you read it first?
21       A.  I do not recall.
22       Q.  What year?
23       A.  Approximately 2000- -- sometime in 2007.
24       Q.  All right.  So a year ago?
```

7/14/2008 1:44 PM   23

**Page 24**

7/11/2008 CIRO, ANTHONY

```
 1       A.  Approximately a year ago.
 2       Q.  All right.  And when you read the -- Where did
 3   you get the minutes that you read a year ago?
 4       A.  Out of our corporate minute book at the
 5   company.
 6       Q.  So you have a copy -- You, SPSS, has a copy of
 7   these SPSS minutes, Ciro Deposition Exhibit 2, correct?
 8       MR. WILLIAMS:  Objection, foundation.
 9   BY THE WITNESS:
10       A.  Yes, we have minutes.  We have minutes from
11   the September 14th meeting.
12       Q.  And are they any different from the minutes
13   that you're looking at, Ciro Deposition Exhibit 2?
14       MR. WILLIAMS:  Objection, foundation.
15   BY THE WITNESS:
16       A.  I don't know.  I haven't read these.
17       Q.  Well, read it.  Read it right now, take a
18   minute.  You read it and you tell me if they -- if what
19   we're looking at as Ciro Deposition Exhibit 2 is any
20   different than the board minutes that you read for the
21   first time, you say, a year ago.
22       MR. WILLIAMS:  Objection, foundation.
23   BY THE WITNESS:
24       A.  Yes, they appear to be.
```

7/14/2008 1:44 PM   24

1    Q.  Where were the corporate -- Where was this

2  particular copy of the minutes of the board of directors

3  of SPSS kept?

4    MR. WILLIAMS:  Objection, foundation.

5  BY THE WITNESS:

6    A.  SPSS's copy of these minutes are in the SPSS

7  corporate closet.

8    Q.  What is the SPSS corporate closet?

9    A.  It's a closet where we keep all of our

10  corporate files.

11    Q.  When you say "all" of the corporate files,

12  what do you mean, minutes and resolutions of the

13  directors or what?

14    A.  It's board minutes and corporate-related

15  documents.

16    Q.  When you say "corporate-related documents,"

17  describe a little more what you mean by that.

18    A.  Corporate partnerships, acquisitions, loan

19  documents, finance -- franchise and distributor

20  agreements.

21    Q.  Where is the SPSS corporate closet?

22    A.  It's at 233 South Wacker Drive, Chicago, on

23  the ninth floor.

24    Q.  Is it fireproof?

---

1  Deposition Exhibit 2 are the license agreement that we

2  looked at as Ciro Deposition Exhibit 1, correct?

3    A.  Yes, appears to be.

4    Q.  Well, is there any doubt in your mind?  You

5  say it "appears to be."  If you want to check and

6  compare them, please do that.

7    A.  Yes, it's the same document.

8    Q.  And up at the top at the right-hand corner in

9  the top, can you read that superscript to us, please.

10    A.  "Exhibit A to minutes of September 14th, 1977

11  special meeting of the board of directors of SPSS, Inc."

12    Q.  And then this Exhibit A is what is referred to

13  on the second page of the minutes, correct?

14    A.  Correct.

15    Q.  Now, do you have any knowledge that suggests

16  that there is anything about the signing or the

17  execution or the authenticity of Ciro Deposition

18  Exhibit 2 that causes you to believe that there is an

19  invalidity or authenticity issue with this exhibit?

20    MR. WILLIAMS:  Objection, compound, beyond the

21  scope of Rule 30- --

22    MR. BAUGHER:  Let me rephrase the question because

23  it was compound.

24  BY MR. BAUGHER:

---

1    A.  Not the entire closet; it's not.

2    Q.  What part of it is?

3    A.  There's a single safe in the closet that is

4  fireproofed.  The other documents -- The other documents

5  are in just file cabinets.

6    Q.  And where are minutes kept?

7    A.  They are kept in a filing cabinet.

8    Q.  Chronologically?

9    A.  Yes.

10    Q.  And Ciro Deposition Exhibit 2, the minutes of

11  the board meeting of September 14, 1977, are located in

12  the SPSS corporate closet on the ninth floor along with

13  other board minutes of the company, correct?

14    A.  Correct.

15    Q.  Now, going again to page 2 of the

16  September 14th, 1977 minutes, the minutes note an

17  Exhibit A to this -- to these minutes in this

18  resolution.

19          (Ms. Robson enters.)

20  BY MR. BAUGHER:

21    Q.  Could you turn to Exhibit 2, please.  Do you

22  got that?

23    A.  I do.

24    Q.  The fourth, fifth, sixth, and seventh pages of

---

1    Q.  Look at Ciro Deposition Exhibit 2 again.  Is

2  there anything, any fact that you know about that

3  suggests that these board minutes and the exhibit

4  attached to the board minutes were not the regular and

5  executed determination of the board of directors of SPSS

6  as indicated in the document?

7    MR. WILLIAMS:  Objection, beyond the scope of

8  Rule 30(b)(6), implicating attorney-client privilege and

9  work product.  I instruct him not to answer.

10    MR. BAUGHER:  What's the work product objection?

11    MR. WILLIAMS:  You've asked him about --

12    MR. BAUGHER:  This is a document from 1977.

13    MR. WILLIAMS:  You asked him quite a bit more than

14  that, though.  You asked him about whether he's come to

15  be aware of any facts that would go to enforceability of

16  the license agreement --

17    MR. BAUGHER:  I didn't use the word

18  "enforceability."

19    MR. WILLIAMS:  Well, I know you --

20    MR. BAUGHER:  In fact, I was trying to be sensitive

21  to your concern about not wanting to get to issues in

22  the lawsuit with the corporate representative of SPSS.

23    MR. WILLIAMS:  You've misstated my concern.  My

24  concern --

1   MR. BAUGHER:  No.  Your concern is you don't want
2   to actually get to what is at issue --
3   MR. WILLIAMS:  May I speak?
4   MR. BAUGHER:  -- between the parties.
5       Let's not spend time talking to one other.
6   MR. WILLIAMS:  I'm sorry, Mr. Baugher.  I have to
7   make a statement now for the record because you've
8   mischaracterized my position.
9       My position has nothing to do with the
10  relevance of the ultimate determination of issues.  My
11  position is that you are asking questions and you are
12  trying deliberately, I agree, to avoid the word
13  "enforceability" to go directly to the enforceability of
14  the license agreement.  Topic No. 8 from your deposition
15  notice, which we objected to and which was not
16  challenged and was the discussion subject of discussions
17  on Rule 36 [sic] -- and there's correspondence where --
18  confirming that this will not be a topic for examination
19  today.  And I think it's improper for you to persist in
20  trying to ask those questions.
21  MR. BAUGHER:  And you're directing him not to
22  answer the question?
23  MR. WILLIAMS:  The basis for the objection to
24  Topic 8 was attorney-client privilege and work product

---

1   doctrine, and that is the second objection.  You're
2   going beyond the scope of 30(b)(6).  It was represented
3   to Judge Darrah earlier this year that you would only be
4   asking him questions about the topics, and you're going
5   beyond those topics.  And I object to that.  I don't
6   think you should be doing that.  And I think that you
7   are also seeking to invade the attorney-client privilege
8   and work product doctrine.
9   MR. BAUGHER:  Will you mark this, please, as Ciro
10  Deposition Exhibit 3.
11              (Ciro Deposition Exhibit No. 3 marked
12               for identification.)
13  BY MR. BAUGHER:
14      Q.  Mr. Ciro, what is Ciro Deposition Exhibit 3?
15      A.  SPSS, Inc. special meeting of the board of
16  directors, September 14th, 1977, minutes from that
17  meeting.
