IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SPSS Inc., <br><br> Plaintiff, <br><br> v. <br><br> Norman H. Nie and C. Hadlai Hull, <br><br> Defendants. <br><br>―――――――――――――――――― <br><br> Norman H. Nie, <br><br> Counterplaintiff, <br><br> v. <br><br> SPSS, Inc., <br><br> Counterdefendant. | Case No. 08 C 66 <br><br> Judge John W. Darrah <br><br> Magistrate Judge Arlander Keys <br><br><br><br> ***REDACTED*** |

**PLAINTIFF/COUNTERDEFENDANT SPSS INC.'S
OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL AND FOR RULE TO SHOW CAUSE**

Robert J. Kriss
Edward H. Williams
Thomas V. Panoff
Daniel K Storino
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

## INTRODUCTION

This case arises out of a claim made by a founder and former chairman of SPSS Inc.'s board of directors, defendant Norman H. Nie ("Nie"), that he has the unfettered power to control all aspects of SPSS Inc.'s marketing and product quality determinations by virtue of a 1976 trademark license agreement (the "License Agreement") (Mot., Ex. A). At the time the License Agreement was executed, SPSS, Inc. was a small company owned by Nie and defendant C. Hadlai Hull ("Hull"). Recent discovery has revealed that Nie and Hull never were the owners of the SPSS trademark ("Trademark"), and, as a result, have no infringement claim against the Company. The Trademark was owned by the corporate predecessors of SPSS, Inc. that developed and sold the SPSS software before SPSS, Inc. was incorporated. Nobody in the room when the License Agreement was signed in 1976—more than a year after the incorporation of SPSS—was looking out for the interests of SPSS, Inc.

In any event, when the Company made an initial public offering ("IPO") in 1993, Nie signed a registration statement that contained a prospectus representing that the SPSS trademark was "a registered Trademark of the Company," even though Nie has testified that he thought he was the owner of the Trademark at the time. The prospectus also purported to list all material license agreements upon which the Company relied. The License Agreement was not listed. The prospectus purported to list all material contracts between the Company and Nie. The License Agreement was not listed. Finally, Nie signed an underwriting agreement and personally represented and warranted that the Company had the right to use the Trademark and that such right could not be terminated without the Company's consent. Ex. A, Underwriting Agreement at 3 (§ 2(a)(vi)). This representation and warranty was a condition to the underwriters' obligation to go forward with the IPO. Ex. B, Certificate of Chairman. In short, at the time SPSS Inc. became a public company, and Nie received millions of dollars in payments

from the proceeds of the offering, Nie represented to the other directors of SPSS and investors that the Company controlled the use of its Trademark.

Nie has admitted at deposition that he did not attempt to enforce any rights as the owner of the Trademark or as a licensor under the License Agreement until October 2007. Ex. C, Nie Dep. at 16-18. At all times, the Company's board of directors and officers, acting in the best interests of the shareholders as required by law, made the decisions as to what types of products should be released to the public and when the products should be released. The Company was the sole judge of product quality.

Then in October 2007, after consulting a lawyer about the License Agreement, Nie decided that he would attempt to literally run the Company himself, as the supposed owner/licensor of the Trademark. He demanded reams of information about product development and warned the Company that he claimed to have the right to decide what types of products the Company would release to the public and when. Alternatively, he offered to assign his "rights" in the Trademark to the Company for $20 million. The License Agreement was royalty free. So after representing in the IPO that the Company controlled the use of its Trademark, and despite the fact that he never expected to make a penny based upon the License Agreement by its own terms, Nie was demanding $20 million to stop harassing the Company with his new Trademark claims.

The Company had no choice but seek a declaratory judgment that Nie had no right to terminate the Company's use of the Trademark. Corporate law required, and the shareholders expected, that product release decisions would be made by officers duly appointed by elected directors of the Company, not a former Chairman of the Company (Nie formally resigned from the Board on January 3, 2008). Moreover, it would be unfair to the Company and its

2

shareholders to pay Nie $20 million for trademark rights that he represented did not exist at the time of the IPO and that he never attempted to enforce until October 2007.