18      Q.  Will you please compare Deposition Exhibit 3
19  with Deposition Exhibit 2?  You've had a chance to
20  compare Ciro Deposition Exhibits 2 and 3 now, correct?
21      A.  I have.
22      Q.  Are they the same?
23      A.  They appear to be the same.
24      Q.  And they're the same even though Ciro

---

1   Deposition Exhibit 2, as Mr. Williams pointed out to
2   you, was produced apparently out of the records of
3   Jenner & Block; is that correct?
4   MR. WILLIAMS:  Objection.  Move to strike the
5   commentary.
6   BY MR. BAUGHER:
7       Q.  Is that correct?
8       A.  Yes, they appear to be the same.
9       Q.  So not only SPSS in its corporate records had
10  a copy of these minutes and the attached license
11  agreement but apparently so did Jenner & Block, correct?
12      A.  It appears so.
13      Q.  Jenner & Block was the successor to the law
14  firm that represented SPSS back in the 1970s and '80s,
15  correct?
16      A.  I have no recollection of who represented
17  SPSS.
18      Q.  Well, you know that Mr. Wanke represented SPSS
19  then, correct?
20      A.  I do.
21      Q.  Because you've talked to Mr. Wanke as recently
22  as last year, right?
23      A.  I have.
24      Q.  And you know that Mr. Wanke, subsequent to his

---

1   own firm, went to work for Jenner & Block, right?
2       A.  I am aware that he worked for Jenner & Block.
3       Q.  And you knew that he was with another law firm
4   before he went to work for Jenner, correct?
5       A.  I am aware of that.
6       Q.  Now, with respect to Deposition Exhibits 2
7   and 3 that you say are the same and the license
8   agreement that is attached as Exhibit A to Deposition
9   Exhibits 2 and 3, has that license agreement ever been
10  rescinded?
11  MR. WILLIAMS:  I'm sorry.  I have to ask.  What
12  topic does rescission of the license agreement relate
13  to?
14  MR. BAUGHER:  I'm asking him about these minutes.
15  I want to know what I can about the minutes and the
16  license agreement attached to the minutes.
17  BY MR. BAUGHER:
18      Q.  Has the license agreement attached to
19  Deposition Exhibits 2 and 3 ever been rescinded?
20  MR. WILLIAMS:  Are you refusing to tell me what
21  topic this relates to?
22  MR. BAUGHER:  I don't have to tell you topics.  My
23  responsibility is to ask the corporate representative of
24  SPSS questions.  And then if he knows -- or the company

1  MR. WILLIAMS:  Objection, asked and answered.
2  BY THE WITNESS:
3      A.  Yes.  As I stated, I believe I told them that
4  there was -- it was an exclusive license to use the
5  product from Dr. Nie and Mr. Hull, and I don't recall
6  anything else.
7      Q.  What did you tell them about SPSS's
8  obligations under the license agreement?
9      A.  I don't recall.
10     Q.  Do you remember when you left the room leaving
11 the room with the license agreement as opposed to
12 leaving it there with the group?
13     A.  I don't recall.
14     Q.  Who else either asked questions or made
15 statements about the trademark or the license agreement
16 during this meeting?
17     A.  I don't know who they were, who they were
18 with.  I don't know if they were with Merrill Lynch or
19 with -- with their attorneys.
20     Q.  And what did -- What did this
21 Merrill-Lynch-affiliated person say or do?
22     A.  I believe they just asked for an explanation,
23 and I provided them that explanation.
24     Q.  Does SPSS have a file on the 2007 Merrill

---

1      A.  I'm sorry.  I don't recall.
2      Q.  Who would know that?
3      A.  Erin McQuade.
4      Q.  And has a search been made of that -- that
5  financing document and the papers associated with it to
6  look for information concerning the trademark and what
7  the company has said about the trademark and the license
8  agreement?
9      A.  I believe so.
10     Q.  In connection with the litigation?
11     A.  Yes, I believe so.
12     Q.  Did you talk with Erin McQuade about that or
13 anyone else about that in preparation for your
14 deposition today?
15     A.  I did not talk to her specifically about that.
16     Q.  Did you talk with her generally about your
17 deposition today?
18     A.  I asked her some of the points that I already
19 stated, but I did not specifically talk to her about the
20 debt offering.
21     Q.  What did you ask her?
22     A.  I don't recall my specific questions with her.
23     Q.  After you had your meeting in the boardroom
24 with the Merrill Lynch people and told them about the

---

1  Lynch offering which would include documents pertaining
2  to the due diligence and the lead up to the transaction
3  itself?
4      A.  I don't know.
5      Q.  In the -- Well, who does know that?
6      A.  I believe Erin McQuade would know.
7      Q.  Because -- Did she have -- Was she the
8  in-house lawyer with principal responsibility for the
9  offering?
10     A.  Yes, she was.
11     Q.  Was she the one who had principal contact with
12 Dave Schuette at Mayer, Brown on the offering?
13     MR. WILLIAMS:  Objection, foundation.
14 BY THE WITNESS:
15     A.  Yes, I believe so.
16     Q.  In the Merrill Lynch offering, did Merrill
17 Lynch take back as collateral interest in SPSS's
18 intellectual property similar, for example, to Foothill
19 Capital Corporation?
20     A.  I don't believe they took our intellectual
21 property as security interest.
22     Q.  Do you know if there was any reference in any
23 of the Merrill Lynch documents to the SPSS trademark or
24 the license agreement?

---

1  license agreement, when next did you consider or review
2  the terms of the license agreement?
3      A.  I believe approximately a couple months --
4  approximately six months after the debt offering was
5  completed.
6      Q.  You mean the next time you thought about it or
7  considered it was six months after the debt offering, or
8  the debt offering was completed six months after your
9  meeting in the boardroom?
10     A.  No, considered it six months after the debt
11 offering.
12     Q.  And how did that come up?
13     A.  Because this -- The license agreement had come
14 up again on a financial matter with a -- It first came
15 up with the loan and now it came up with this debt
16 offering.  And because we had been -- the license
17 agreement had not been -- Dr. Nie and Mr. Hull had not
18 talked about the license agreement and had not done
19 anything with the license agreement through all the
20 years, we felt that it was probably worthwhile to clean
21 up the matter on the license -- the matter on the
22 license agreement and get an assignment to the company
23 of the mark.
24     Q.  So when you say it would come up under a loan

**Page 226**

1  and with the financing, the loan you're talking about is
2  Foothill?
3      A.  Correct.
4      Q.  And the financing is this more recent Merrill
5  Lynch matter?
6      A.  Correct.
7      Q.  So who was it that was thinking about the
8  license agreement then?  There's you and who else, or is
9  that your idea?
10     MR. WILLIAMS:  Objection, foundation, beyond the
11  scope of the 30(b)(6).
12         Go ahead.
13  BY THE WITNESS:
14     A.  Mostly mine; and then I did talk with outside
15  counsel about it as well.
16     Q.  Well, before you talked with outside counsel,
17  who did you talk with at SPSS?
18     A.  Mr. Noonan and Mr. Panza.
19     Q.  When did you talk with Mr. Noonan about the
20  license agreement?
21     A.  Approximately that same time frame I
22  mentioned, approximately six months after the debt
23  offering.
24     Q.  So what is that, mid 2007?

**Page 227**

7/11/2008 CIRO, ANTHONY

1      A.  Approximately.
2      Q.  And what did you say to Mr. Noonan?  What did
3  he say to you about the license agreement?
4      MR. WILLIAMS:  Objection, attorney-client privilege
5  and beyond the scope of 30(b)(6).  Instruct the witness
6  not to answer.