Nie is now attempting to use discovery as a sword to continue harassing the Company to compel a settlement. The Company asks the Court to protect it and its shareholders from the abusive tactics of a disgruntled former chairman who is looking for a $20 million windfall profit.

Although, as will be discussed below, none of the discovery Nie seeks in his motion is relevant to the issues raised by the complaint or counterclaim, the Company followed the Court's direction at the last status hearing and provided specifically identifiable, reasonably available information on each subject. See Ex. D, September 4, 2008 letter from E. Williams to W. Berndt. Nevertheless, Nie filed a motion seeking "all documents" on these various subjects or broad categories that would be very burdensome to produce. Since the subject areas for which Nie demands additional discovery have no relevance to these proceedings and, in any event, the Company has provided all the information that could reasonably be necessary to address those subjects, Nie's motion should be denied in its entirety and Nie should be required to pay the Company's costs in responding to this unnecessary motion.

## ARGUMENT

I.

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

3

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

II.

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

### III. SPSS HAS PRODUCED THE FINANCIAL DOCUMENTS SOUGHT BY NIE AND SHOULD NOT BE COMPELLED TO DESIGNATE A WITNESS ON RULE 30(B)(6) DEPOSITION TOPIC 3.

As discussed above, even if Nie were able to establish that he was entitled to monetary damages in the case (which he is not), at most, Nie would be entitled to disgorgement of some portion of the Company's profits or a reasonable royalty. Since all the Company's products use the Trademark, there is no need for the voluminous and burdensome information that Nie is seeking regarding profits by product. The Company's publicly available financial statements contain the information necessary to determine the profits of the Company.

---

[2]   SPSS has not been mysterious about its position on ownership of the Trademark. After the depositions of Nie, Hull and Bova, SPSS amended its answer to Interrogatory No. 1 to contend that Nie is not the owner of the Trademarks based on events that occurred in the 1970s. Ex. H.

7

Nevertheless, as the Court directed, SPSS compromised and agreed to produce certain presentations that were made to the Board that allocated some but not all costs to specific families of products. These documents were not prepared in accordance with GAAP and are not the product-by-product accounting information that Nie demanded. That type of information does not exist. At his deposition, Ray Panza, SPSS's Chief Financial Officer, explained that, on occasion, the SPSS Board had requested some information relating to cost allocation among SPSS's five product lines. Ex. I, Panza Dep. at 140. In response, management provided non-GAAP estimates of R&D cost allocations among SPSS's product lines. Panza Dep. at 142. Directly contrary to the claim made by Nie in his motion (at 7), Panza made it clear that SPSS tracks its profits "in accordance with GAAP" and that these documents could *not* be used to calculate "profitability . . . from an accounting standpoint" because it's "non-GAAP." Panza Dep. at 139, 142-43. During the meet-and-confer process reinitiated by Nie's counsel on September 2, SPSS agreed to produce these documents, which took the form of PowerPoint slides, and it produced them on September 4. Thus, there appears to be no real issue with respect to the document production.[3]

Nie also complains about SPSS's response to Topic 3 from his Rule 30(b)(6) notice. As the Court can see for itself, SPSS's response to the Rule 30(b)(6) request was clear and reasonable:

> **Topic 3:** Gross profit margins, operating profit margins, contribution margins and/or incremental profit margins for various "SPSS"-branded and non-branded products.
>
> **Response:** SPSS objects to this Matter for Examination on the grounds that the phrases "gross profit margins," "operating profit margins," "contribution margins," and "profit margins" are vague and ambiguous. SPSS further objects to this Matter for Examination

---

[3] In footnote 2 of his motion, Nie complains that SPSS did not agree to produce other slides presented to the SPSS Board at the same time as the slides relating to the cost allocations. Those slides are not responsive to any of Nie's document requests and therefore SPSS should not be compelled to produce them.

8

on the grounds that this Matter for Examination is overly broad, unduly burdensome, cumulative and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objection, SPSS states that it does not engage in segment accounting by product and therefore cannot designate a witness to testify on its behalf regarding "gross profit margins, operating profit margins, contribution margins and/or incremental profit margins" regarding each of its various products.