7  BY MR. BAUGHER:
8      Q.  Were you offering Mr. Noonan legal advice?
9      A.  Yes, I believe I was.
10     Q.  When did you speak with Mr. Panza?
11     A.  Approximately the same time.
12     Q.  Separate meetings?
13     A.  Yes, I believe so.
14     Q.  Why did you talk to Mr. Noonan about the
15  license agreement?
16     MR. WILLIAMS:  Cautioning the witness not to reveal
17  any information relating to the context of your
18  discussion with Mr. Noonan or any legal advice that you
19  provided.  If you can answer the question within the
20  scope of that instruction, that's fine.  If you cannot,
21  please let us know.
22  BY THE WITNESS:
23     A.  I don't know if I can answer the question.  I
24  felt like it was a legal discussion with Mr. Noonan.

**Page 228**

1      Q.  Because it was an important corporate decision
2  and you needed to talk with the chief executive officer
3  of the company about it?
4      MR. WILLIAMS:  Objection, mischaracterizes prior
5  testimony.
6  BY THE WITNESS:
7      A.  I believe it's because of the fact that if we
8  were going to go forward with an assignment of the mark,
9  we'd have --
10     MR. WILLIAMS:  I mean, you're not -- not to discuss
11  the content of your discussion with Mr. Noonan.  I think
12  we're on very shaky ground here and I'm trying to give
13  you some leeway, but I instruct him not to complete his
14  answer.  I think it's clearly getting into the content
15  of the discussion.  It's privileged.
16  BY THE WITNESS:
17     A.  I can't answer the question.
18     Q.  What was the nature of your discussion with
19  Mr. Panza?
20     MR. WILLIAMS:  You can report the subject matter.
21  BY THE WITNESS:
22     A.  Similar to the discussion with Mr. Noonan.
23     Q.  You believe you were giving him legal advice
24  or was the nature of your conversation different from

**Page 229**

7/11/2008 CIRO, ANTHONY

1  that?
2      A.  I believe I was giving him legal advice.
3      Q.  Who else did you talk with about this possible
4  assignment of the mark?
5      MR. WILLIAMS:  Objection, beyond the scope of
6  30(b)(6).
7  BY THE WITNESS:
8      A.  Erin McQuade.
9      Q.  Why did you talk with her?
10     A.  Because she's an associate general counsel.
11     Q.  Well, why did you think she would have
12  responsibility for this or why did you raise it with
13  her?
14     MR. WILLIAMS:  Objection, assuming facts.
15         I would again caution the witness not to
16  reveal the content of any discussions you had with Ms.
17  McQuade with respect to this time frame and the license
18  agreement and the trademark assignment.
19  BY THE WITNESS:
20     A.  I shared the same legal opinions that I gave
21  to Mr. Noonan and Mr. Panza with her.
22     Q.  Who else did you discuss the possible
23  assignment of the mark with?
24     A.  Just outside counsel.

Q. What outside counsel?

A. Talked with Len Rubin.

Q. By then at Reed, Smith?

A. By then at Reed, Smith.

Q. Anybody else?

A. I believe at that time Mayer, Brown was also aware.

Q. Who did you speak with at Mayer, Brown?

A. It would have been Fritz Thomas.

Q. And Fritz Thomas is a partner at Mayer, Brown?

A. That's correct.

Q. He's also general counsel of SPSS, right?

A. He's outside counsel of SPSS.

Q. And in addition to that he's general counsel of SPSS, isn't he?

A. I don't believe we've called him out as general counsel of SPSS.

Q. Doesn't he have a title with SPSS?

A. No, he does not.

Q. Does he function as the company's general counsel?

A. He functions as the company's outside counsel. We don't have a general counsel within SPSS.

Q. Okay. So you talked to Fritz Thomas, though,

---

about the proposed assignment of the mark?

MR. WILLIAMS: Caution the witness just to reveal the subject matter of the conversation and nothing more.

BY THE WITNESS:

A. I did talk to Fritz Thomas.

Q. All right. Is there anybody else that you spoke with about the assignment of the mark other than Noonan, Panza, McQuade, Rubin, and Thomas?

A. I don't believe so.

Q. What did you do next?

A. We had the assignment agreement created.

Q. How did you have the assignment agreement created?

A. I asked Mr. Rubin to create it.

Q. You mean, like, write it?

A. Like draft it; I asked Mr. Rubin to draft the assignment agreement.

Q. And what were your instructions to him in drafting the trademark assignment?

MR. WILLIAMS: Objection, attorney-client privilege; instruct him not to answer.

BY MR. BAUGHER:

Q. Did Mr. Rubin draft a trademark assignment?

A. He did.

---

Q. And did it comply with your instructions as he had drafted it?

MR. WILLIAMS: I'm going to object, attorney-client privilege. I think you're trying to -- The result of the question would be to get into attorney-client communications with respect to the nature of communications, instructions.

BY MR. BAUGHER:

Q. Did Mr. Rubin send you a draft?

A. Yes, he did.

Q. Did you review the draft?

A. Yes, I did.

Q. Did you approve it?

A. Yes, I did.

Q. Did it meet your expectations?

MR. WILLIAMS: Same objection, attorney-client privilege; instruct him not to answer.

BY MR. BAUGHER:

Q. Did you send the draft back to Mr. Rubin for revisions or was it acceptable in the fashion -- in the manner he delivered it to you?

A. I don't recall if there was revisions back and forth.

Q. But ultimately there was a draft that you were

---

satisfied with?

A. Yes.

Q. Okay.

(Ciro Deposition Exhibit No. 11 marked for identification.)

BY MR. BAUGHER:

Q. Let me show you what's been marked as Ciro Deposition Exhibit 11, a document entitled "Trademark Assignment." Is this the proposed trademark assignment that you asked Mr. Rubin to draft for you in May of 2007?

MR. WILLIAMS: I'm going to interpose an objection on 30(b)(6). This was a specific topic -- was the request for trademark assignment. I want to move along and get you the information you need, so I'm going to -- I'm perfectly fine with the witness asking [sic] questions based upon his personal knowledge of nonprivileged communications relating to the trademark assignment.

MR. BAUGHER: Well, and to the extent that there are appropriate privilege objections, of course, you can make those, but I don't think the question I asked was problematic.

MR. WILLIAMS: I felt that, as I did before, that

1  it might be helpful just to let you know that this was
2  another topic, the request for trademark assignment,
3  that was objected to.  The objection was not challenged.
4  And pursuant to my most recent letter, Mr. Ciro is not
5  designated to testify on behalf of the company with
6  respect to that topic.
7      MR. BAUGHER:  Who is the company's witness then for
8  the trademark assignment?
9      MR. WILLIAMS:  We have not designated a witness.
10 We objected to --
11     MR. BAUGHER:  You can't just not produce a witness.
12 If he's not it, that's your judgment, but --
13     MR. WILLIAMS:  I disagree with your legal position
14 that you -- I think that it is entirely appropriate to
15 object to a 30(b)(6) topic and inform the other party
16 that you have an objection to designating a witness and
17 allow them to pursue that objection as they see fit.
18 But Mr. Ciro has not been so designated.  We objected
19 and that objection was never pursued.  In fact, during
20 discussions that objection was never even followed up
21 on.
22     MR. BAUGHER:  Well, I'm going to ask him questions
23 about this document.  If you tell him not to answer, I
24 guess he won't answer.

1      MR. WILLIAMS:  I am going to allow you to ask him
2  nonprivileged -- you know, obtain nonprivileged
3  information relating to things he has personal knowledge
4  about, but I'm telling you that his testimony with
5  respect to Topic No. 9, the request for the trademark
6  assignment, is not a 30(b)(6) topic, and he's going to
7  testify only from his personal knowledge --
8      MR. BAUGHER:  All right.  And for that we need to
9  get another corporate representative then?  Is that what
10 you're saying?