Mot., Ex. H. Nie claims this response was "misleading" because "SPSS does engage in internal segment accounting by product *family*." Mot. at 7 (emphasis original).[4] It is certainly true that the request for testimony regarding each of SPSS's products was one of the infirmities of Topic 3 as SPSS does not do any such calculations, compliant with GAAP accounting or otherwise, with respect to each product. But that infirmity was only one of the problems making it impossible for SPSS to designate a witness. As Panza explained, SPSS does *not* engage in GAAP segment accounting by product or product family at all. Panza Dep. at 140. The information presented to the Board is *not* an example of segment accounting; it is an example of non-GAAP partial cost allocations. *Id.* at 143. Further, the requests sought testimony that made a meaningless distinction between "'SPSS'-branded and non-branded products." As counsel has explained in discovery correspondence, all of the Company's products bear the SPSS Trademark. Ex. J (August 20, 2008 letter from T. Panoff to W. Berndt)

Nie issued a Rule 30(b)(6) deposition notice for the last business day before the discovery cutoff. After he served the notice, he was notified of numerous infirmities with Topic 3 that made it impossible for SPSS to designate a witness. He now wants this Court to order SPSS to designate a witness to testify about documents, which do not fall within the scope of Topic 3, that were only recently produced through no fault of SPSS. His request should be denied.

---

[4] Citing Holada's deposition, Nie also claims that SPSS "often creates summaries of the rate of return for various product lines." Mot. at 7 (citing Holada Dep. at 195-96). Holada was describing the same documents described by Panza that have been produced.

9

## IV. SPSS CONDUCTED REASONABLY DILIGENT SEARCHES AND TIMELY PRODUCED TRADEMARK DUE DILIGENCE DOCUMENTS.

Nie's assertion that SPSS has not been timely and thorough in producing documents regarding the trademark is baseless. SPSS diligently searched for documents spanning over 30 years (from 1975 to 2008) that were responsive to Nie's document requests and produced a wide variety of documents, including "due diligence" materials:

- Board minutes dating back to 1975
- Corporate filings with the State of Illinois and the SEC
- Applications and registrations with the PTO
- Foreign trademark applications and registrations
- The offering memorandum for the 2007 Merrill Lynch transaction.
- Detailed correspondence between counsel for Nie and SPSS regarding the License Agreement and the Trademark ownership issues
- Letters from SPSS's intellectual property counsel dating back to the 1970s and 1980s
- 1998 and 1999 loan agreements with American National Bank
- Internal SPSS emails discussing the Trademark and the License Agreement
- SPSS emails with Nie discussing the Trademark and License Agreement
- The entire two volumes of the 2003 financing with Foothill Capital Corporation, which discussed ownership of the Trademark

This list is only representative of what was produced by SPSS—it is not exhaustive—and its breadth demonstrates that SPSS conducted a diligent search despite Nie's vague, overly broad and unduly burdensome requests. Despite the flurry of depositions taking place in the last days of fact discovery, and in response to a specific request of Nie's counsel, SPSS conducted yet another review of its files and located and produced the email attached as Ex. J to Nie's motion.

Given this backdrop, which Nie conveniently omits from his motion, SPSS's production of the email on August 29 is hardly the nefarious scheme Nie claims it to be. From the very beginning of discovery, SPSS searched emails exchanged among SPSS employees who had involvement in trademark issues and the parties to the litigation. Nie's assertion that SPSS must not have fulfilled its obligation to conduct a diligent search because a single email that

10

referenced trademarks in general (it did not even specifically refer to the Trademark at issue in this case) was not captured in SPSS's initial searches should be rejected.[5]

Moreover, there is no need to reconvene Panza's deposition concerning this document. Nie's counsel had an opportunity to ask Panza about all representations made to Merrill Lynch regarding the Trademark and he answered those questions. Ex. I, Panza Dep. at 17-21, 27-32.