11     MR. WILLIAMS:  If you want to follow up on the
12 issue that was the subject of extensive discussions
13 between myself and your partner, Mr. Berndt, and others
14 over the several weeks leading up to this deposition and
15 the letters exchanged between the parties on that topic,
16 you're certainly entitled to do that.  I had thought
17 that issue had been laid to rest.
18     MR. BAUGHER:  No.
19     MR. WILLIAMS:  If you wanted to try and revisit
20 that issue --
21     MR. BAUGHER:  No.  I'm going to ask him questions
22 about Ciro Deposition Exhibit 11.  To the extent that we
23 get information on that subject, I don't need to ask
24 other people or -- and I don't need to ask him at a

1  deposition of Tony Ciro later on.
2      MR. WILLIAMS:  And I think my position's clear.
3      MR. BAUGHER:  I think mine is too.
4      MR. WILLIAMS:  I think we're ready to roll.
5      MR. BAUGHER:  Okay.
6  BY MR. BAUGHER:
7      Q.  You're looking at Ciro Deposition Exhibit 11.
8  Is this the trademark assignment document that Mr. Rubin
9  drafted for you?
10     A.  I believe so.
11     Q.  When did you get this draft trademark
12 assignment?
13     A.  I don't recall when I got the draft.
14     Q.  Well, this particular edition has a mark down
15 at the bottom which suggests that it was drafted or
16 this -- or printed May 14th, 2007.  Does that refresh
17 your recollection as to when you received or had this
18 proposed trademark assignment?
19     MR. WILLIAMS:  Objection, foundation as to the
20 footer.
21     MR. BAUGHER:  It's not my document, so I don't know
22 anything other than --
23     MR. WILLIAMS:  I don't know whose document it is.
24 It doesn't have a Bates stamp, so I don't know whose

1  copy this is.
2  BY MR. BAUGHER:
3      Q.  When do you recall receiving Ciro Deposition
4  Exhibit 11?
5      A.  Approximately around that time frame.
6      Q.  Around May of 2007?
7      A.  Approximately the mid to late 2007.
8      Q.  You think it was late 2007?
9      A.  I don't recall the exact date.
10     Q.  Do you have notes or a file that would help
11 you identify the appropriate -- the correct date?
12     A.  I don't know.
13     Q.  Are there e-mails between you and Mr. Rubin
14 asking Mr. Rubin to undertake this assignment?
15     A.  I don't know.  I don't know if I called him.
16 I don't know.
17     Q.  Did you ever check your e-mails to see if
18 there were any e-mails concerning this proposed
19 trademark assignment, Ciro Deposition Exhibit 11?
20     A.  I did not specifically check them.
21     Q.  Did you send copies of Ciro Deposition
22 Exhibit 11 to anyone else at the company -- Jack Noonan,
23 Pay Panza, Erin McQuade -- or to Fritz Thomas at Mayer,
24 Brown?

1    A.   I don't recall.

2    Q.   You asked Mr. Rubin to draft a trademark
3  assignment and you discussed that topic with the others
4  that you identified after you got the draft from
5  Mr. Rubin.  Did you circulate the draft to the same
6  group?

7    A.   No, I did not circulate the draft to the same
8  group for review.

9    Q.   When you sent it out, the proposed trademark
10 assignment, to Mr. Nie, did you send copies of that to
11 the group that you'd conferred with on this proposed
12 assignment, that is, Noonan, Panza, McQuade, Rubin, and
13 Thomas?

14   A.   I did end up sending this trademark assignment
15 to Mr. Noonan, Mr. Panza, and Ms. McQuade at various
16 times but not as a circulation review of the document.

17   Q.   Did Noonan, Panza, and McQuade all review the
18 trademark assignment, Ciro Deposition Exhibit 11?

19   MR. WILLIAMS:   Objection, foundation.

20 BY THE WITNESS:

21   A.   I don't know if they specifically did.

22   Q.   But you gave copies of this document, Ciro
23 Deposition Exhibit 11, to Jack Noonan, Ray Panza, and
24 Erin McQuade, as I understand it; is that right?

---

1    MR. WILLIAMS:   Objection, asked and answered.

2  BY THE WITNESS:

3    A.   Yes, I did.

4    Q.   And you did that in or around the time that
5  you were sending it to Dr. Nie?

6    A.   I believe so.

7    Q.   Did you receive comments back from Jack Noonan
8  on the proposed trademark assignment?

9    MR. WILLIAMS:   That's a yes-or-no question or if
10 you don't recall ...

11 BY THE WITNESS:

12   A.   I don't recall.

13   Q.   Did you receive comments on the proposed
14 trademark assignment from Ray Panza?

15   A.   I don't recall.

16   Q.   Did you receive comments on the proposed
17 trademark assignment from Erin McQuade?

18   A.   I don't recall.

19   Q.   Did you receive comments from anyone that you
20 recall on the trademark assignment?

21   A.   I don't recall.

22   Q.   Well, do you make notes in order to try to
23 keep up with materials that you're sending out to
24 people?

---

1    A.   I don't believe so.

2    Q.   Do you ever keep notes on subjects or is that
3  just not part of your work habit?

4    A.   I do not keep detailed notes about subject
5  matters.

6    Q.   Do you recall sending e-mails to anyone about
7  the subject of this trademark assignment?

8    MR. WILLIAMS:   Objection, asked and answered.

9  BY THE WITNESS:

10   A.   I sent the trademark assignment at various
11 times to Mr. Noonan, Mr. Panza, and Ms. McQuade.

12   Q.   With a cover e-mail?

13   A.   I don't -- I'm sure I sent an e-mail with it.
14 Yeah, it was an e-mail that I sent, the document.

15   Q.   Do you remember there being any text in that?

16   A.   I don't recall.

17   Q.   Did you give a copy of this to Hadlai Hull?

18   A.   I don't recall if I gave a copy to Hadlai
19 Hull.

20   Q.   Did you deliver a copy to him?

21   A.   I do not believe I delivered a copy to him.

22   Q.   Why not?

23   A.   Norman Nie was the chairman of our board.  We
24 sent it to Norman first.

---

1    Q.   Mr. Hull worked for SPSS at that time, right?

2    A.   He did.

3    Q.   He was in the same building you were in?

4    A.   That's correct.

5    Q.   But you didn't give him a copy of this
6  proposed trademark assignment?

7    MR. WILLIAMS:   Objection, asked and answered.

8  BY THE WITNESS:

9    A.   I don't believe I did.

10   Q.   Well -- And he was one of the signatories,
11 proposed signatories, on it, right?

12   A.   That's correct.

13   Q.   So you sent it to Nie.  How did you do that?

14   A.   Via e-mail.

15   Q.   Now, the trademark assignment makes various
16 statements in the whereas clause.  Do you see those?

17   A.   I do.

18   Q.   Are these statements correct?

19   A.   Yes, they are correct, I believe so.

20   Q.   So it is correct that as of May 2007 Nie and
21 Hull were the owners of the trademark SPSS, right?

22   A.   Yes, I believe so.

23   Q.   And that the validity of this trademark
24 Registration No. 2,864,243 and its registration had been

1  maintained by and through the assignors, that is, Nie
2  and Hull, correct?
3      A.   Yes, I believe so.
4      Q.   And that that mark registration for SPSS is
5  presently valid and subsisting; is that right?
6      A.   Yes, I believe so.
7      Q.   And then in the next whereas clause it says
8  that the "Assignors" -- that is, Nie and Hull is "have
9  licensed the Marks exclusively to SPSS," and that's a
10  true statement, correct?