## V. SPSS COMPLIED WITH JUDGE KEYS' ORDER.

At the time of Judge Key's ruling on third party complaints, SPSS had not yet taken the depositions of Nie and Hull. Testimony from those depositions confirmed that third party complaints are irrelevant. As Nie and Hull admitted, they never established any quality standards pursuant to the License Agreement. Ex. C, Nie Dep. at 111-14; Ex. L, Hull Dep. at 8-9. Indeed, Nie claims in his Amended Counterclaim (Dkt. 34, ¶¶ 19, 32) that he "forgot" about the License Agreement from shortly after it was signed in 1976 until May 2007, thereby further acknowledging that he never established any standards of quality pursuant to the License Agreement (or otherwise). Since Nie never provided any quality standards pursuant to the License Agreement, this case cannot be about whether bugs in SPSS software caused the software not to meet the non-existent standards. Instead, as Nie confirmed at his deposition and in answers to interrogatories, the only violation of the License Agreement that Nie alleges constitutes a breach of that agreement and is the basis for his trademark infringement claims is that he had a right under the License Agreement to demand various types of information about product development and software bugs and the Company did not provide it. Ex C, Nie Dep. at 39-41. Accordingly, Nie's counterclaim boils down to whether he had a right to demand and the

---

[5] The same email attachment discussed in Nie's motion was produced two months *before* Panza's deposition on June 27, 2008 as part of Mayer Brown LLP's production in response to Nie's subpoena to the firm. Ex. K, MB 000007-000010.

11

Company had an obligation to provide the specific information that he demanded. The Company's position is that even if Nie had rights under the License Agreement (which he does not for reasons alleged in the complaint for declaratory judgment), the License Agreement only obligates the Company to make the product available for inspection (Mot., Ex. A, ¶ 5), which the Company did repeatedly. Nie never bothered to inspect the product. The License Agreement simply does not obligate the Company to provide the reams of information that Nie demanded. Indeed, when asked at his deposition to point to the language of the License Agreement that he thought gave him the right to all the information that he demanded, Nie could only defer to his counsel. He could not find any language himself. Ex. C, Nie Dep. at 40-41.

In any event, given Nie's narrow contentions, which were not known at the time of Judge Keys' order, complaints regarding the product have no relevance to this case. This is not a case about how "buggy" SPSS's software was. This is a case about whether Nie had a right to demand the voluminous information that was the subject of a series of letters his counsel sent the Company beginning in October 2007.

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

In the final analysis, Nie has resorted to using discovery as a weapon. As the Seventh Circuit has held, a court evaluating discovery requests must look to "the totality of the circumstances, weighing the value of the material sought against the burden of providing it." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (internal quotation omitted); *Lawrence E. Jaffee Pension Plan v. Household Intern Inc.*, 2006 WL 3445742, at *4-5 (N.D. Ill. Nov. 22, 2006) (same). Nie should not be allowed to further harass SPSS with irrelevant discovery that will only serve to inflict needless costs on SPSS. In fact, he should be ordered to pay SPSS's costs in opposing this motion pursuant to Fed. R. Civ. Pro. 37(a)(5)(B).

## CONCLUSION

For the foregoing reasons, Nie's motion to compel and for rule to show cause should be denied in its entirety. Furthermore, pursuant to Fed. R. Civ. Pro. 37(a)(5)(B), Nie should be ordered to pay SPSS's reasonable expenses in opposing the motion, including attorney's fees.

Dated: September 8, 2008

Respectfully submitted,

SPSS INC.

By: /s/ Edward H. Williams
One of its attorneys

Robert J. Kriss
Edward H. Williams
Thomas V. Panoff
Daniel K Storino
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

15

## CERTIFICATE OF SERVICE

I, Edward H. Williams, an attorney, hereby certify that on September 8, 2008, I caused a true and correct copy of **PLAINTIFF/COUNTERDEFENDANT SPSS INC.'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL AND FOR RULE TO SHOW CAUSE** to be filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following counsel who have registered for receipt of documents filed in this matter:

Peter V. Baugher
William B. Berndt
Jennifer A. Waters
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, Illinois 60606

Luther Orton
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, California 94104

/s/ Edward H. Williams
Edward H. Williams