11      A.   Yes, I believe so.
12      Q.   And that the document in which they did that
13  is a license agreement dated February 1, 1975, correct?
14      A.   Yes, I believe so.
15      Q.   And that's Ciro Deposition Exhibit 1?
16      A.   Yes.
17      Q.   And then the next whereas clause says that the
18  "Assignee" -- And that's SPSS, Inc., your company,
19  right?
20      A.   That's correct.
21      Q.   And it says that the "Assignee has been using
22  the Marks" -- including this registration 2,864,243 --
23  "in a manner and to the extent authorized and approved
24  by Assignor."  That's Nie and Hull, right?

---

1      A.   Yes, it is.  I believe it is correct.  We have
2  been using it.  And because we had not heard from Nie
3  and Hull, it was assumed that it had been approved by
4  the assignors.
5      Q.   And that you'd been -- that SPSS had been
6  using the marks as a licensee of assignor, Nie and Hull,
7  continuously since the date of the license agreement
8  which is 1975; is that correct?
9      A.   Yes, that is what this document says.
10      Q.   And is it a correct statement?
11      MR. WILLIAMS:  Objection, asked and answered.
12  BY THE WITNESS:
13      A.   Yes, that is what the -- exactly what the
14  document says.
15      Q.   And is it a correct statement?
16      MR. WILLIAMS:  Objection, asked and answered --
17  BY THE WITNESS:
18      A.   Yes --
19      MR. WILLIAMS:  -- vague.
20  BY THE WITNESS:
21      A.   We've been using the mark since 1975.
22      Q.   As a licensee of an assignor, right?
23      MR. WILLIAMS:  Objection, asked and answered.
24  BY THE WITNESS:

---

1      A.   Yes.
2      Q.   And you'd been -- You, SPSS, had been using
3  the mark to the extent authorized and approved by Nie
4  and Hull as a licensee of Nie and Hull continually since
5  the date of the license agreement.  Is that a true
6  statement?
7      A.   Yes, we've been using the -- As I stated
8  before, we've been using the mark since 1975 with no
9  direction from Nie and Hull and we have been using the
10  mark.
11      Q.   Well, but this says it a little bit
12  differently than the sentence that you've been repeating
13  to us, Mr. Ciro.  This says that you used the mark "in a
14  manner and to the extent authorized and approved by" Nie
15  and Hull "as a licensee."  You see that language?
16      A.   I do.
17      Q.   And that's correct, right?
18      MR. WILLIAMS:  I would just move to strike the
19  prior comments of the questioner with respect to
20  Mr. Ciro's prior testimony.
21  BY MR. BAUGHER:
22      Q.   And the statement here is correct, isn't it?
23      MR. WILLIAMS:  Objection, asked and answered.
24  BY THE WITNESS:

---

1      A.   Yes, we've been using the mark since 1975.
2      Q.   Mr. Ciro, is the whereas clause that concludes
3  that SPSS had been using the marks "as a licensee of
4  Assignor continuously since the date of the License
5  Agreement" a correct statement?
6      A.   Yes, I believe so.
7      Q.   And the next whereas clause says that
8  "Assignee now wishes to acquire full ownership."  SPSS
9  did not have full ownership of the marks as of May 2007,
10  did it?
11      A.   No, I believe they did not.
12      Q.   And SPSS also wished to acquire "the good will
13  symbolized and generated through use of the Marks,"
14  correct?
15      A.   Yes, I believe so.
16      Q.   And what's the goodwill that was symbolized
17  and generated through the use of the marks?
18      A.   The fact that the SPSS -- the company had been
19  marketing and promoting this mark as part of its
20  products all along.  The mark had an association to
21  SPSS, the products, and that's the goodwill that has
22  been built up in the mark.  So the quality of the
23  products that SPSS has been putting out at its direction
24  had built up a goodwill in these products, in this name;

1    and that's the goodwill we're referring to.

2        Q.   So that by 2007 the SPSS mark had a

3    substantial amount or has a substantial amount of value?

4        A.   Once again, through SPSS's effort, it has

5    built up that goodwill.

6        Q.   Now, this assignment agreement was not entered

7    into, right?

8        A.   That is correct.

9        Q.   Why is that?

10       A.   Dr. Nie did not want to sign the agreement.

11       Q.   All right.  Did you send Dr. Nie, along with

12   this proposed draft assignment agreement, a copy of the

13   license agreement?

14       A.   I did not send it with the original note that

15   I sent to Dr. Nie, a copy of the license agreement,

16   because I assumed he already had it.

17       Q.   But did you subsequently send him a copy of

18   the license agreement?

19       A.   I did.

20       Q.   Because he asked for it?

21       A.   That's correct.

22       Q.   And where did you go to get the license

23   agreement?

24       A.   Where did I go to get the license agreement?

---

1        A.   The license agreement does allow him to review

2    the quality of the products that contain the SPSS name.

3        Q.   And the license agreement allows the licensors

4    to review other aspects of the company's use of the

5    trademark, correct?

6        MR. WILLIAMS:  Objection, vague, foundation.

7    BY THE WITNESS:

8        A.   I believe the license agreement also allows

9    them to use -- to review marketing material that has the

10   name, packaging.

11       Q.   And has SPSS complied with the request that

12   Dr. Nie has made?

13       A.   Yes, we believe we have.

14       Q.   Well, in fact, SPSS has declined to provide

15   Dr. Nie with the information that he asked for on newly

16   implemented features of the company's software; isn't

17   that correct?

18       A.   No, it's not correct.

19       Q.   And isn't it correct that the company has

20   declined to provide him with bug lists and inventories

21   of the issues concerning the Dimension 5.0 and the

22   SPSS 16 software which was to be released?

23       A.   The company believes it has provided all the

24   information required --

---

1        Q.   Yes.

2        A.   By that time I had saved a copy of the license

3    agreement on my computer, so I could -- as a PDF, so I

4    could forward it on to him.

5        Q.   Did you also send that to Mr. Hull?

6        A.   I did not.

7        Q.   Why not?

8        A.   As I mentioned -- As I stated before, Dr. Nie

9    is the chairman of our board, so we wanted to talk to

10   Dr. Nie about this first.

11       Q.   Since the middle of 2007, just starting at

12   that point, what efforts has Mr. Nie made to enforce

13   various aspects of the license agreement?

14       A.   I don't believe he made any efforts to enforce

15   the license agreement until October, November time frame

16   of 2007.

17       Q.   And what efforts has he made to enforce the

18   license agreement as of that date?

19       A.   He has asked to review product releases that

20   we're coming out with.

21       Q.   And that's something that the license

22   agreement provides for, correct?

23       MR. WILLIAMS:  Objection, foundation.

24   BY THE WITNESS:

---

1        Q.   No.  I've got a specific question for you.

2        MR. WILLIAMS:  No, no, no, no, mo, sorry, sir.  You

3    can interrupt me all day long.  You cannot interrupt

4    this witness.

5        Please complete your answer, Mr. Ciro.

6    BY THE WITNESS:

7        A.   The company had -- believes that it has

8    provided all the information it's required to provide in

9    regards to product releases under the agreement.

10       Q.   Has the company declined to provide Mr. Nie

11   with information about bugs that have been noted with

12   respect to Dimension 5.0 and SPSS 16?

13       MR. WILLIAMS:  Objection, vague, foundation.

14   BY THE WITNESS:

15       A.   Once again, the company believes it has

16   provided Dr. Nie all the information it's required to

17   provide under the specific -- under that -- under the

18   license agreement.

19       MR. WILLIAMS:  Can you reread the question for the

20   witness, please.

21          (Record read as requested.)

22   BY THE WITNESS:

23       A.   Yes, it has refused to provide that

24   information because it believes it's not obligated to

1    you're skating very close, I mean, trying to ascertain
2    what work product has been prepared by us in connection
3    with this litigation.  I have no intention of trying to
4    get that kind of information from your witnesses.  I
5    don't understand why it's even necessary.
6         MR. BAUGHER:  I want to know --
7         MR. WILLIAMS:  I mean, he's testified that it's
8    attorney-client work product.
9         MR. BAUGHER:  I want to know what paper exists and
10   then we'll consider whether or not it's privileged.  It
11   may well be.
12        MR. WILLIAMS:  It --
13        MR. BAUGHER:  But I can't -- I can't -- I can't
14   inquire about that unless -- unless I know something
15   exists, which it may not.
16        MR. WILLIAMS:  Without revealing the content of any
17   communications you've had with Mayer, Brown or other
18   attorney-client-privileged communications with that
19   internally, you can answer the question posed or the --
20   or better put, you can answer whether or not documents
21   exist that provide this legal advice, yes or no.
22   BY THE WITNESS:
23        A.  I don't believe there's a -- I've not seen a
24   comprehensive document that describes all of our

1    obligation and rights under the license agreement.
2         Q.  Has the company received advice as to its --
3    what rights or what obligations SPSS has under the
4    license agreement?  Has it gotten such information?
5         MR. WILLIAMS:  The witness has already testified
6    that he has had privileged communications, the subject
7    matter of which was the license agreement.  I --
8    Anything that you ask would be a part of that subject
9    matter, and I just don't think this is appropriate at
10   all.  I instruct the witness not to answer that
11   question.
12   BY MR. BAUGHER:
13        Q.  Who has the company gotten legal advice from
14   on the subject of the license agreement, what law firms?
15        A.  At the time -- At the time -- In regards to
16   the license agreement, at the time of the registration
17   and the assignment, from Len Rubin at Reed, Smith and
18   then also from Mayer, Brown.
19             (Ciro Deposition Exhibit No. 12
20             marked for identification.)
21   BY MR. BAUGHER:
22        Q.  Mr. Ciro, I'm handing you what the court
23   reporter has marked as Ciro Deposition Exhibit 12, a
24   Form 8-K filed December 31st, 2007 by SPSS, Inc.

1         MR. WILLIAMS:  And I'll state again for the record
2    that Mr. Ciro has not been designated pursuant to
3    Topic 13 of the defendant's 30(b)(6) notice to testify
4    on the Form 8-K and we have -- We objected to that.
5         I will in the spirit of cooperation allow you
6    to ask him some questions with respect to that, but they
7    will only be with respect to his personal knowledge and
8    will not obviously be allowed to penetrate any
9    attorney-client privileges.
10   BY MR. BAUGHER:
11        Q.  You have read the Form 8-K, Ciro Deposition
12   Exhibit 12, at the end of 2007, correct?
13        A.  Yes, I believe so.
14        Q.  Did you see a draft of this 8-K before it was
15   issued on December 31st, 2007?
16        A.  Yes, I believe so.
17        Q.  And do you believe that the statements in
18   Item 8.01, Other Events, are correct statements?
19        A.  Yes, I believe so.
20        Q.  The 8-K, Ciro Deposition Exhibit 12, describes
21   the agreement in the text.  Do you see that?  By the
22   "agreement," I mean the license agreement.
23        A.  Yes.
24        Q.  Is its description of the license agreement a

1    correct description?
2         A.  Yes, I believe so.
3         Q.  Is it a complete description?
4         MR. WILLIAMS:  Objection, calls for speculation, a
5    complete -- calls -- vague and overbroad.
6         MR. BAUGHER:  I agree.  Let me rephrase the
7    question.
8    BY MR. BAUGHER:
9         Q.  It's an accurate statement and does it -- In
10   order to make this description of the agreement not
11   misleading, is there anything else that should be said
12   about the license agreement?
13        MR. WILLIAMS:  Objection, mischaracterizes the
14   document taken as a whole.
15   BY THE WITNESS:
16        A.  Included as an exhibit to this agreement is
17   the entire agreement itself; so in combination with the
18   Item No. 1 and the exhibits itself, it gives a full
19   description of the license agreement.
20        Q.  Are there any other statements with respect to
21   the license agreement that need to be made in order to
22   make the disclosures in this item, other events
23   nonmisleading?
24        MR. WILLIAMS:  I'm going to instruct the witness

not to answer on attorney-client privilege and seeking a legal conclusion.

BY MR. BAUGHER:

Q. You didn't dissent from filing this 8-K in 2007, did you?

A. No, I did not.

Q. Now, at the end or towards the end of the statement under "Other Events," it says, "The Company believes it is in full compliance with any obligations it may have under the Agreement."

What obligations does the company have under the agreement as of December 31, 2007?

MR. WILLIAMS: I'm going to -- Invades the attorney-client privilege and work product doctrine. I'm going to instruct the witness not to answer.

BY MR. BAUGHER:

Q. That sentence continues that the company "expects to continue to have the right to use the SPSS trademark consistent with its past practices." Do you know what that means?

MR. WILLIAMS: Same objections; instruct the witness not to answer.

BY MR. BAUGHER:

Q. Is there any statement made in this 8-K that

suggests that the license agreement is not a valid and effective agreement as of December 31st, 2007?

MR. WILLIAMS: Objection, calls for opinion testimony, beyond the scope of the 30(b)(6).

If you can, answer that question without revealing attorney-client communications and work product with respect to the issues in this case.

BY THE WITNESS:

A. I don't know how I can. I don't know how I could answer that. This matter -- This document was thoroughly gone through with our outside counsel, so I don't know how I could answer that.

Q. Who drafted the 8-K?

A. I don't recall.

Q. Did you?

A. I did not.

Q. Did Erin McQuade?

A. I don't recall.

Q. Did Mayer, Brown?

A. I don't recall specifically. I was not involved in the specific drafting.

Q. Were you present in any discussions of the 8-K?

A. I don't recall.

Q. Do you know if there were any discussions of the 8-K whether or not you were in them or not?

A. I don't believe I was.

Q. Do you know what time frame this 8-K was considered? It's dated December 31st, 2007. Do you know when this was that discussions began about the 8-K?

A. I don't.

Q. Or a draft of an 8-K?

A. I don't specifically recall.

Q. Who made the decision to file this document?

A. The company did.

Q. But who?

A. I don't specifically know.

Q. Was it Ray Panza?

A. We talked about these matters internally and with our outside counsel. We came to a joint conclusion on what's appropriate.

Q. Who are the decision-makers on that?

A. For 8-K-related items it's Raymond Panza and Erin McQuade.

Q. What about Jack Noonan?

A. Jack Noonan is involved in decisions, but it's mainly those two that make the decisions.

Q. Now, the SPSS mark has been registered outside

the United States, correct?

A. That is correct.

Q. Do you know where or who prepared registrations for the SPSS trademark internationally?

A. It's been various law firms that have done that.

Q. Do you have records that would tell you which registrations the company has of the SPSS mark outside the United States?

A. Yes, we do.

Q. And where are those records kept? This is -- I'm talking about the international registrations.

A. Where are the international documentation kept?

Q. Yes.

A. In the same -- In the same -- Either the safe or that same file cabinet that I referred to before.

Q. So either the safe or the locked file cabinet?

A. Correct.

Q. And as far as you know, have all of those records concerning the registrations outside the United States been produced to your counsel for production in this suit?

A. Yes, I believe so.

1    MR. WILLIAMS:  I have no further questions.
2    MR. BAUGHER:  Good.  Thank you.
3    THE WITNESS:  Thank you.
4    MR. WILLIAMS:  We reserve signature.
5    THE COURT REPORTER:  Do you want a copy?
6    MR. WILLIAMS:  Yes.
7              (Witness excused.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

1    UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
2    EASTERN DIVISION                )  SS.
     STATE OF ILLINOIS               )
3    COUNTY OF COOK                  )
4         I, Monica Kim, Certified Shorthand Reporter,
5    Registered Professional Reporter, and Notary Public, do
6    hereby certify that ANTHONY CIRO was first duly sworn by
7    me to testify to the whole truth and that the above
8    deposition was reported stenographically by me and
9    reduced to typewriting under my personal direction.
10        I further certify that the said deposition was
11   taken at the time and place specified and that the
12   taking of said deposition commenced on the 30th day of
13   May, A.D., 2008, at 10:03 a.m.
14        I further certify that I am not a relative or
15   employee or attorney or counsel of any of the parties,
16   nor a relative or employee of such attorney or counsel,
17   nor financially interested directly or indirectly in
18   this action.
19
20
21
22
23
24

---

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2
3    SPSS Inc.,                      )
4         Plaintiff/Counterdefendant, )
                                     )
5         vs.                        )  Case No. 08 C 66
                                     )
6    Norman H. Nie and C. Hadlai Hull, )  Judge John W.
                                     )  Darrah
7         Defendants/Counterplaintiffs. )
                                     )  Magistrate Judge
8                                    )  Arlander Keys
9
10        I, ANTHONY CIRO state that I have read the
11   foregoing transcript of the testimony given by me at my
12   deposition on the 30th day of May, A.D., 2008, and that
13   said transcript constitutes a true and correct record of
14   the testimony given by me at said deposition except as I
15   have so indicated on the errata sheets provided herein.
16
17
18   _____
              ANTHONY CIRO
19
20
21   SUBSCRIBED AND SWORN to
     before me this _____ day
22   of _____, 2008.
23
24   _____
         NOTARY PUBLIC

---

1         In witness whereof, I have hereunto set my
2    hand and affixed my seal of office at Chicago, Illinois,
3    this 9th day of June, A.D., 2008.
4
5
6
7
8
9
                             _____
10                           MONICA KIM, CSR, RPR
                             205 West Randolph Street
11                           5th Floor
                             Chicago, Illinois  60606
12                           Phone:  (312) 236-6936
13
14
     CSR No.  084-004606
15
16
17
18
19
20
21
22
23
24

**Exhibit B**



# FORM 8-K

## SPSS INC - SPSS

**Filed: January 04, 2008 (period: January 03, 2008)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K - FORM 8-K

**ITEM 8.01**    OTHER EVENTS

**ITEM 9.01**    FINANCIAL STATEMENTS AND EXHIBITS

SIGNATURES
EX-99.1 (COMPLAINT FOR DECLARATORY JUDGMENT)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

FORM 8-K

Current Report Pursuant
to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of report (Date of earliest event reported) January 3, 2008

SPSS Inc.
(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 000-22194 | 36-2815480 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 233 South Wacker Drive, Chicago, Illinois | 60606 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

(312) 651-3000
(Registrant's Telephone Number, Including Area Code)

Not Applicable
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

ITEM 8.01 OTHER EVENTS

As previously reported in a Form 8-K filed by SPSS Inc. (the "Company") on December 31, 2007, Norman H. Nie, a former director of the Company, has recently informed the Company that, in his view, the Company's use of the SPSS trademark is subject to a License Agreement (the "Agreement") dated September 30, 1976 between a predecessor of the Company, as licensee, and Norman H. Nie and C. Hadlai Hull, as licensors.

On January 3, 2008, the Company filed a complaint for declaratory judgment in the U.S. District Court for the Northern District of Illinois against Dr. Nie and Mr. Hull. The complaint seeks a declaratory judgment that Dr. Nie and Mr. Hull are estopped from enforcing any rights under the Agreement and that the Company shall be deemed to have an irrevocable, assignable and exclusive license to use the SPSS trademark.

Regardless of the outcome of this action, the Company believes it is in full compliance with any obligations it may have under the Agreement and expects to continue to have the right to use the SPSS trademark consistent with its past practices. A copy of the complaint is attached to this report as Exhibit 99.1.

ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS

(d)  Exhibits.

99.1 Complaint for Declaratory Judgment

2

SIGNATURES

Source: SPSS INC, 8-K, January 04, 2008

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

SPSS Inc.

Dated: January 4, 2008

By: /s/ Raymond H. Panza
    -------------------------------------
    Raymond H. Panza
    Executive Vice President, Corporate
    Operations, Chief Financial Officer
    and Secretary

3

Exhibit 99.1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SPSS INC. | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION |
| | ) | NO. _____ |
| NORMAN H. NIE AND C. HADLAI HULL, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

COMPLAINT FOR DECLARATORY JUDGMENT

For its complaint, SPSS Inc. ("SPSS" or the "Company"), by and through its attorneys Mayer Brown LLP, alleges as follows:

THE PARTIES

1. Plaintiff SPSS is a leading worldwide provider of predictive analytics software and solutions. It is incorporated under the laws of the State of Delaware and its principal place of business is Chicago, Illinois.

2. Defendant Norman H. Nie ("Nie") was Chairman of the Board of Directors of SPSS. He resigned from SPSS's board of directors on January 3, 2008. He resides in California.

3. Defendant C. Hadlai (Tex) Hull ("Hull") is an employee of SPSS. He resides in Illinois.

VENUE AND JURISDICTION

4. Jurisdiction is proper in this court because this litigation arises under federal law, namely 17 U.S.C. Section 1051 et seq. (Lanham Act). The Court has jurisdiction over this action under 28 U.S.C. Section 1331 (federal question), 28 U.S.C. Section 1338(a) (trademarks), and 28 U.S.C. Section 2201 (Declaratory Judgment Act). In addition, to the extent that aspects of the claim are governed by

state law, jurisdiction is proper based on 28 U.S.C. Section 1367 (Supplemental Jurisdiction) because the state law claims are so related to the claims arising under federal law as to form part of the same case and/or controversy.

5. The Court has personal jurisdiction over defendant Nie because he regularly attends meetings of the Board of Directors of SPSS in this district and the subject matter of this suit arises from conduct of Nie and Hull that took place in this district. In addition, the Court has personal jurisdiction over defendant Hull because he resides in this district.

6. Venue is proper in this district under 28 U.S.C. Sections 1391(b) in that defendant Hull resides in this district and a substantial part of the events giving rise to the claim occurred in this district.

FACTS

7. SPSS uses the trademarks "SPSS" and "Statistical Package for the Social Sciences" (the "Trademarks") in its business. SPSS has brought this action for declaratory judgment because an actual, justiciable controversy of sufficient immediacy exists between it and defendants as to the parties' respective rights and obligations under a purported trademark license agreement. Defendants did not disclose the existence of the purported trademark license agreement to the other directors or officers of the Company or prospective shareholders at the time the Company became a public company in 1993 and did not assert any rights under the purported trademark license agreement from 1993 until very recently. Nevertheless, defendants are now claiming to have the right to control SPSS's product design, development, marketing and sales through the trademark license agreement and are threatening to terminate the license agreement, to the detriment of the Company, if the Company does not accede to their directions or pay them $20 million for their purported trademark rights. The Company is compelled to bring this action to

protect the business interests of the Company and to meet the expectations of its shareholders who reasonably understood, based upon defendants' conduct, as described below, that the Company would be managed by its duly elected directors and officers approved by the directors, and not the two defendants through the operation of an undisclosed trademark license agreement.

8. The Trademarks were initially used beginning in 1968 by a de facto partnership composed of Nie, Hull and an associate named Dale H. Bent ("Bent").

Source: SPSS INC, 8-K, January 04, 2008

The business of the partnership was the development of computer programs to perform statistical analysis. Bent left the business in 1969. On information and belief, Nie and Hull never used the Trademarks as individuals, but only as part of a business enterprise in which they were partners.

9. In January 1975, Nie and Hull continued their business by forming SPSS, Inc. an Illinois corporation. SPSS, Inc. immediately used the Trademarks in its business without a license from Nie or Hull.

10. At some time between August 1976 and September 1977, Nie and Hull arranged for the execution of a document that purported to be a license agreement between them as individual owners of the Trademarks and SPSS, Inc. as licensee, even though SPSS, Inc. had been using the Trademarks for nearly two years without any purported license. At the time the document was executed, Nie and Hull each owned 50% of the stock of SPSS, Inc. A copy of the purported license agreement is attached hereto as Exhibit 1.

11. On October 7, 1976, Nie and Hull applied for registration of the Trademarks with the U.S. Patent and Trademark Office ("PTO") and represented that "the applicants control, by written license, the nature and quality of the goods to which the mark is applied." The application was signed by Nie and Hull and was dated September 30, 1976.

12. The purported trademark license agreement was not approved by the Board of Directors of SPSS, Inc. until September 14, 1977. At that time, Nie and Hull each continued to own 50% of the stock of SPSS, Inc. The license agreement was placed in the files of SPSS, Inc. at some point during 1976 or 1977.

13. On April 11, 1978, based upon the representations made by Nie and Hull, the PTO granted registration of the Trademarks to Nie and Hull as individuals.

14. In May 1993, SPSS Inc., an Illinois corporation, was merged into R&H Delaware Shelf Corporation I, a Delaware corporation, and the surviving entity later changed its name to "SPSS Inc."

15. In August 1993, SPSS Inc. made an initial public offering of common stock ("IPO"). Immediately prior to the IPO, Nie beneficially owned 46% of the common stock of SPSS. Immediately after the IPO, Nie beneficially owned 31% of the Company's common stock. Nie was Chairman of the Board and a principal stockholder of the Company as of the IPO. As a director of SPSS, he signed the registration statement for the IPO, which included the prospectus.

16. The IPO prospectus states in pertinent part: "SPSS(R) and Categories(R) are registered trademarks of the Company." Also, in the prospectus there is a section entitled "Reliance on Third Parties," which purports to list all material license agreements in which the Company is licensee, and a section entitled "Transactions with Norman Nie," which lists material transactions and contracts between Nie and the Company. Neither of these sections of the prospectus discloses the existence of the purported trademark license agreement or describes its terms. Nie and Hull received millions of dollars from the proceeds of the IPO in payment of certain subordinated notes that Nie held through a trust and certain deferred royalties owing to Hull.

17. In December 1994, the Company made a follow-on public offering which included the sale of 300,000 shares of SPSS common stock beneficially owned by Nie. Like the prospectus for the IPO, the prospectus for the follow-on offering stated in pertinent part: "SPSS(R) and Categories(R) and SYSTAT(R) are registered trademarks of the Company." Also, as in the prospectus for the IPO, the prospectus for this offering included a section entitled "Reliance on Third Parties," which purports to list all material license agreements in which the Company is licensee, and a section entitled "Transactions with Norman Nie," which lists material transactions and contracts between Nie and the Company. Neither of these sections of the prospectus discloses the existence of the purported trademark license agreement or describes its terms. Nie was still Chairman of the Board and a principal shareholder of the Company at the time of the follow-on offering. Nie, as a director of SPSS, signed the registration statement for the follow-on offering which included the prospectus. Nie received millions of dollars of the proceeds of the follow-on offering.

18. Nie and Hull did not disclose to any director or officer of the Company at the time of the IPO or follow-on offering the existence of the purported license agreement or that they believed the license agreement conferred any substantial rights upon them or that they might exercise those rights in the future. At the time of these transactions, the attorney who represented the Company also represented Nie personally.

19. All foreign registrations of the Trademarks have been made in the name of the Company as owner. All trademark disputes with third parties involving the Trademarks have been addressed and resolved by the Company.

20. Nie and Hull never asserted any rights under the purported trademark license agreement from August 1993, when the Company first became a public company, to October 2007. On

October 9, 2007, Nie through his attorney, for the first time asserted that he had rights under the purported trademark license agreement. See copy of letter from Luther Orton to Jack Noonan, President and Chief Executive Officer of the Company, dated October 9, 2007, a copy of which is attached hereto as Exhibit 2.

21. Since October 9, 2007, Nie has made and continues to make a series of increasingly onerous demands for information and inspection and has threatened and continues to threaten to terminate the purported license agreement if his demands are not met or if he, in his sole discretion, is dissatisfied with any of the Company's products or uses of the Trademarks.

22. Responding to Nie's demands and threats have imposed and continue to impose significant costs on the Company and have delayed and continue to delay the delivery of products to customers. Customers have expressed dissatisfaction with the delay.

23. Nie and Hull's current interpretation of their rights under the purported license agreement gives them sole discretion to decide what products the Company will offer for sale and when products will be delivered. In essence, Nie and Hull are attempting to use the purported license agreement, and the threat to terminate it to the detriment of the Company, as a means to run the Company and/or to extract a payment of millions of dollars from the Company for the assignment of purported rights to the Trademarks. Defendants' conduct is continuing and presents an actual, justiciable controversy of sufficient immediacy to warrant a declaratory judgment as requested herein.

                          CLAIM FOR RELIEF

24. SPSS incorporates by reference the allegations contained in paragraphs 1 through 23, inclusive.


25. Defendants' misrepresentations, omissions and conduct deceived the Company with respect to the existence, meaning and enforceability of the purported trademark license agreement. The Company reasonably relied upon defendants' misrepresentations, omissions and conduct in deciding to invest millions of dollars into developing SPSS's business and becoming a public company. Defendants have benefited greatly from these investments and from SPSS becoming a public company. Among other things, the Company paid millions of dollars owed to the defendants using the proceeds of the transactions described above in paragraph 15, and Nie received millions of dollars from the proceeds of the transaction described above in paragraph 17 and defendants received millions of dollars from subsequent sales of the Company's stock. Complying with all of defendants' recently asserted demands under the purported trademark license agreement would deprive the Company's board of directors and management of the ability to control the design, development, marketing and sales of the Company's products and would cause significant damage to SPSS and its shareholders. Furthermore, if SPSS were unable to use the Trademarks, the Company would suffer substantial injury. Finally, it would injure the Company and be inequitable to pay defendants for the rights to use the Trademarks when defendants created the impression that the Trademarks could be used exclusively by the Company in perpetuity without the conditions they are now asserting.

26. Accordingly, Nie and Hull should be estopped from enforcing any rights under the purported trademark license agreement under the doctrines of estoppel, acquiescence and laches.

27. SPSS seeks a declaratory judgment from this Court that Nie and Hull are estopped from enforcing any rights under the purported trademark license agreement and that SPSS shall be deemed to have an irrevocable, assignable and exclusive license to use the Trademarks.

                          PRAYER FOR RELIEF


    WHEREFORE, SPSS respectfully requests that the Court enter judgment according to the declaratory relief sought; award SPSS its costs in this action and enter such other further relief to which SPSS may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

                          SPSS INC.


                          By: s/ Robert J. Kriss
                          -------------------------------------
                          One of Its Attorneys

Robert J. Kriss
Edward H. Williams
Thomas V. Panoff
Daniel K. Storino
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60601
Ph: 312-782-0600
Fx: 312-762-7711

Source: SPSS INC, 8-K, January 04, 2008

Created by 10KWizard    www.10KWizard.com

Source: SPSS INC, 8-K, January 04, 2008