# Exhibit A

# SPSS INC.

## 2,000,000 Shares

## Common Stock

## UNDERWRITING AGREEMENT

August 18, 1993

HAMBRECHT & QUIST INCORPORATED
VOLPE, WELTY & COMPANY
    c/o Hambrecht & Quist Incorporated
    One Bush Street
    San Francisco, CA 94104

Ladies and Gentlemen:

SPSS Inc., a Delaware corporation (herein called the Company), proposes to issue and sell 2,000,000 shares of its authorized but unissued Common Stock, $0.01 par value per share (herein called the Common Stock) (said 2,000,000 shares of Common Stock being herein called the Underwritten Stock). The Company and the stockholders of the Company named in Schedule II hereto (herein collectively called the Selling Securityholders) propose to grant to the Underwriters (as hereinafter defined) an option to purchase up to 300,000 additional shares of Common Stock of which the Company proposes to issue and sell 266,667 shares and the Selling Securityholders propose to sell an aggregate total of 33,333 shares (the aggregate total shares subject to said option being herein called the Option Stock and with the Underwritten Stock herein collectively called the Stock). The Common Stock is more fully described in the Registration Statement and the Prospectus hereinafter mentioned.

The Company and the Selling Securityholders severally hereby confirm the agreements made with respect to the purchase of the Stock by the several underwriters, for whom you are acting, named in Schedule I hereto (herein collectively called the Underwriters, which term shall also include any underwriter purchasing Stock pursuant to Section 3(b) hereof). You represent and warrant that you have been authorized by each of the other Underwriters to enter into this Agreement on its behalf and to act for it in the manner herein provided.

1.    Registration Statement. The Company has filed with the Securities and Exchange Commission (herein called the Commission) a registration statement on Form S-1 (No. 33-64732), including the related preliminary prospectus, for the registration under the Securities Act of 1933, as amended (herein called the Securities Act) of the Stock. Copies of such registration statement and of each amendment thereto, if any, including the related preliminary prospectus (meeting the requirements of Rule 430 of the rules and regulations of the Commission) heretofore filed by the Company with the Commission have been delivered to you.

The term Registration Statement as used in this agreement shall mean such registration statement, including all exhibits and financial statements and all information omitted therefrom in reliance upon Rule 430A and contained in the Prospectus referred to below, in the form in which it became effective and, in the event of any amendment thereto after the effective date of such registration statement (herein called the Effective Date), shall also mean (from and after the effectiveness of such amendment) such registration statement as so amended. The term Prospectus as used in this Agreement shall mean the prospectus relating to the Stock first filed with the Commission

MGW001846

pursuant to Rule 424(b) and Rule 430A (or if no such filing is required, as included in the Registration Statement) and, in the event of any supplement or amendment to such prospectus after the Effective Date, shall also mean (from and after the filing with the Commission of such supplement or of the effectiveness of such amendment) such prospectus as so supplemented or amended. The term Preliminary Prospectus as used in this Agreement shall mean each preliminary prospectus included in such registration statement prior to the time it becomes effective.

The Registration Statement has been declared effective under the Securities Act, and no post-effective amendment to the Registration Statement has been filed as of the date of this Agreement. The Company has caused to be delivered to you copies of each Preliminary Prospectus and has consented to the use of such copies for the purposes permitted by the Securities Act.

2.       Representations and Warranties of the Company and the Selling Securityholders.

(a)      Each of the Company and the Selling Securityholders hereby represents and warrants as follows:

(i)      Each of the Company and its subsidiaries has been duly incorporated and is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation, has full corporate power and authority to own or lease its properties and conduct its business as described in the Registration Statement and the Prospectus and as being conducted, and is duly qualified as a foreign corporation and in good standing in all jurisdictions in which the character of the property owned or leased or the nature of the business transacted by it makes qualification necessary (except where the failure to be so qualified would not reasonably be expected to have a material adverse effect on the business, properties, financial condition or results of operations of the Company and its subsidiaries, taken as a whole).

(ii)     Since the respective dates as of which information is given in the Registration Statement and the Prospectus, there has not been any materially adverse change in the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, other than as set forth in the Registration Statement and the Prospectus, and since such dates neither the Company nor any of its subsidiaries has engaged or agreed to engage in any material transaction not described in the Registration Statement and the Prospectus.

(iii)    The Registration Statement and the Prospectus comply, and on the Closing Date (as hereinafter defined) and any later date on which Option Stock is to be purchased, the Prospectus will comply, in all material respects, with the provisions of the Securities Act and the rules and regulations of the Commission thereunder; on the Effective Date, the Registration Statement did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading; and, on the Effective Date the Prospectus did not, and on the Closing Date and any later date on which Option Stock is to be purchased will not, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that none of the representations and warranties in this subparagraph (iii) shall apply to statements in, or omissions from, the Registration Statement or the Prospectus made in reliance upon and in conformity with information concerning the Underwriters set forth herein or otherwise furnished in writing to the Company by or on behalf of the Underwriters expressly for use in the Registration Statement or the Prospectus.

-2-

MGW001847

(iv)     The Stock is duly and validly authorized, is (or, in the case of shares of the Stock to be sold by the Company, will be, when issued and sold to the Underwriters as provided herein) duly and validly issued, fully paid and nonassessable and conforms to the description thereof in the Prospectus. No further approval or authority of the stockholders or the Board of Directors of the Company will be required for the transfer and sale of the Stock to be sold by the Selling Securityholders or the issuance and sale of the Stock by the Company as contemplated herein.

(v)     Neither the Company nor any of its subsidiaries is in violation of its certificate of incorporation or corporate charter or by-laws, or in default in the performance or observance of any provision of any obligation, agreement, covenant or condition contained in any bond, debenture, note or other evidence of indebtedness or in any contract, indenture, mortgage, loan agreement, joint venture or other agreement or instrument to which the Company or such subsidiary is a party or by which it or any of its properties may be bound which default, either singly or in the aggregate, would have a material adverse effect on the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole, nor, to the best of the Company's knowledge, is in material violation of any law, order, rule, regulation, writ, injunction or decree of any government, governmental instrumentality or court, domestic or foreign.

(vi)     The Company and each of its subsidiaries owns, or possesses adequate rights to use, all material patents, patent rights, inventions, trade secrets, know-how, proprietary techniques, including processes and substances, trademarks, service marks, trade names and copyrights described or referred to in the Prospectus as owned or used by it or which are necessary for the conduct of its business as described in the Prospectus, and no such rights as are material to the business and prospects of the Company and its subsidiaries, taken as a whole, expire or are subject to termination at the election of another party without the Company's consent at a time or under circumstances which would have a material adverse effect on the business, operation, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole. Neither the Company nor any of its subsidiaries has received any notice of infringement of or conflict with asserted rights of others with respect to any patents, patent rights, inventions, trade secrets, know-how, proprietary techniques, including processes and substances, trademarks, service marks, trade names or copyrights which, singly or in the aggregate, if the subject of any unfavorable decision, ruling or finding, would have a material adverse effect on the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole, as currently being conducted or as proposed to be conducted.

(vii)     This Agreement has been duly authorized, executed and delivered by the Company and is binding upon the Company in accordance with its terms; the performance of this Agreement and the consummation of the transactions herein contemplated will not result in a breach or violation of any of the terms and provisions of, or constitute a default under, (A) any indenture, mortgage, deed of trust, loan agreement, bond, debenture, note agreement or other evidence of indebtedness, lease, contract or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries or any of their respective properties are bound, (B) the certificate of incorporation or corporate charter or by-laws of the Company or any of its subsidiaries or (C) any statute or any order, rule or regulation of any court or (assuming due qualification of the Stock for public offering under state and foreign securities laws) governmental agency or body having jurisdiction over the Company or any of its subsidiaries or over any of their properties.

(viii)     Except as otherwise expressly disclosed in the Registration Statement, there is not any action, suit or proceeding, at law or in equity pending or, to the best knowledge of the Company, threatened, against the Company or any of its subsidiaries by a private litigant, by any federal, state or other commission, board or agency, or any proceeding before any administrative

-3-

MGW001848

agency, wherein any unfavorable result or decision could materially adversely affect the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries taken as a whole, or prevent consummation of the transactions contemplated hereby; and there are no contracts or documents of the Company or any of its subsidiaries which would be required by the Securities Act or by the rules and regulations of the Commission to be filed as exhibits to the Registration Statement which have not been filed as exhibits to the Registration Statement.

(ix)     All leases, contracts and agreements referred to in or filed as exhibits to the Registration Statement to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound are, except as otherwise set forth in the Registration Statement, in full force and effect. The Company and its subsidiaries enjoy peaceful and undisturbed possession under all such leases to which any of them is a party as lessee, subject only to such exceptions as do not materially interfere with the use made by the Company or such subsidiary of the leased premises.

(x)     The consolidated financial statements of the Company and its subsidiaries, together with related notes and schedules, and unaudited interim financial information, as set forth in the Registration Statement, present fairly the financial position and the results of operations of the Company and all of its subsidiaries consolidated, at the indicated dates and for the indicated periods. Such financial statements have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved, and all adjustments necessary for a fair presentation of results of operations for such periods have been made. The summary financial and statistical data included in the Registration Statement present fairly the information shown therein and have been compiled on a basis consistent with the financial statements presented therein.

(xi)     The Company and its subsidiaries have good and, with respect to real estate owned by the Company or its subsidiaries, marketable title to all of the properties and assets reflected in the financial statements (or as described in the Registration Statement) hereinabove described, subject to no lien, mortgage, pledge, charge or encumbrance of any kind except those reflected in such financial statements (or as described in the Registration Statement) or which are not material in amount and which would not otherwise have a material adverse effect on the condition, financial or otherwise, of the Company.

(xii)     The Company and its subsidiaries have filed all federal, state, local and foreign income and other tax returns which have been required to be filed (or have obtained any required extensions in connection therewith); all such returns are complete, accurate and correct in all material respects and the Company and its subsidiaries have paid all taxes indicated by said returns and all assessments received by them or any of them to the extent that such taxes have become due and are not being contested in good faith.

(xiii)     Each approval, consent, order, authorization, designation, declaration or filing by or with any United States regulatory, administrative or other governmental body necessary in connection with the execution and delivery by the Company of this Agreement and the consummation of the transactions herein contemplated (except (A) such additional steps as may be required by the National Association of Securities Dealers, Inc. (herein called the NASD), (B) such actions as may be necessary to qualify the Stock for public offering by the Underwriters under state securities laws and (C) filings required under Rule 424(b) or Rule 430A), has been obtained or made and is in full force and effect.

(xiv)     KPMG Peat Marwick, who have certified the financial statements, together with the related schedules and notes, of the Company and certain of its subsidiaries filed with the

-4-

Commission as part of the Registration Statement, are independent public accountants with respect to the Company as required by the Securities Act and the rules and regulations of the Commission.

(xv)    Neither the Company nor any of its subsidiaries is involved in any labor dispute which, either individually or in the aggregate, could have a material adverse effect on the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company or any of its subsidiaries, nor, to the knowledge of the Company, is any such dispute threatened.

(xvi)    The Company has filed a registration statement pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (herein called the Exchange Act) to register the Common Stock, has filed an application for inclusion of the Stock on the National Market System of the NASD Automated Quotation System (herein called the NASDAQ), and has received notification that such inclusion has been approved, subject to notice of issuance of the Stock.

(xvii)    Except as otherwise set forth in the Registration Statement and the Prospectus, neither the Company nor any of its subsidiaries has, to the best of the Company's knowledge, violated any environmental, safety or similar law applicable to its business, nor any federal, state or foreign law relating to discrimination in the hiring, promotion or pay of employees, nor any applicable federal, state or foreign wages and hours laws, nor any provisions of the Employee Retirement Income Security Act or the rules and regulations promulgated thereunder (or any similar applicable foreign laws, rules or regulations), which in each case might result in any material adverse change in the business, prospects, financial condition or results of operation of the Company and its subsidiaries, taken as a whole.

(xviii)    The Company and each of its subsidiaries maintains reasonably adequate insurance.

(b)    Each of the Selling Securityholders (and, with respect to Section 2(b)(iii) only, Norman H. Nie) hereby represents and warrants as follows:

(i)    Such Selling Securityholder has good and marketable title to all the shares of Stock to be sold by such Selling Securityholder hereunder, free and clear of all liens, encumbrances, equities, security interests and claims whatsoever, with full right and authority to deliver the same hereunder, subject, in the case of each Selling Securityholder, to the rights of Ross & Hardies, as Custodian (herein called the Custodian), and upon the delivery of and payment for such shares of the Stock hereunder, the several Underwriters will receive good and marketable title thereto, free and clear of all liens, encumbrances, equities, security interests and claims whatsoever.

(ii)    Certificates in negotiable form for the shares of the Stock to be sold by such Selling Securityholder have been placed in custody under a Custody Agreement with the Custodian for delivery under this Agreement; such Selling Securityholder specifically agrees that the shares of the Stock represented by the certificates so held in custody for such Selling Securityholder are subject to the interests of the several Underwriters and the Company, that the arrangements made by such Selling Securityholder for such custody, including the Power of Attorney provided for in such Custody Agreement, are to that extent irrevocable, and that the obligations of such Selling Securityholder shall not be terminated by any act of such Selling Securityholder or by operation of law, whether by the death or incapacity of such Selling Securityholder (or, in the case of a Selling Securityholder that is not an individual, the dissolution or liquidation of such Selling Securityholder) or the occurrence of any other event; if any such death, incapacity, dissolution, liquidation or other such event should occur before the delivery of such shares of the Stock hereunder, certificates for such shares of the Stock shall be delivered by the Custodian in accordance with the terms and conditions of this Agreement as if

MGW001850

such death, incapacity, dissolution, liquidation or other event had not occurred, regardless of whether the Custodian shall have received notice of such death, incapacity, dissolution, liquidation or other event.

      (iii)     Such Selling Securityholder (or Norman H. Nie, as the case may be) has reviewed the Registration Statement and Prospectus and, although such Selling Securityholder (or Norman H. Nie, as the case may be) has not independently verified the accuracy or completeness of all the information contained therein, nothing has come to the attention of such Selling Securityholder (or Norman H. Nie, as the case may be) that would lead such Selling Securityholder (or Norman H. Nie, as the case may be) to believe that on the Effective Date, the Registration Statement contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading; or that, on the Effective Date the Prospectus contained or, on any later date on which Option Stock is to be purchased, contains any untrue statement of a material fact or omitted or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

    3.     Purchase of the Stock by the Underwriters.

    (a)     On the basis of the representations and warranties and subject to the terms and conditions herein set forth, the Company agrees to issue and sell the 2,000,000 shares comprising the Underwritten Stock to the several Underwriters, and each of the Underwriters agrees to purchase from the Company the respective aggregate number of shares of Underwritten Stock set forth opposite its name in Schedule I. The price at which such shares of Underwritten Stock shall be sold by the Company and purchased by the several Underwriters shall be $7.44 per share. The obligation of each Underwriter to the Company shall be to purchase from the Company that number of shares of the Underwritten Stock which represents the same proportion of the total number of shares of the Underwritten Stock to be sold by the Company pursuant to this Agreement as the number of shares of the Underwritten Stock set forth opposite the name of such Underwriter in Schedule I hereto represents of the total number of shares of the Underwritten Stock to be purchased by all Underwriters pursuant to this Agreement, as adjusted by you in such manner as you deem advisable to avoid fractional shares. In making this Agreement, each Underwriter is contracting severally and not jointly; except as provided in paragraphs (b) and (c) of this Section 3, the agreement of each Underwriter is to purchase only the respective number of shares of the Underwritten Stock specified in Schedule I.

    (b)     If for any reason one or more of the Underwriters shall fail or refuse (otherwise than for a reason sufficient to justify the termination of this Agreement under the provisions of Section 8 or 9 hereof) to purchase and pay for the number of shares and portion of the Stock agreed to be purchased by such Underwriter or Underwriters, the Company or the Selling Securityholders shall immediately give notice thereof to you, and the non-defaulting Underwriters shall have the right within 24 hours after the receipt by you of such notice to purchase, or procure one or more other Underwriters to purchase, in such proportions as may be agreed upon between you and such purchasing Underwriter or Underwriters and upon the terms herein set forth, all or any part of the shares of the Stock which such defaulting Underwriter or Underwriters agreed to purchase. If the non-defaulting Underwriters fail so to make such arrangements with respect to all such shares and portion, the number of shares of the Stock which each non-defaulting Underwriter is otherwise obligated to purchase under this Agreement shall be automatically increased on a pro rata basis to absorb the remaining shares and portion which the defaulting Underwriter or Underwriters agreed to purchase; provided, however, that the non-defaulting Underwriters shall not be obligated to purchase the shares and portion which the defaulting Underwriter or Underwriters agreed to purchase if the

MGW001851

aggregate number of such shares of the Stock exceeds 10% of the total number of shares of the Stock which all Underwriters agreed to purchase hereunder. If the total number of shares of the Stock which the defaulting Underwriter or Underwriters agreed to purchase shall not be purchased or absorbed in accordance with the two preceding sentences, the Company and the Selling Securityholders shall have the right, within 24 hours next succeeding the 24-hour period above referred to, to make arrangements with other underwriters or purchasers satisfactory to you for purchase of such shares and portion on the terms herein set forth. In any such case, either you or the Company and the Selling Securityholders shall have the right to postpone the Closing Date determined as provided in Section 5 hereof for not more than seven business days after the date originally fixed as the Closing Date pursuant to said Section 5 in order that any necessary changes in the Registration Statement, the Prospectus or any other documents or arrangements may be made. If neither the non-defaulting Underwriters nor the Company and the Selling Securityholders shall make arrangements within the 24-hour periods stated above for the purchase of all the shares of the Stock which the defaulting Underwriter or Underwriters agreed to purchase hereunder, this Agreement shall be terminated without further act or deed and without any liability on the part of the Company or the Selling Securityholders to any non-defaulting Underwriter and without any liability on the part of any non-defaulting Underwriter to the Company or the Selling Securityholders. Nothing in this paragraph (b), and no action taken hereunder, shall relieve any defaulting Underwriter from liability in respect of any default of such Underwriter under this Agreement.

(c)    On the basis of the representations, warranties and covenants herein contained, and subject to the terms and conditions herein set forth, the Company and the Selling Securityholders hereby grant an option to the several Underwriters to purchase, severally and not jointly, up to 300,000 shares in the aggregate of the Option Stock of which 266,667 shares shall be issued and sold by the Company (herein called the Company Option Shares) and an aggregate total of 33,333 shares shall be sold by the respective Selling Securityholders (herein called the Securityholders Option Shares), in each case at the same price per share as the Underwriters shall pay for the Underwritten Stock. Said option may be exercised only to cover over-allotments in the sale of the Underwritten Stock by the Underwriters and may be exercised in whole or in part at any time (but not more than once) on or before the thirtieth day after the date of this Agreement upon written or telegraphic notice by you to the Company and the Custodian setting forth the aggregate number of shares of the Option Stock as to which the several Underwriters are exercising the option. None of the Company Option shares may be purchased hereunder unless all of the Securityholders Option Shares are purchased and, in the event the option is exercised with respect to less than all of the Securityholders Option Shares the shares purchased pursuant to such exercise shall be taken pro rata, as adjusted by you in such manner as you deem advisable to avoid fractional shares, from the respective Selling Securityholders, based upon the respective proportions of the total Securityholders Option Shares represented by the respective amounts of the Securityholders Option Shares set forth opposite their names in Schedule II hereto. Delivery of certificates for the shares of Option Stock, and payment therefor, shall be made as provided in Section 5 hereof. The number of shares of the Option Stock to be purchased by each Underwriter shall be the same percentage of the total number of shares of the Option Stock to be purchased by the several Underwriters as such Underwriter is purchasing of the Underwritten Stock, as adjusted by you in such manner as you deem advisable to avoid fractional shares.

4.    Offering by Underwriters.

(a)    The terms of the initial public offering by the Underwriters of the Stock to be purchased by them shall be as set forth in the Prospectus. The Underwriters may from time to time change the public offering price after the closing of the initial public offering and increase or decrease the concessions and discounts to dealers as they may determine.

-7-

MGW001852

(b)     The information set forth in the last paragraph on the front cover page and under "Underwriting" in the Registration Statement, any Preliminary Prospectus and the Prospectus relating to the Stock filed by the Company (insofar as such information relates to the Underwriters) constitutes the only information furnished by the Underwriters to the Company for inclusion in the Registration Statement, any Preliminary Prospectus, and the Prospectus, and you on behalf of the respective Underwriters represent and warrant to the Company that the statements made therein are correct.

5.     Delivery of and Payment for the Stock.

(a)     Delivery of certificates for the shares of the Underwritten Stock and the Option Stock (if the option granted in Section 3(c) hereof shall have been exercised not later than 7:00 a.m., San Francisco time, on the date two business days preceding the Closing Date), and payment therefor, shall be made at the office of Ross & Hardies, 150 North Michigan Avenue, Chicago, Illinois, at 9:00 a.m., Chicago time, on the fifth business day after the date of this Agreement, or at such time on such other day, not later than seven full business days after such fifth business day, as shall be agreed upon in writing by the Company, the Selling Securityholders (if the option granted in Section 3(c) hereof shall have been so exercised) and you.  The date and hour of such delivery and payment (which may be postponed as provided in Section 3(b) hereof) are herein called the Closing Date.

(b)     If the option granted by Section 3(c) hereof shall be exercised after 7:00 a.m., San Francisco time, on the date two business days preceding the Closing Date, delivery of certificates for the shares of Option Stock, and payment therefor, shall be made at the office of Ross & Hardies, 150 North Michigan Avenue, Chicago, Illinois, at 9:00 a.m., Chicago time, on the third business day after the date on which such exercise occurs.

(c)     Payment for the Stock purchased from the Company shall be made to the Company or its order, and payment for the Stock purchased from the Selling Securityholders shall be made to the Custodian, for the account of the Selling Securityholders, in each case by one or more certified or official bank check or checks payable in next day funds (and the Company and the Selling Securityholders agree not to deposit any such check in the bank on which it is drawn until the day following the date of its delivery to the Company or the Custodian, as the case may be).  Such payment shall be made upon delivery of certificates for the Stock to you for the respective accounts of the several Underwriters against receipt therefor signed by you.  Certificates for the Stock to be delivered to you shall be registered in such name or names and shall be in such denominations as you may request at least three business days before the Closing Date, in the case of Underwritten Stock, and at least one business day prior to the purchase thereof, in the case of the Option Stock.  Such certificates will be made available to the Underwriters for inspection, checking and packaging at the offices of Lewco Securities Corporation, 2 Broadway, New York, New York 10004 not less than one full business day prior to the Closing Date or, in the case of the Option Stock, by 3:00 p.m., New York time, on the business day preceding the date of purchase.

It is understood that you, individually and not on behalf of the Underwriters, may (but shall not be obligated to) make payment to the Company and the Selling Securityholders for shares to be purchased by any Underwriter whose check shall not have been received by you on the Closing Date or any later date on which Option Stock is purchased for the account of such Underwriter.  Any such payment by you shall not relieve such Underwriter from any of its obligations hereunder.

6.     Further Agreements of the Company and the Selling Securityholders.  Each of the Company and the Selling Securityholders respectively covenants and agrees as follows:

(a)     The Company will (i) prepare and timely file with the Commission under Rule 424(b) a Prospectus containing information previously omitted at the time of effectiveness of the Registration

-8-


Statement in reliance on Rule 430A and (ii) not file any amendment to the Registration Statement or supplement to the Prospectus of which you shall not previously have been advised and furnished with a copy or to which you shall have reasonably objected in writing or which is not in compliance with the Securities Act or the rules and regulations of the Commission.

(b)    The Company will promptly notify each Underwriter in the event of (i) request by the Commission for an amendment of the Registration Statement or for a supplement to the Prospectus or for any additional information, (ii) issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement, (iii) institution or notice of intended institution of any action or proceeding for that purpose, (iv) receipt by the Company of any notification with respect to the suspension of the qualification of the Stock for sale in any jurisdiction, or (v) receipt by the Company of any notice of the initiation or threat of any proceeding for such purpose. The Company and the Selling Securityholders will make every reasonable effort to prevent the issuance of such a stop order and, if such an order shall at any time be issued, to obtain the withdrawal thereof at the earliest possible moment.

(c)    The Company will (i) on or before the Closing Date, deliver to you a signed copy of the Registration Statement as originally filed with the Commission and of each amendment thereto filed with the Commission prior to the time the Registration Statement becomes effective and, promptly upon the filing thereof with the Commission, a signed copy of each post-effective amendment, if any, to the Registration Statement (together with, in each case, all exhibits thereto unless previously furnished to you) and will also deliver to you, for distribution to the Underwriters, a sufficient number of additional conformed copies of each of the foregoing (but without exhibits) so that one copy of each may be distributed to each Underwriter, (ii) as promptly as possible deliver to you and send to the several Underwriters, at such office or offices as you may designate, as many copies of the Prospectus as you may reasonably request, and (iii) thereafter from time to time during the period in which a prospectus is required by law to be delivered by an Underwriter or dealer, likewise send to the Underwriters as many additional copies of the Prospectus and as many copies of any supplement to the Prospectus and of any amended prospectus, filed by the Company with the Commission, as you may reasonably request for the purposes contemplated by the Securities Act.

(d)    If at any time during the period in which a prospectus is required by law to be delivered by an Underwriter or dealer any event relating to or affecting the Company, or of which the Company shall be advised in writing by you, shall occur as a result of which it is necessary, in the opinion of counsel for the Company or of counsel for the Underwriters, to supplement or amend the Prospectus in order to make the Prospectus not misleading in the light of the circumstances existing at the time it is delivered to a purchaser of the Stock, the Company will forthwith prepare and file with the Commission a supplement to the Prospectus or an amended prospectus so that the Prospectus as so supplemented or amended will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances existing at the time such Prospectus is delivered to such purchaser, not misleading. If, after the initial public offering of the Stock by the Underwriters and during such period, the Underwriters shall propose to vary the terms of offering thereof by reason of changes in general market conditions or otherwise, you will advise the Company in writing of the proposed variation, and, if in the opinion either of counsel for the Company or of counsel for the Underwriters such proposed variation requires that the Prospectus be supplemented or amended, the Company will forthwith prepare and file with the Commission a supplement to the Prospectus or an amended prospectus setting forth such variation. The Company authorizes the Underwriters and all dealers to whom any of the Stock may be sold by the several Underwriters to use the Prospectus, as from time to time supplemented or amended, in connection with the sale of the Stock in accordance with the applicable provisions of the Securities Act and the applicable rules and regulations thereunder for such period.

-9-

MGW001854

(e)    Prior to the filing thereof with the Commission, the Company will submit to you, for your information, a copy of any post-effective amendment to the Registration Statement and any supplement to the Prospectus or any amended prospectus proposed to be filed.

(f)    The Company will cooperate, when and as requested by you, in the qualification of the Stock for offer and sale under the securities or blue sky laws of such jurisdictions as you may designate and, during the period in which a prospectus is required by law to be delivered by an Underwriter or dealer, in keeping such qualifications in good standing under said securities or blue sky laws; provided, however, that the Company shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation in any jurisdiction in which it is not so qualified. The Company will, from time to time, prepare and file such statements, reports, and other documents as are or may be required to continue such qualifications in effect for so long a period as you may reasonably request for distribution of the Stock.

(g)    During a period of five years commencing with the date hereof, the Company will furnish to you, and to each Underwriter who may so request in writing, copies of all periodic and special reports furnished to stockholders of the Company and of all information, documents and reports filed with the Commission (including the Report on Form SR required by Rule 463 under the Securities Act).

(h)    Not later than the 45th day following the end of the fiscal quarter first occurring after the first anniversary of the Effective Date, the Company will make generally available to its security holders an earnings statement in accordance with Section 11(a) of the Securities Act and Rule 158 thereunder.

(i)    The Company and the Selling Securityholders jointly and severally agree to pay all costs and expenses incident to the performance of their obligations under this Agreement, including all costs and expenses incident to (i) the preparation, printing and filing with the Commission and the NASD of the Registration Statement, any Preliminary Prospectus and the Prospectus, (ii) the furnishing to the Underwriters of copies of any Preliminary Prospectus and of the several documents required by paragraph (c) of this Section 6 to be so furnished, (iii) the printing of this Agreement and related documents delivered to the Underwriters, (iv) the preparation, printing and filing of all supplements and amendments to the Prospectus referred to in paragraph (d) of this Section 6, (v) the furnishing to you and the Underwriters of the reports and information referred to in paragraph (g) of this Section 6 and (vi) the printing and issuance of stock certificates, including the transfer agent's fees. The Selling Securityholders will pay any transfer taxes incident to the transfer to the Underwriters of the shares of Stock being sold by the Selling Securityholders.

(j)    The Company and the Selling Securityholders jointly and severally agree to reimburse you, for the account of the several Underwriters, for blue sky fees and related disbursements (including counsel fees and disbursements and cost of printing memoranda for the Underwriters) paid by or for the account of the Underwriters or their counsel in qualifying the Stock under state securities or blue sky laws and in the review of the offering by the NASD.

(k)    The provisions of paragraphs (i) and (j) of this Section are intended to relieve the Underwriters from the payment of the expenses and costs which the Company and the Selling Securityholders hereby agree to pay and shall not affect any agreement which the Company and the Selling Securityholders may make, or may have made, for the sharing of any such expenses and costs.

(l)    The Company agrees that, without the prior written consent of Hambrecht & Quist Incorporated, the Company will not, directly or indirectly, sell, offer, contract to sell, make any short sale, pledge or otherwise dispose of any shares of Common Stock or any securities convertible into or

-10-

MGW001855

exchangeable or exercisable for or any rights to purchase or acquire Common Stock for a period of 180 days following the date of the Prospectus first filed with the Commission, other than (i) the Stock to be sold by the Company to the Underwriters pursuant to this Agreement, (ii) shares of Common Stock issued upon the exercise of options heretofore granted under the stock option plans of the Company (the "Option Plans"), all as described in the Preliminary Prospectus, and (iii) options to purchase Common Stock hereafter granted under the Option Plans.  For purposes of this paragraph (l) a sale, offer, or other disposition shall be deemed to include any sale to an institution which can, following such sale, sell Common Stock to the public in reliance on Rule 144A.

(m)     The Selling Securityholders agree that, without the prior written consent of Hambrecht & Quist Incorporated, the Selling Securityholders will not, directly or indirectly, sell, offer, contract to sell, make any short sale, pledge or otherwise dispose of any shares of Common Stock or any securities convertible into or exchangeable or exercisable for or any rights to purchase or acquire Common Stock for a period of 180 days following the date of the Prospectus first filed with the Commission.

(n)     If at any time during the 25-day period after the Registration Statement becomes effective any rumor, publication or event relating to or affecting the Company shall occur as a result of which in your opinion the market price for the Stock has been or is likely to be materially affected (regardless of whether such rumor, publication or event necessitates a supplement to or amendment of the Prospectus), the Company will, after written notice from you advising the Company to the effect set forth above, forthwith prepare, consult with you concerning the substance of, and disseminate a press release or other public statement, reasonably satisfactory to you, responding to or commenting on such rumor, publication or event.

7.     Indemnification and Contribution.

(a)     Subject to the provisions of paragraph (f) of this Section 7, the Company and the Selling Securityholders (and, with respect to any breach of his representations set forth in Section 2(b)(iii) only, Norman H. Nie) jointly and severally agree to indemnify and hold harmless each Underwriter and each person (including each partner or officer thereof) who controls any Underwriter within the meaning of Section 15 of the Securities Act from and against any and all losses, claims, damages or liabilities, joint or several, to which such indemnified parties or any of them may become subject under the Securities Act, the Securities Exchange Act of 1934, as amended (herein called the Exchange Act), or the common law or otherwise, and the Company and the Selling Securityholders (and, with respect to any breach of his representations set forth in Section 2(b)(iii) only, Norman H. Nie) jointly and severally agree to reimburse each such Underwriter and controlling person for any legal or other expenses (including, except as otherwise hereinafter provided, reasonable fees and disbursements of counsel) incurred by the respective indemnified parties in connection with defending against any such losses, claims, damages or liabilities or in connection with any investigation or inquiry of, or other proceeding which may be brought against, the respective indemnified parties, in each case arising out of or based upon (i) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement (including the Prospectus as part thereof) or any posteffective amendment thereto, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) any untrue statement or alleged untrue statement of a material fact contained in any Preliminary Prospectus or the Prospectus (as amended or as supplemented if the Company shall have filed with the Commission any amendment thereof or supplement thereto) or the omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that (1) the indemnity agreements of the Company and the Selling Securityholders (and, to the extent applicable, Norman H. Nie) contained in this paragraph (a) shall not apply to any such losses, claims, damages, liabilities or expenses if such

-11-

MGW001856

statement or omission was made in reliance upon and in conformity with information furnished as herein stated or otherwise furnished in writing to the Company by or on behalf of any Underwriter expressly for use in any Preliminary Prospectus or the Registration Statement or the Prospectus or any such amendment thereof or supplement thereto, (2) the indemnity agreement contained in this paragraph (a) with respect to any Preliminary Prospectus shall not inure to the benefit of any Underwriter from whom the person asserting any such losses, claims, damages, liabilities or expenses purchased the Stock which is the subject thereof (or to the benefit of any person controlling such Underwriter) if at or prior to the written confirmation of the sale of such Stock a copy of the Prospectus (or the Prospectus as amended or supplemented) was not sent or delivered to such person and the untrue statement or omission of a material fact contained in such Preliminary Prospectus was corrected in the Prospectus (or the Prospectus as amended or supplemented) unless the failure is the result of noncompliance by the Company with paragraph (c) of Section 6 hereof, and (3) each Selling Securityholder (and, to the extent applicable, Norman H. Nie) shall only be liable under this paragraph with respect to (A) information pertaining to such Selling Securityholder (or, to the extent applicable, Norman H. Nie) furnished by or on behalf of such Selling Securityholder (or, to the extent applicable, Norman H. Nie) expressly for use in any Preliminary Prospectus or the Registration Statement or the Prospectus or any such amendment thereof or supplement thereto or (B) facts that would constitute a breach of any representation or warranty of such Selling Securityholder (or, to the extent applicable, Norman H. Nie) set forth in Section 2 hereof. The indemnity agreements of the Company and the Selling Securityholders (and, to the extent applicable, Norman H. Nie) contained in this paragraph (a) and the representations and warranties of the Company and the Selling Securityholders (and, to the extent applicable, Norman H. Nie) contained in Section 2 hereof shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any indemnified party and shall survive the delivery of and payment for the Stock.

(b)     Each Underwriter severally agrees to indemnify and hold harmless the Company, each of its officers who signs the Registration Statement on his own behalf or pursuant to a power of attorney, each of its directors, each other Underwriter and each person (including each partner or officer thereof) who controls the Company or any such other Underwriter within the meaning of Section 15 of the Securities Act, and the Selling Securityholders from and against any and all losses, claims, damages or liabilities, joint or several, to which such indemnified parties or any of them may become subject under the Securities Act, the Exchange Act, or the common law or otherwise and to reimburse each of them for any legal or other expenses (including, except as otherwise hereinafter provided, reasonable fees and disbursements of counsel) incurred by such indemnified party in connection with defending against any such losses, claims, damages or liabilities or in connection with any investigation or inquiry of, or other proceeding which may be brought against, such indemnified party, in each case arising out of or based upon (i) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement (including the Prospectus as part thereof) or any posteffective amendment thereto or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading or (ii) any untrue statement or alleged untrue statement of a material fact contained in the Prospectus (as amended or as supplemented if the Company shall have filed with the Commission any amendment thereof or supplement thereto) or the omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case if, but only if, such statement or omission was made in reliance upon and in conformity with information furnished as herein stated or otherwise furnished in writing to the Company by or on behalf of such indemnifying Underwriter expressly for use in the Registration Statement or the Prospectus or any such amendment thereof or supplement thereto. The indemnity agreement of each Underwriter contained in this paragraph (b) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any such indemnified party and shall survive the delivery of and payment for the Stock.

-12-

MGW001857

(c)      Each party indemnified under the provision of paragraphs (a) and (b) of this Section 7 agrees that, upon the service of a summons or other initial legal process upon it in any action or suit instituted against it or upon its receipt of written notification of the commencement of any investigation or inquiry of, or proceeding against, it in respect of which indemnity may be sought on account of any indemnity agreement contained in such paragraphs, it will promptly give written notice (herein called the Notice) of such service or notification to the party or parties from whom indemnification may be sought hereunder.  No indemnification provided for in such paragraphs shall be available to any party who shall fail so to give the Notice if the party to whom such Notice was not given was not otherwise aware of the action, suit, investigation, inquiry or proceeding to which the Notice would have related and was prejudiced by the failure to give the Notice, but the omission so to notify such indemnifying party or parties of any such service or notification shall not relieve such indemnifying party or parties from any liability which it or they may have to the indemnified party for contribution or otherwise than on account of such indemnity agreement.  Any indemnifying party shall be entitled at its own expense to participate in the defense of any action, suit or proceeding against, or investigation or inquiry of, an indemnified party.  Any indemnifying party shall be entitled, if it so elects within a reasonable time after receipt of the Notice by giving written notice (herein called the Notice of Defense) to the indemnified party, to assume (alone or in conjunction with any other indemnifying party or parties) the entire defense of such action, suit, investigation, inquiry or proceeding, in which event such defense shall be conducted, at the expense of the indemnifying party or parties, by counsel chosen by such indemnifying party or parties and reasonably satisfactory to the indemnified party or parties; provided, however, that (i) if the indemnified party or parties reasonably determine that there may be a conflict between the positions of the indemnifying party or parties and the positions of the indemnified party or parties in conducting the defense of such action, suit, investigation, inquiry or proceeding or that there may be legal defenses available to such indemnified party or parties different from or in addition to those available to the indemnifying party or parties, then counsel for the indemnified party or parties shall be entitled to conduct the defense to the extent reasonably determined by such counsel to be necessary to protect the interests of the indemnified party or parties and (ii) in any event, the indemnified party or parties shall be entitled to have counsel chosen by such indemnified party or parties participate in, but not conduct, the defense.  If, within a reasonable time after receipt of the Notice, an indemnifying party gives a Notice of Defense and the counsel chosen by the indemnifying party or parties is reasonably satisfactory to the indemnified party or parties, the indemnifying party or parties will not be liable under paragraphs (a) through (c) of this Section 7 for any legal or other expenses subsequently incurred by the indemnified party or parties in connection with the defense of the action, suit, investigation, inquiry or proceeding, except that (A) the indemnifying party or parties shall bear the legal and other expenses incurred in connection with the conduct of the defense as referred to in clause (i) of the proviso to the preceding sentence and (B) the indemnifying party or parties shall bear such other expenses as it or they have authorized to be incurred by the indemnified party or parties.  If, within a reasonable time after receipt of the Notice, no Notice of Defense has been given, the indemnifying party or parties shall be responsible for all legal and other expenses incurred by the indemnified party or parties in connection with the defense of the action, suit, investigation, inquiry or proceeding.

(d)      If the indemnification provided for in this Section 7 is unavailable or insufficient to hold harmless an indemnified party under paragraph (a) or (b) of this Section 7, then each indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of the losses, claims, damages or liabilities referred to in paragraph (a) or (b) of this Section 7: (i) in such proportion as is appropriate to reflect the relative benefits received by each indemnifying party from the offering of the Stock or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of each indemnifying party in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, or actions in respect thereof, as well as any other relevant equitable considerations.  The

·13·

relative benefits received by the Company and the Selling Securityholders on the one hand and the Underwriters on the other shall be deemed to be in the same respective proportions as the total net proceeds from the offering of the Stock received by the Company and the Selling Securityholders and the total underwriting discount received by the Underwriters, as set forth in the table on the cover page of the Prospectus, bear to the aggregate public offering price of the Stock. Relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by each indemnifying party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission.

The parties agree that it would not be just and equitable if contributions pursuant to this paragraph (d) were to be determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation which does not take into account the equitable considerations referred to in the first sentence of this paragraph (d). The amount paid by an indemnified party as a result of the losses, claims, damages or liabilities, or actions in respect thereof, referred to in the first sentence of this paragraph (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating, preparing to defend or defending against any action or claim which is the subject of this paragraph (d). Notwithstanding the provisions of this paragraph (d), no Underwriter shall be required to contribute any amount in excess of the underwriting discount applicable to the Stock purchased by such Underwriter. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations in this paragraph (d) to contribute are several in proportion to their respective underwriting obligations and not joint.

Each party entitled to contribution agrees that upon the service of a summons or other initial legal process upon it in any action instituted against it in respect of which contribution may be sought, it will promptly give written notice of such service to the party or parties from whom contribution may be sought, but the omission so to notify such party or parties of any such service shall not relieve the party from whom contribution may be sought from any obligation it may have hereunder or otherwise (except as specifically provided in paragraph (c) of this Section 7).

(e)     Neither the Company nor the Selling Securityholders (nor, to the extent applicable, Norman H. Nie) will, without the prior written consent of each Underwriter, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not such Underwriter or any person who controls such Underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act is a party to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of such Underwriter and each such controlling person from all liability arising out of such claim, action, suit or proceeding.

(f)     The liability of each Selling Securityholder under such Selling Securityholder's representations and warranties contained in paragraph (a) of Section 2 hereof and under the indemnity and reimbursement agreements contained in the provisions of this Section 7 and Section 11 hereof shall be limited to an amount equal to the initial public offering price of the stock sold by such Selling Securityholder to the Underwriters. The liability of Norman H. Nie under his representations and warranties contained in subparagraph (b) (iii) of Section 2 hereof and under the related indemnity and reimbursement agreements contained in the provisions of this Section 7 and Section 11 hereof shall be limited to an amount equal to the lesser of (i) the amount of the principal balance, if any, of the subordinated notes payable to Norman H. Nie as described in Note (8) of the Notes to Consolidated Financial Statements included in the Registration Statement which is repaid with the net proceeds of the stock sold by the Company pursuant hereto and (ii) the amount, if any, of the aggregate losses,

-14-

claims, damages and liabilities incurred by the Underwriters which the Company and the Selling Securityholders fail or refuse to pay within ninety (90) days following written demand therefor. The Company and the Selling Securityholders (and, to the extent applicable, Norman H. Nie) may agree, as among themselves and without limiting the rights of the Underwriters under this Agreement, as to the respective amounts of such liability for which they each shall be responsible.

8.    Termination. This Agreement may be terminated by you at any time prior to the Closing Date by giving written notice to the Company and the Selling Securityholders if after the date of this Agreement trading in the Common Stock shall have been suspended, or if there shall have occurred (i) an engagement in hostilities or an escalation of major hostilities by the United States or a declaration of war or a national emergency by the United States on or after the date hereof, (ii) any outbreak of hostilities or other national or international calamity or crisis or change in economic or political conditions if the effect of such outbreak, calamity, crisis or change in economic or conditions in the financial markets of the United States would, in the Underwriters' reasonable judgment, make the offering or delivery of the Stock impracticable, (iii) suspension of trading in securities generally or a material adverse decline in value of securities generally on the New York Stock Exchange, the American Stock Exchange, the NASDAQ or the NASDAQ National Market System, or limitations on prices (other than limitations on hours or numbers of days of trading) for securities on either such exchange or system, (iv) the enactment, publication, decree or other promulgation of any federal or state statute, regulation, rule or order of, or commencement of any proceeding or investigation by, any court, legislative body, agency or other governmental authority which in the Underwriters' reasonable opinion materially and adversely affects or will materially adversely affect the business or operations of the Company, (v) declaration of a banking moratorium by either federal or New York State authorities or (vi) the taking of any action by any federal, state or local government or agency in respect of its monetary or fiscal affairs which in the Underwriters' reasonable opinion has a material adverse effect on the securities markets in the United States. If this Agreement shall be terminated pursuant to this Section 8, there shall be no liability of the Company or the Selling Securityholders (or Norman H. Nie) to the Underwriters and no liability of the Underwriters to the Company or the Selling Securityholders; provided, however, that in the event of any such termination the Company and the Selling Securityholders agree to indemnify and hold harmless the Underwriters from all costs or expenses incident to the performance of the obligations of the Company and the Selling Securityholders under this Agreement, including all costs and expenses referred to in paragraphs (i) and (j) of Section 6 hereof.

9.    Conditions of Underwriters' Obligations. The obligations of the several Underwriters to purchase and pay for the Stock shall be subject to the performance by the Company and by the Selling Securityholders of all their respective obligations to be performed hereunder at or prior to the Closing Date or any later date on which Option Stock is to be purchased, as the case may be, and to the following further conditions:

(a)    The Registration Statement shall have become effective; and no stop order suspending the effectiveness thereof shall have been issued and no proceedings therefor shall be pending or threatened by the Commission.

(b)    The legality and sufficiency of the sale of the Stock hereunder and the validity and form of the certificates representing the Stock, all corporate proceedings and other legal matters incident to the foregoing, and the form of the Registration Statement and of the Prospectus (except as to the financial statements contained therein), shall have been approved at or prior to the Closing Date by Sachnoff & Weaver, Ltd., Chicago, Illinois, counsel for the Underwriters, which approval shall not be unreasonably withheld.

-15-

MGW001860

(c)     You shall have received from Ross & Hardies, Chicago, Illinois, counsel for the Company, (and/or, with respect to foreign subsidiaries of the Company, from such other counsel as shall be reasonably acceptable to the Underwriters) an opinion, addressed to the Underwriters and dated the Closing Date, covering the matters set forth in Annex A hereto, and if Option Stock is purchased at any date after the Closing Date, additional opinions from such counsel, addressed to the Underwriters and dated such later date, reconfirming as of such later date each of the opinions expressed by such counsel as of the Closing Date and from Graham & James, Los Angeles, California, counsel for the Selling Securityholders. (or from such other counsel as shall be reasonably acceptable to the Underwriters) an opinion, addressed to the Underwriters and dated such later date, covering the matters set forth in Annex A-1 hereto.

(d)     You shall be satisfied that (i) as of the Effective Date, the statements made in the Registration Statement and the Prospectus were true and correct and neither the Registration Statement nor the Prospectus omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, respectively, not misleading, (ii) after the Effective Date, no event has occurred which should have been set forth in a supplement or amendment to the Prospectus which has not been set forth in such a supplement or amendment, (iii) after the respective dates as of which information is given in the Registration Statement in the form in which it originally became effective and the Prospectus contained therein, there has not been any material adverse change or any development involving a prospective material adverse change in or affecting the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, and, since such dates neither the Company nor any of its subsidiaries has engaged or agreed to engage in any material transaction not referred to in the Registration Statement in the form in which it originally became effective and the Prospectus contained therein, (iv) neither the Company nor any of its subsidiaries has any material contingent obligations which are not disclosed in the Registration Statement and the Prospectus, (v) there are not any pending or known threatened legal proceedings to which the Company or any of its subsidiaries is a party or of which property of the Company or any of its subsidiaries is the subject which are material and which are not disclosed in the Registration Statement and the Prospectus, (vi) there are not any franchises, contracts, leases or other documents which are required to be filed as exhibits to the Registration Statement which have not been filed as required, (vii) the representations and warranties of the Company herein are true and correct in all material respects as of the Closing Date or any later date on which Option Stock is to be purchased, as the case may be, and (viii) there has not been any change in financial markets or in political, economic or financial conditions that, in your reasonable judgment, renders it impracticable or inadvisable to proceed with the offering and sale of the Stock on the terms set forth in the Prospectus or that materially and adversely affects the market for the Stock and other equity securities.

(e)     You shall have received on the Closing Date and on any later date on which Option Stock is purchased a certificate, dated the Closing Date or such later date, as the case may be, and signed by the Chairman of the Board, the President and the Chief Financial Officer of the Company, stating that the respective signers of said certificate have carefully examined the Registration Statement in the form in which it originally became effective and the Prospectus contained therein and any supplements or amendments thereto, and that the statements included in clauses (i) through (vii) of paragraph (d) of this Section 9 are true and correct.

(f)     You shall have received from KPMG Peat Marwick, a letter or letters, addressed to the Underwriters and dated the Closing Date and any later date on which Option Stock is purchased, confirming that they are independent public accountants with respect to the Company within the meaning of the Securities Act and the applicable published rules and regulations thereunder and based upon the procedures described in their letter delivered to you concurrently with the execution of this

-16-

MGW001861

Agreement (herein called the Original Letter), but carried out to a date not more than five business days prior to the Closing Date or such later date on which Option Stock is purchased (i) confirming, to the extent true, that the statements and conclusions set forth in the Original Letter are accurate as of the Closing Date or such later date, as the case may be, and (ii) setting forth any revisions and additions to the statements and conclusions set forth in the Original Letter which are necessary to reflect any changes in the facts described in the Original Letter, or their knowledge thereof, after the date of the Original Letter or to reflect the availability of more recent financial statements, data or information. The letters shall not disclose any change, or any development involving a prospective change, in or affecting the business or properties of the Company or any of its subsidiaries which, in your sole judgment, makes it impractical or inadvisable to proceed with the public offering of the Stock or the purchase of the Option Stock as contemplated by the Prospectus.

(g)    You shall have received from KPMG Peat Marwick a letter stating that their review of the Company's system of internal accounting controls, to the extent they deemed necessary in establishing the scope of their examination of the Company's financial statements as at December 31, 1992, did not disclose any weakness in internal controls that they considered to be a material weakness.

(h)    You shall have been furnished evidence in usual written or telegraphic form from the appropriate authorities of the several jurisdictions, or other evidence satisfactory to you, of the qualifications referred to in paragraph (f) of Section 6 hereof.

(i)    Prior to the Closing Date, the Stock shall have been duly approved for inclusion on the NASDAQ National Market System upon official notice of issuance.

(j)    On or prior to the Closing Date, you shall have received from all directors, officers, and holders of more than 1% of the outstanding Common Stock written agreements stating that without the prior written consent of Hambrecht & Quist Incorporated, each of such holders will not, directly or indirectly, sell, offer, contract to sell, make any short sale, pledge or otherwise dispose of any shares of Common Stock or any securities convertible into or exchangeable or exercisable for or any rights to purchase or acquire Common Stock for a period of 180 days following the date of the Prospectus as first filed with the Commission.

(k)    You shall have been furnished evidence, in written form satisfactory to you, that all of the transactions affecting the outstanding Common Stock of the Company have been consummated as described in the Prospectus, including but not limited to the conversion of all previously outstanding preferred stock of the Company into Common Stock and the 1-for-3 reverse split of the Common Stock.

(l)    You shall have been furnished, in form satisfactory to you, all such other documents, instruments and certificates as are customarily delivered to Underwriters upon closing of transactions such as those contemplated herein or as you or such counsel shall otherwise reasonably request to evidence or effect the transactions contemplated herein or the performance and compliance by the Company and each of the Selling Securityholders with their respective obligations hereunder and with the various conditions set forth herein.

All the agreements, opinions, certificates, letters, documents and instruments mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof only if Sachnoff & Weaver, Ltd., counsel for the Underwriters, shall be reasonably satisfied that they comply fully in scope, form and substance in all material respects.

-17-

MGW001862

In case any of the conditions specified in this Section 9 shall not be fulfilled, this Agreement may be terminated by you by giving notice to the Company and to the Selling Securityholders. Any such termination shall be without liability of the Company or the Selling Securityholders to the Underwriters and without liability of the Underwriters to the Company or the Selling Securityholders; provided, however, that (i) in the event of such termination, the Company and the Selling Securityholders agree to indemnify and hold harmless the Underwriters from all costs or expenses incident to the performance of the obligations of the Company and the Selling Securityholders under this Agreement, including all costs and expenses referred to in paragraphs (i) and (j) of Section 6 hereof, and (ii) if this Agreement is terminated by you because of any refusal, inability or failure on the part of the Company or the Selling Securityholders to perform any agreement herein, to fulfill any of the conditions herein, or to comply with any provision hereof other than by reason of a default by any of the Underwriters, the Company will reimburse the Underwriters severally upon demand for all out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been incurred by them in connection with transactions contemplated hereby.

10.    Conditions of the Obligation of the Company and the Selling Securityholders.  The obligation of the Company and the Selling Securityholders to deliver the Stock shall be subject to the conditions that (a) the Registration Statement shall have become effective and (b) no stop order suspending the effectiveness thereof shall be in effect and no proceedings therefor shall be pending or threatened by the Commission.

In case either of the conditions specified in this Section 10 shall not be fulfilled, this Agreement may be terminated by the Company and the Selling Securityholders by giving notice to you.  Any such termination shall be without liability of the Company and the Selling Securityholders to the Underwriters and without liability of the Underwriters to the Company or the Selling Securityholders; provided, however, that in the event of any such termination the Company and the Selling Securityholders jointly and severally agree to indemnify and hold harmless the Underwriters from and against all costs and expenses incident to the performance of the obligations of the Company and the Selling Securityholders under this Agreement, including all costs and expenses referred to in paragraphs (i) and (j) of Section 6 hereof.

11.    Reimbursement of Certain Expenses.  In addition to their other obligations under Section 7 of this Agreement (and subject, in the case of a Selling Securityholder, or, to the extent applicable, Norman H. Nie, to the provisions of paragraph (f) of Section 7), the Company and the Selling Securityholders (and, to the extent applicable, Norman H. Nie) hereby jointly and severally agree to reimburse on a quarterly basis the Underwriters for all reasonable legal and other expenses incurred in connection with investigating or defending any claim, action, investigation, inquiry or other proceeding arising out of or based upon any statement or omission, or any alleged statement or omission, described in paragraph (a) of Section 7 of this Agreement, notwithstanding the absence of a judicial determination as to the propriety and enforceability of the obligations under this Section 11 and the possibility that such payments might later be held to be improper; provided, however, that (i) to the extent any such payment is ultimately held to be improper, the persons receiving such payments shall promptly refund them and (ii) such persons shall provide to the Company, upon request, reasonable assurances of their ability to effect any such refund, when and if due.

12.    Persons Entitled to Benefit of Agreement.  This Agreement shall inure to the benefit of the Company, the Selling Securityholders and the several Underwriters and, with respect to the provisions of Section 7 hereof, the several parties (in addition to the Company, the Selling Securityholders and the several Underwriters) indemnified under the provisions of said Section 7, and their respective personal representatives, successors and assigns. Nothing in this Agreement is intended or shall be construed to give to any other person, firm or corporation any legal or equitable remedy or claim under or in respect of this Agreement or any provision herein contained.  The term

-18-

MGW001863

"successors and assigns" as herein used shall not include any purchaser, as such purchaser, of any of the Stock from any of the several Underwriters.

13.   Notices.   Except as otherwise provided herein, all communications hereunder shall be in writing or by telegraph and, if to the Underwriters, shall be mailed, telegraphed or delivered to Hambrecht & Quist Incorporated, One Bush Street, San Francisco, California 94104; and if to the Company, shall be mailed, telegraphed or delivered to it at its office, 444 N Michigan Avenue, Chicago, Illinois 60611, Attention: President and if to the Selling Securityholders (or Norman H. Nie), shall be mailed, telegraphed or delivered to the Selling Securityholders (or Norman H. Nie) in care of the Company at the Company's address set forth above; or in each case to such other address as Hambrecht & Quist Incorporated or the Company or the Selling Securityholders (or Norman H. Nie), respectively, may hereafter designate for notices to be sent to them in a notice given to the other parties in accordance herewith.   All notices given by telegraph shall be promptly confirmed by letter.

14.   Miscellaneous.   The reimbursement, indemnification and contribution agreements contained in this Agreement and the representations, warranties and covenants in this Agreement shall remain in full force and effect regardless of (a) any termination of this Agreement, (b) any investigation made by or on behalf of any Underwriter or controlling person thereof, or by or on behalf of the Company or the Selling Securityholders or their respective directors or officers, and (c) delivery and payment for the Stock under this Agreement; provided, however, that if this Agreement is terminated prior to the Closing Date, the provisions of paragraphs (l) and (m) of Section 6 hereof shall be of no further force or effect.

This Agreement may be executed in two or more counterparts, each of which shall be deemed and original, but all of which together shall constitute one and the same instrument.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

Please sign and return to the Company and to the Selling Securityholders in care of the Company the enclosed duplicates of this letter, whereupon this letter will become a binding agreement among the Company, the Selling Securityholders and the several Underwriters in accordance with its terms.

Very truly yours,

SPSS INC.

By _____
Jack Noonan, President

SELLING SECURITYHOLDER:
Cooke & Andrews Investments, Inc.

By _____

Norman H. Nie

_____

-19-

MGW001864

"successors and assigns" as herein used shall not include any purchaser, as such purchaser, of any of the Stock from any of the several Underwriters.

13.    Notices.  Except as otherwise provided herein, all communications hereunder shall be in writing or by telegraph and, if to the Underwriters, shall be mailed, telegraphed or delivered to Hambrecht & Quist Incorporated, One Bush Street, San Francisco, California 94104; and if to the Company, shall be mailed, telegraphed or delivered to it at its office, 444 N Michigan Avenue, Chicago, Illinois 60611, Attention: President and if to the Selling Securityholders (or Norman H. Nie), shall be mailed, telegraphed or delivered to the Selling Securityholders (or Norman H. Nie) in care of the Company at the Company's address set forth above; or in each case to such other address as Hambrecht & Quist Incorporated or the Company or the Selling Securityholders (or Norman H. Nie), respectively, may hereafter designate for notices to be sent to them in a notice given to the other parties in accordance herewith.  All notices given by telegraph shall be promptly confirmed by letter.

14.    Miscellaneous.  The reimbursement, indemnification and contribution agreements contained in this Agreement and the representations, warranties and covenants in this Agreement shall remain in full force and effect regardless of (a) any termination of this Agreement, (b) any investigation made by or on behalf of any Underwriter or controlling person thereof, or by or on behalf of the Company or the Selling Securityholders or their respective directors or officers, and (c) delivery and payment for the Stock under this Agreement; provided, however, that if this Agreement is terminated prior to the Closing Date, the provisions of paragraphs (l) and (m) of Section 6 hereof shall be of no further force or effect.

This Agreement may be executed in two or more counterparts, each of which shall be deemed and original, but all of which together shall constitute one and the same instrument.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

Please sign and return to the Company and to the Selling Securityholders in care of the Company the enclosed duplicates of this letter, whereupon this letter will become a binding agreement among the Company, the Selling Securityholders and the several Underwriters in accordance with its terms.

Very truly yours,

SPSS INC.

By _Jack Noonan_
     Jack Noonan, President

SELLING SECURITYHOLDER:
Cooke & Andrews Investments, Inc.

xBy _[signature]_

Norman H. Nie

-19-

MGW001865

"successors and assigns" as herein used shall not include any purchaser, as such purchaser, of any of the Stock from any of the several Underwriters.

13.    Notices.  Except as otherwise provided herein, all communications hereunder shall be in writing or by telegraph and, if to the Underwriters, shall be mailed, telegraphed or delivered to Hambrecht & Quist Incorporated, One Bush Street, San Francisco, California 94104; and if to the Company, shall be mailed, telegraphed or delivered to it at its office, 444 N Michigan Avenue, Chicago, Illinois 60611, Attention: President and if to the Selling Securityholders (or Norman H. Nie), shall be mailed, telegraphed or delivered to the Selling Securityholders (or Norman H. Nie) in care of the Company at the Company's address set forth above; or in each case to such other address as Hambrecht & Quist Incorporated or the Company or the Selling Securityholders (or Norman H. Nie), respectively, may hereafter designate for notices to be sent to them in a notice given to the other parties in accordance herewith.  All notices given by telegraph shall be promptly confirmed by letter.

14.    Miscellaneous.  The reimbursement, indemnification and contribution agreements contained in this Agreement and the representations, warranties and covenants in this Agreement shall remain in full force and effect regardless of (a) any termination of this Agreement, (b) any investigation made by or on behalf of any Underwriter or controlling person thereof, or by or on behalf of the Company or the Selling Securityholders or their respective directors or officers, and (c) delivery and payment for the Stock under this Agreement; provided, however, that if this Agreement is terminated prior to the Closing Date, the provisions of paragraphs (1) and (m) of Section 6 hereof shall be of no further force or effect.

This Agreement may be executed in two or more counterparts, each of which shall be deemed and original, but all of which together shall constitute one and the same instrument.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

Please sign and return to the Company and to the Selling Securityholders in care of the Company the enclosed duplicates of this letter, whereupon this letter will become a binding agreement among the Company, the Selling Securityholders and the several Underwriters in accordance with its terms.

Very truly yours,

SPSS INC.

By _Jack Noonan_
    Jack Noonan, President

SELLING SECURITYHOLDER:
Cooke & Andrews Investments, Inc.

By _____

Norman H. Nie

_Norman N. Nie_

-19-

MGW001866

Mr. Nie is executing this Agreement, solely with respect to his representations and warranties set forth in Subparagraph (b)(iii) of Section 2, and the notice provisions in Section 13 hereof and for purposes of evidencing his related obligations as provided in Sections 7 and 11 hereof, and in order to induce the Underwriters to enter into and perform this Agreement.

The foregoing Agreement is hereby confirmed and accepted as of the date first above written.

HAMBRECHT & QUIST INCORPORATED
VOLPE, WELTY & COMPANY
        By Hambrecht & Quist Incorporated

By _____
        Managing Director

Acting on behalf of the several Underwriters, including themselves, named in Schedule I hereto.

-20-

MGW001867

SCHEDULE I

UNDERWRITERS

| Underwriters | Number of Shares to be Purchased |
|---|---|
| Hambrecht & Quist Incorporated | 482,500 |
| Volpe, Welty & Company | 482,500 |
| Alex. Brown & Sons Incorporated | 60,000 |
| Cowen & Company | 60,000 |
| Dillon, Read & Co. Inc. | 60,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | 60,000 |
| Montgomery Securities | 60,000 |
| Morgan Stanley & Co. Incorporated | 60,000 |
| Prudential Securities Incorporated | 60,000 |
| Robertson, Stephens & Co. | 60,000 |
| William Blair & Company | 40,000 |
| Dain Bosworth Incorporated | 40,000 |
| Kemper Securities Group, Inc. | 40,000 |
| Needham & Company, Inc. | 40,000 |
| Piper Jaffray Inc. | 40,000 |
| Raymond James & Associates, Inc. | 40,000 |
| Wessels, Arnold & Henderson | 40,000 |
| Adams, Harkness & Hill Inc. | 25,000 |
| The Chicago Corporation | 25,000 |
| First Albany Corporation | 25,000 |
| Foley Mufson Howe & Company | 25,000 |
| Janney Montgomery Scott Inc. | 25,000 |
| Pennsylvania Merchant Group Ltd. | 25,000 |
| Punk, Ziegel & Knoell | 25,000 |
| Seidler Amdec Securities Inc. | 25,000 |
| Soundview Financial Group, Inc. | 25,000 |
| Unterberg Harris | 25,000 |
| Van Kasper & Company | 25,000 |
| Total | 2,000,000 |

-21-

MGW001868

SCHEDULE II

SELLING SECURITYHOLDER

| Names and Addresses | Number of Shares to be Sold |
|---|---|
| Cooke & Andrews Investments, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,333 |

-22-

MGW001869

# Exhibit B

**SPSS INC.**

CERTIFICATE OF THE CHAIRMAN OF THE BOARD, PRESIDENT
AND CHIEF FINANCIAL OFFICER
PURSUANT TO SECTION 9(e) OF THE UNDERWRITING AGREEMENT

The undersigned, Norman Nie, Jack Noonan and Edward Hamburg, duly appointed, qualified and acting Chairman of the Board, President and Chief Financial Officer, respectively, of SPSS Inc., a Delaware corporation (the "Company"), each hereby certifies that he has carefully reviewed the Company's Registration Statement on Form S-1 (Registration No. 33-64732; the "Registration Statement") in the form in which it originally became effective, as well as the prospectus filed with the Securities and Exchange Commission on August 19, 1993 pursuant to Rule 424(b) (the "Prospectus") and, based on that review, the following statements are true and correct:

(i) as of the effective date of the Registration Statement, the statements made in the Registration Statement and the Prospectus were true and correct and neither the Registration Statement nor the Prospectus omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, respectively, not misleading;

(ii) after the Effective Date, no event has occurred which should have been set forth in a supplement or amendment to the Prospectus which has not been set forth in such a supplement or amendment;

(iii) after the respective dates as of which information is given in the Registration Statement in the form in which it originally became effective and in the Prospectus, there has not been any material adverse change or any development involving a prospective material adverse change in or affecting the business, operations, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole, whether or not arising from transactions in the ordinary course of business, and, since such dates neither the Company nor any of its subsidiaries has engaged or agreed to engage in any material transaction not referred to in the Registration Statement in the form in which it originally became effective and in the Prospectus;

(iv) neither the Company nor any of its subsidiaries has any material contingent obligations which are not

HXS\401959.\HXS60205.WPF

MGW001985

disclosed in the Registration Statement and the Prospectus;

(v) there are not any pending or known threatened legal proceedings to which the Company or any of its subsidiaries is a party or of which property of the Company or any of its subsidiaries is the subject which are material and which are not disclosed in the Registration Statement and the Prospectus and there has been no adverse development or material change in the legal proceedings described therein;

(vi) there are not any franchises, contracts, leases or other documents which are required to be filed as exhibits to the Registration Statement which have not been filed as required; and

(vii) the representations and warranties of the Company contained in the Underwriting Agreement are true and correct in all material respects as of the Closing Date.

IN WITNESS WHEREOF, the Company has caused this certificate to be executed and the seal of the Company to be affixed this 25th day of August, 1993.

_____
Norman Nie
Chairman of the Board

_____
Jack Noonan
President

_____
Edward Hamburg
Chief Financial Officer

[SEAL]

-2-

BXS\401959.\BXS60205.WPF

MGW001986

(iv) neither the Company nor any of its subsidiaries has any material contingent obligations which are not disclosed in the Registration Statement and the Prospectus;

(v) there are not any pending or known threatened legal proceedings to which the Company or any of its subsidiaries is a party or of which property of the Company or any of its subsidiaries is the subject which are material and which are not disclosed in the Registration Statement and the Prospectus and there has been no adverse development or material change in the legal proceedings described therein;

(vi) there are not any franchises, contracts, leases or other documents which are required to be filed as exhibits to the Registration Statement which have not been filed as required; and

(vii) the representations and warranties of the Company contained in the Underwriting Agreement are true and correct in all material respects as of the Closing Date.

IN WITNESS WHEREOF, the Company has caused this certificate to be executed and the seal of the Company to be affixed this 25th day of August, 1993.

Norman Nie
Chairman of the Board

Jack Noonan
President

Edward Hamburg
Chief Financial Officer

[SEAL]

-2-

HXS\401959.\HXS40205.WPF

MGW001987

# Exhibit C

1                  IN THE UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF ILLINOIS

3                          EASTERN DIVISION

4      SPSS, INC.,                        )

5                      Plaintiff,          )

6          -vs-                           )Case No.

7      NORMAN H. NIE and C. HADLAI HULL,  )08 C 66

8                      Defendants.         )

9      --------------------------------   )

10     NORMAN H. NIE,                     )

11                  Counterplaintiff,      )

12              vs.                        )

13     SPSS, INC.,                        )

14                  Counterdefendant.      )

15              The videotaped deposition of NORMAN H.

16     NIE, called for examination, taken pursuant to the

17     Federal Rules of Civil Procedure of the United

18     States District Courts pertaining to the taking of

19     depositions, taken before LINDA M. STRATTON, CSR

20     No. 84-2613, a Notary Public within and for the

21     County of DuPage, State of Illinois, and a

22     Certified Shorthand Reporter of said state, at

23     Suite 3200, 71 South Wacker Drive, Chicago,

24     Illinois, on August 22, 2008, at 9:50 a.m.

1                    for identification, as of

2                    08/22/2008.)

3          THE WITNESS:  Oh, thank you.

4    BY MR. KRISS:

5          Q.    Dr. Nie, does -- did you see a copy

6    of -- of Exhibit 2 on or about October 9, 2007?

7          A.    Yes.

8          Q.    Does this letter represent the first

9    time that you communicated to SPSS, Inc., that you

10   were asserting rights as a trademark owner?

11         A.    I can't remember whether there were

12   informal conversations with Jack or with Ray,

13   myself and Jack and Ray, prior to the actual

14   sending of this letter.  I can't remember the order

15   of -- of which, but there were.  That was the only

16   other communication.  Those were the only other

17   communications.

18         Q.    And those other communications with Jack

19   Noonan, Ray Panza, those communications occurred in

20   2007?

21         A.    Yes.  But I -- as I say, I can't

22   remember whether they were after October 9th or

23   before October 9th.  They were certainly after I

24   received both the original license agreement I

1    requested, which I requested in May, and didn't

2    receive until July, and -- and before legal

3    proceedings, you know, began, towards the end of

4    the year.

5         Q.    All in 2007?

6         A.    All in 2007.

7         MR. KRISS:  Let's mark as Nie Deposition

8    Exhibit 3 a letter from Luther Orton to Jack Noonan

9    dated October 12, 2007.

10                   (WHEREUPON, a certain document was

11                   marked Nie Deposition Exhibit No. 3,

12                   for identification, as of

13                   08/22/2008.)

14   BY MR. KRISS:

15        Q.    Dr. Nie, did you see a copy of Exhibit 3

16   on or about October 12, 2007?

17        A.    I -- can I please read it --

18        Q.    Sure.

19        A.    -- so I can make sure I'm answering.

20              Yes.

21        Q.    Does this letter represent the first

22   time that you communicated to SPSS, Inc., that you

23   were asserting rights under the trademark license

24   agreement?

17

1      A.    Yes, I believe that this was the first

2   explicit letter.

3      MR. KRISS:  Okay.  Let's mark as Nie

4   Deposition Exhibit 4 a e-mail from Dr. Nie to Jack

5   Noonan dated October 12, 2007.

6                    (WHEREUPON, a certain document was

7                    marked Nie Deposition Exhibit No. 4,

8                    for identification, as of

9                    08/22/2008.)

10  BY MR. KRISS:

11     Q.    Dr. Nie, did you send a copy of this

12  e-mail to Mr. Noonan on or about October 12, 2007?

13     A.    Yes.

14     Q.    You say in this e-mail that you have

15  sought the advice of numerous advisors, colleges,

16  and three separate attorneys.  What advisors did

17  you seek the advice of?

18     A.    Well, I have a few friends who are CEOs

19  of large corporations who are dear friends of mine.

20  I sought -- I sought their counsel.  I went to

21  Larry Samuels and asked him if he had ever seen

22  this agreement and what he thought.

23            He said he'd never seen the agreement

24  and he thought it was important but that he could

1       A.     Beginning sometime either in late summer

2    or early fall of 2007, we drafted a list of

3    materials about the trademark, the licenses, the

4    sublicenses, the -- the quality specifications, the

5    feature specifications, the list of bugs of the --

6    of the products, of two of the products that

7    were -- for imminent release, SPSS Version 16 and

8    Dimensions, the survey deployment engines,

9    Release 5.0, and repeatedly asked for that

10   information, and we were -- was -- were repeatedly

11   rebuffed in our efforts to secure that information,

12   in spite of the license's clear stipulations that

13   we had the ability to do that.

14       Q.     Anything else?

15       A.     No -- well, yes.  After you sued me,

16   you -- you -- you repudiated the license, and --

17   and -- and because the license was at will.

18       Q.     Anything else?

19       A.     No.

20       Q.     On the first page of Exhibit 5, at the

21   bottom it states, "Mr. Nie, through his counsel,

22   has repeatedly notified SPSS since at least January

23   of this year that SPSS has not fulfilled its

24   obligations under the license agreement."

1          What obligations under the license

2     agreement did you believe SPSS has not fulfilled?

3          A.    Its unwillingness to provide me with

4     information on the quality of the products and --

5     and -- and its unwillingness to share any of that

6     information in detail and its repudiation that

7     the -- that the license -- that I had any rights

8     under the license.

9          Q.    All right.  Anything else?

10          A.    The letter's first paragraph states the

11     reasons for the termination.

12          Q.    The letter's which paragraph?

13          A.    Very first paragraph.

14          Q.    Anything else?

15          A.    Nothing else.

16          Q.    Take a look at Exhibit 1 again, if you

17     would, please.  What language in Exhibit 1 do you

18     believe entitles you to obtain the information that

19     you requested from SPSS?

20          A.    Well, I don't want to get into analyzing

21     documents that I have legal counsel to do, but I

22     certainly believe that Provisions 8 and 9 about the

23     conditions under termination and the obligations

24     specified under 4 and under 3.

8/22/2008 NIE, NORMAN H.

1              But I -- I'm -- I think that I have to

2     defer to legal counsel for -- I'm not going to get

3     into -- I -- I have not a law degree.  I'm --

4     I'm -- I'm an academic, and I -- I -- I don't have

5     a legal license.  But I think the language is

6     pretty clear.

7          Q.    Well, if you think the language is

8     pretty clear, can you just point to me the language

9     that says that you get the information that you

10    requested from SPSS.

11         A.    No.  I think I -- I -- I relied on my

12    legal counsel -- counselors, by that time, both

13    Mr. Orton and -- and Mr. Baugher here, and they

14    believed that the license stipulated that I had the

15    right to get that information.  I have to defer to

16    them.

17         Q.    Now, Dr. Nie, as of September, 1976,

18    when you executed the -- the license agreement

19    which is Exhibit 1, you understood that you were

20    one of the joint owners of the trademark SPSS?

21         A.    Yes, of course.

22         Q.    By the time of the initial public

23    offering of SPSS in 1993, did you understand that

24    SPSS was a registered trademark of SPSS, Inc.?

1        Q.    October 9th.  It's No. 2.

2        A.    Well, they've gotten out of sequence

3    here.  There's 10.  There's 9.  There's 8.  There's

4    7.  There's 6.  There's 7.  Let me get them in

5    order here.  And what was the date again?

6        Q.    October 9th, but it's Exhibit 2.

7        A.    I do not seem to have Exhibit -- ah,

8    here it is.  I do have it.

9        Q.    Okay.  Do you have Exhibit 2 in front of

10   you?

11       A.    Yes.

12       Q.    Okay.  From October 9th, 2007, the date

13   of this letter, Exhibit 2, to the present, have you

14   established any quality standards for any SPSS

15   products?

16       A.    No.  Well, I have -- that's not quite

17   true.  I've sent -- Mr. Orton sent, that I put

18   together, a list of things that I would need to

19   evaluate specifically released 5.0 of Dimensions

20   product, and that letter was sent from Mr. Orton to

21   Mr. Noonan.

22       Q.    Okay.  But that -- that --

23       A.    That was -- that was sometime during --

24   after October 12th and before the end -- before the

1    end of the year.

2        Q.    And that letter did not contain any

3    quality standards.  It requested information,

4    correct?

5        A.    It requested what it would take for me

6    to establish quality standards.  And I'm sure that

7    letter is in your file.

8            And I actually proposed to take on those

9    responsibilities with a consultant.

10        Q.    Is it possible to develop quality

11    standards for SPSS products without the information

12    that you requested?

13        A.    Absolutely impossible.

14        Q.    Why?

15        A.    Well, it's like taking something of the

16    complexity of a jet aircraft landing at -- on a

17    runway and asking some engineers and people who

18    know something about it, "Would you please certify

19    this aircraft for -- for safety of flight."

20            You need to have the manuals.  You need

21    to have engineering specs.  You need to have the --

22    the knowledge of known problems.  You need to have

23    how those problems were prepared.

24            I mean, these -- this is a

1    several million line -- lines of code piece of

2    software made up of hundreds if not thousands of

3    subroutines.  You can't just kick the tires and

4    find out if it's -- if it's -- if it's any good.

5         Q.    I'm not asking you whether you would

6    kick the tires, so to speak, to find out if it was

7    good.  I'm asking whether you could develop

8    standards for the software without that

9    information.

10        A.    The answer is absolutely not.

11        Q.    Okay.  Have you ever seen any document

12   that purports to set forth quality standards for

13   SPSS products?

14        A.    Oh, yes.

15        Q.    What are those documents?

16        A.    Well, there's a whole -- there is an

17   entire process.  It begins with an SOL, which is

18   a -- a -- an SOR, a statement of requirements, and

19   at every stage, there's detailed documentation as

20   to what the product will look like from the user's

21   perspective, how it will be engineered internally,

22   and how the pieces will fit together, which are now

23   in these days often from several different physical

24   sites and merged together.

1           So there is a complete set of

2     specifications, manuals, engineering, what are

3     called arc releases, architectural releases where

4     different pieces of the system are slowly put

5     together.

6           There's an entire blueprint for the

7     software any -- every which -- every bit as

8     complicated as engineering specifications and

9     architectural drawings for the building we sit in.

10    Q.    And it's your testimony that those

11    specifications that you've just described are

12    standards of quality?

13    A.    They -- without them, there could be no

14    standards of quality.  You must have those pieces

15    of information in your hands and do the final

16    quality review of the product before releasing it.

17    You've got to have much of that information.  This

18    is extremely, extremely complex pieces of -- and

19    large pieces of software.

20    Q.    I understand that it's complex.  I've

21    done work with software disputes.

22          But what do you understand to be a

23    standard of quality that should be applied in

24    determining whether a product should be released or

114

# Exhibit D

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrown.com

September 4, 2008

**BY E-MAIL**

Edward H. Williams
Direct Tel (312) 701-7405
Direct Fax (312) 706-8696
ewilliams@mayerbrown.com

William B. Berndt
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, Illinois 60606

Re:    *SPSS Inc. v. Nie, et al.*, Case No. 08 C 0066 (N.D. Ill.)

Dear Will:

At the August 20, 2008 status hearing before Judge Darrah, the parties were instructed to attempt to work out their differences on the open discovery items. In particular, defendants were instructed to consult with their experts and make specific requests to SPSS. SPSS was instructed to balance its relevance objections and its burden objections – as the Court put it, "obviously it's kind of a balancing, that the more relevance that's in doubt the more things like burdensomeness weigh."

We convened a series of discovery conferences commencing Tuesday, September 2 and running through today. In the spirit of compromise, SPSS has endeavored to implement Judge Darrah's instruction by making available materials that SPSS continues to believe are irrelevant but the compilation of which does not impose an undue burden. SPSS will state its position on the various issues we have discussed below.

1.     You have asked for documents relating to any assignment by SPSS of any trademark. As we have discussed, SPSS has not assigned the Trademarks at issue in this case and other assignments would have no relevance. Nonetheless, SPSS will produce documents reflecting its assignment of the trademark "SYSTAT" in connection with a transaction with Cranes Software International, Ltd. After a diligent search, SPSS has not located other documents reflecting assignments of its trademarks.

2.     You have asked for the non-GAAP cost allocation by product family documents described by Ray Panza at his deposition. We are producing those documents. Note, however, as Mr. Panza stressed, these are non-GAAP rough estimates used solely to provide the SPSS board of directors with management's best guesses on cost allocation. They are also non-public documents.

Mayer Brown LLP

September 4, 2008
Page 2

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*

4.    You have asked about graphs with customer call volumes described by Bill Lapacek during his deposition. These will be produced.

5.    You have asked about due diligence performed with respect to the Trademarks at issue in this case between 1993 (after the IPO) and 2002 (before the Foothill transaction). The Company has performed a reasonably diligent search and has not located any IP due diligence files in connection with transactions taking place during this time other than what has previously been produced. SPSS did make general representations regarding its IP rights in connection with two acquisition transactions and a financing. The financing documents were previously produced (*see* SPSS 549-663; 743-756). We will produce those portions of the final deal documents for the acquisition transactions that containing the IP representations.

6.    You have asked about a 1984 memo authored by Mr. Nie and referred to in Jack Noonan's deposition. It will be produced.

7.    We have agreed to supplement the Excel spreadsheets reflecting SPSS's business records – as maintained in several electronic databases – for customer complaints. This supplement will provide additional details regarding the nature of each individual complaint. You have also asked that we produce all documents relating to any customer complaint. As you know, we are talking about thousands of complaints that could come to the Company via email, letter, or telephone call. It would be incredibly burdensome for the Company to search for all documents relating to these complaints. We are in the process of producing the best and most definitive Company documentation reflecting the numerosity, severity, nature and handling of the customer complaints. Requiring anything more would impose an undue burden on SPSS.

8.    You have asked about files relating to the communications with an SPSS insurer described in Ray Panza's deposition. SPSS has not located a file maintained by Mr. Panza

Mayer Brown LLP

September 4, 2008
Page 3

containing information relating to that meeting; it will confirm that no such file exists when Mr. Panza returns to the office next week. SPSS has also confirmed that the insurance company questionnaires you asked about do not include queries relating to trademarks.

9.      You have inquired about a variety of documents relating to how SPSS develops software products and eliminates defects. None of these documents are responsive to the document requests we have discussed and any such documents would be irrelevant. Further, the identification and production of all documents relating to SPSS's software development process would be impossible. Software development is SPSS's business, and the majority of its employees are involved in that process every day. That process has nothing to do with whether defendants established quality standards under the License Agreement or whether SPSS met any such standards. In fact, as you know, defendants both admitted that they did not establish any such standards.

10.      As detailed in Tom Panoff's September 2, 2008 letter, defendants were provided with access to SPSS's sublicense agreements in mid-July as had been requested. Defendants' lack of diligence in doing anything with those documents after July 21 demonstrates their lack of relevance. While SPSS continues to believe that it should not have to copy all of these highly confidential documents given their lack of relevance and defendants' lack of interest in them, we are having them copied for you.

11.      Yesterday, you referenced defendants' third set of documents requests, to which SPSS responded in a timely manner on September 2, 2008. We have not had the opportunity to meet and confer with respect to that discovery or defendants' responses to SPSS's last round of written discovery, to which defendants responded in an untimely manner also on September 2, 2008. If you wish to schedule a call to discuss all of the discovery issues raised by the parties' recently exchanged discovery responses, please contact me.

12.      With respect to defendants' Rule 30(b)(6) deposition, it is my understanding that defendants will not be pursing Topics 1, 2, 4 or 5. Please let me know if that is incorrect. On Topic 3, SPSS does not engage in segment accounting by product and therefore cannot designate a witness. Also, we have agreed to produce the non-GAAP documents referenced in Item 2 above. On Topics 6 and 7, it would be impossible for SPSS to educate a witness with respect to all customer complaints regarding its products released from 2006 to the present and SPSS's response to each one of those complaints. As you know, we are talking about thousands of complaints and related defects.

13.      SPSS will provide a supplemental response to Interrogatory No. 8 from defendants' second set of interrogatories.

We believe that we have implemented Judge Darrah's instructions in reaching these numerous compromises but that defendants have not provided the type of specific and targeted requests for

Mayer Brown LLP

September 4, 2008
Page 4

relevant information along with explanations of their relevance.  We continue to ask that you do so.

Sincerely,

Edward H. Williams

# Exhibit E

1    IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION

3

4  SPSS, INC.,                          )
                                        )
5              Plaintiff,               )
                                        )
6  -vs-                                 )   Case No. 08 C 66
                                        )
7                                       )   Chicago, Illinois
   NORMAN H. NIE, et al.,               )   August 20, 2008
8                                       )   9:00 o'clock a.m.
               Defendants.              )
9

10            TRANSCRIPT OF PROCEEDINGS
    BEFORE THE HONORABLE JOHN W. DARRAH
11
   APPEARANCES:
12
   For the Plaintiff:        MAYER BROWN LLP
13                           MR. ROBERT J. KRISS
                             71 South Wacker Drive
14                           Chicago, Illinois 60606

15 For the Defendants:       SCHOPF & WEISS LLP
                             MS. JENNIFER A. WATERS
16                           One South Wacker Drive
                             28th Floor
17                           Chicago, Illinois 60606

18
   Court Reporter:
19
                          Mary M. Hacker
20                     Official Court Reporter
                    United States District Court
21          219 South Dearborn Street, Suite 1426
                    Chicago, Illinois  60604
22               Telephone:  (312) 435-5564

23

24

25

1    THE CLERK:  08 C 66, SPSS versus Nie.

2    MS. WATERS:  Good morning, your Honor.  Jenny

3    Waters on behalf of Dr. Nie and Mr. Hull.

4    THE COURT:  Good morning, Ms. Waters.

5    MR. KRISS:  Good morning, your Honor.  Robert Kriss

6    on behalf of plaintiff, SPSS, Inc.

7    THE COURT:  Good morning, Mr. Kriss.

8    MR. KRISS:  Your Honor, we're here on status.

9    In March of this year the Court entered an agreed

10   order that set forth the comprehensive schedule for the case,

11   and I'm reporting this morning that we seem to be on

12   schedule.  And I have no suggestions for any variation on the

13   schedule at this point.

14   MS. WATERS:  And, your Honor, we may have a

15   discovery issue that may have an effect on intermediate

16   dates, not the end date.

17   Last Friday we got responses to discovery that

18   we've already met and conferred on, and we intend to file a

19   motion to compel today.  But obviously briefing will take us

20   past the discovery date.

21   But more importantly, we were looking for damages

22   documents that our experts will need in order to meet the

23   October 1 date.

24   THE COURT:  Is that the subject of the motion to

25   compel dispute?

1        MS. WATERS:  It is and will be.

2        THE COURT:  Mr. Kriss, what's the nature of the

3   objection?

4        MR. KRISS:  The nature of the objection, your

5   Honor, is that the documents that are necessary for any kind

6   of damage claim in a trademark case have been produced,

7   everything that's necessary to do a disgorgement of profits,

8   which is the only claim that they could possibly have if they

9   prove many other elements.

10       They are seeking documents about royalties, about

11  marginal profits on different products.  This is information

12  that isn't conceivably relevant to this case, but it's very

13  burdensome and I feel that the defendant at this point is

14  attempting to use discovery as a weapon to coerce a

15  settlement.  And this is going to be presented to Judge Keys.

16       THE COURT:  What would be the relevance of that

17  information, Ms. Waters?

18       MS. WATERS:  Your Honor, the only documents that we

19  received are basically the public financials of the company.

20  And based on the case law that we'll be citing in the motion

21  today, we believe that there's additional information that

22  our experts will need in order to evaluate the disgorgement

23  --

24       THE COURT:  Do you have some specific information

25  in mind?

1    MS. WATERS:  There was a list --

2    THE COURT:  The issue is disgorgement, right?

3    MR. KRISS:  That would be the issue on damages, and

4    it's a question of profits.  And we asked them to identify

5    any authority before motions were filed so that we could see

6    if there was any basis for anything other than income

7    statements which show the profits that were made on the

8    company's goods.

9        In a trademark case you show -- the plaintiff has

10   to show revenue, and then it's the burden of the defendant to

11   show costs and the profits are the difference.  And so, if

12   you have the financial statements that show the profits of

13   the company, you've got it.

14   THE COURT:  You're both very knowledgeable in this

15   area of the law.  I'm going to ask you to meet and confer

16   again.  And perhaps you can speak to your experts and get

17   some specific direction from them as to what specific

18   documents they think are relevant.

19       And, Mr. Kriss, if that's the case, if we can limit

20   this to a number of documents that aren't burdensome but

21   you're concerned about their dissemination, we can enter a

22   protective order restricting them to Ms. Waters' use only

23   until further order of court.

24   MR. KRISS:  My concern has been burden, your Honor.

25   And I don't think the company should be attacked with

1    discovery requests that are not relevant.

2         THE COURT:  All right.  And obviously it's kind of

3    a balancing, that the more relevance that's in doubt, the

4    more things like burdensomeness weigh --

5         MS. WATERS:  There is one other small discovery

6    issue that doesn't relate to the -- the expert reports that

7    will be entered in October, and that's on an order that's

8    already been entered by Judge Keys and we feel that it hasn't

9    been complied with fully.

10        And we --

11        THE COURT:  Let me ask you to confer on that as

12   well.  It's a complicated case and your clients' resources

13   are best used to get to the merits.

14        MR. KRISS:  We agree.  But we don't want to have an

15   avalanche of discovery that isn't relevant.

16        THE COURT:  All right.  Let me ask you to confer on

17   that.  You can restrict your request to something specific.

18   And even though you believe that it's not necessarily

19   relevant even for purposes of discovery, we can protect it

20   from disclosure and protect your client in that regard as

21   well.

22        MR. KRISS:  Thank you, your Honor.

23        MS. WATERS:  Thank you.

24        THE COURT:  Shall we take a status date on this

25   issue, say, in about three weeks?

1    And I really urge you to resolve this, but if you
2    cannot, you can make your motion to compel agree with that
3    three-week date so it gives you two weeks to talk about it.
4         MS. WATERS:  Should we present that motion, if
5    conferring does not work, to Judge Keys?
6         THE COURT:  If conferring does not work.  But I
7    have the utmost confidence in both of you that that won't be
8    necessary.
9         Mel?
10         THE CLERK:  September 10th at 9:00 a.m.
11    (Brief pause.)
12         THE COURT:  Mel just reminds me that apparently
13    there had been a referral to Judge Keys for discovery issues.
14         MS. WATERS:  Yes, sir.
15         MR. KRISS:  Yes.
16         THE COURT:  Why don't we leave that date stand.
17    And, if necessary, if I can't resolve it, we'll consider
18    sending it to Judge Keys.  So we'll leave the date in here
19    for status on that issue stand.
20         MR. KRISS:  I understand.  So we're not to file any
21    documents until September 10th?
22         THE COURT:  I urge you to resolve this, and if you
23    can't, if you can have a motion to compel on file by
24    September 10th, you can do so.  We'll give you time to
25    respond, if that's going to be necessary.

1          MR. KRISS:  And is that a motion that should be

2     filed before this Court or before Judge Keys?

3          THE COURT:  Yes, you can file that here.

4          MR. KRISS:  Okay.  Thank you, your Honor.

5          MS. WATERS:  Thank you.

6          THE COURT:  You're welcome.

7          (Which were all the proceedings heard.)

8                         CERTIFICATE

9          I certify that the foregoing is a correct transcript

10    from the record of proceedings in the above-entitled matter.

11

12    _____          _____

13    Mary M. Hacker                    Date    8/22/08
      Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit F

8/26/2008  NOONAN, JACK

1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION
3    SPSS INC.,                     )
                                    )
4           Plaintiff/             )
            Counterdefendant,      )
5                                   )
            vs.                     )  No. 08 C 66
6                                   )
            NORMAN H. NIE and HADLAI       )
7           HULL,                   )
                                    )
8           Defendants/            )
            Counterplaintiffs.     )
9
10              The videotaped deposition of JACK NOONAN,
11    called for examination pursuant to the Rules of Civil
12    Procedure for the United States District Courts
13    pertaining to the taking of depositions, taken before
14    Margaret M. Kruse, Certified Shorthand Reporter for
15    the State of Illinois, at One South Wacker Drive,
16    Suite 2800, Chicago, Illinois, on the 26th day of
17    August, 2008, at the hour of 9:36 a.m.
18
19
20
21
22
23    REPORTED BY:  Margaret M. Kruse, CSR, RPR
24    LICENSE NO:  084-003036

1                    (Whereupon, the record was

2                     read as requested.)

3          THE WITNESS:  Not that I recall.

4    BY MS. WATERS:

5          Q.  Do you know if SPSS was incorporated

6    as of the date of these minutes, September 14,

7    1977?

8          MR. KRISS:  Objection; no foundation.

9          THE WITNESS:  If memory serves me

10   correctly, this is only hearsay I guess, we

11   incorporated in '75.  I think that's what we

12   tell everyone.

13   BY MS. WATERS:

14         Q.  Have you ever seen any documents that

15   would reflect the date of incorporation of

16   SPSS?

17         A.  Not that I recall.

18         Q.  On the third page of Exhibit 1, there

19   are three signatures.  Do you recognize the

20   name Patrick Bova?

21         A.  No.

22         Q.  Who currently owns the trademark SPSS?

23         MR. KRISS:  Objection, calls for

24   privileged information.  And I'm going to

1        advise the witness not to answer on the

2        grounds of the attorney-client privilege and

3        the work product doctrine.

4     BY MS. WATERS:

5          Q.   Mr. Noonan, do you have any -- any

6        personal opinion outside of what you've been

7        told by an attorney as to who owns the SPSS

8        trademark?

9          A.   No.

10         Q.   Have you ever seen any -- any

11       trademark registration for the SPSS trademark?

12         A.   I don't know what it even looks like.

13                        (Whereupon, Noonan

14                        Deposition Exhibit No. 2

15                        was marked for

16                        identification.)

17     BY MS. WATERS:

18         Q.   I've marked a document as Exhibit 2.

19              Have you ever seen a document like

20       this or this document in particular?

21         A.   I can't say for certain, no.

22         Q.   What attorneys did you speak with

23       regarding the ownership of the trademark

24       registration?

# Exhibit G

1            IN THE UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF ILLINOIS

2                  EASTERN DIVISION

3       SPSS INC.,                    )

                                      )

4            Plaintiff/              )

             Counterdefendant,       )

5                                     )

           vs.                        )   No. 08 C 66

6                                     )

        NORMAN H. NIE and HADLAI      )

7       HULL,                         )

                                      )

8            Defendants/             )

             Counterplaintiffs.      )

9

10

                        CONTAINS PAGES

11

                           1-42

12                         59-125

                          136-153

13

14            The deposition of RICHARD MARK HOLADA,

15      called for examination pursuant to the Rules of Civil

16      Procedure for the United States District Courts

17      pertaining to the taking of depositions, taken before

18      Margaret M. Kruse, Certified Shorthand Reporter for

19      the State of Illinois, at One South Wacker Drive,

20      Suite 2800, Chicago, Illinois, on the 27th day of

21      August, 2008, at the hour of 9:32 a.m.

22

23      REPORTED BY:  Margaret M. Kruse, CSR, RPR

24      LICENSE NO:  084-003036

1

8/27/2008  HOLADA, RICHARD MARK (CONFIDENTIAL)

1

2

3

4

5

6

7

8

9

10    *Confidential Material Redacted*

11    *Pursuant to April 15, 2008*

12

13    *Agreed Protective Order (Dkt. 28)*

14

15

16

17

18

19

20

21

22

23

24

8/27/2008  HOLADA, RICHARD MARK (CONFIDENTIAL)

1

2

3

4

5

6

7

8

9

10

11

12

13          *Confidential Material Redacted*

14          *Pursuant to April 15, 2008*

15          *Agreed Protective Order (Dkt. 28)*

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10        *Confidential Material Redacted*

11        *Pursuant to April 15, 2008*

12

13        *Agreed Protective Order (Dkt. 28)*

14

15

16

17

18

19

20

21

22

23

24

8/27/2008  HOLADA, RICHARD MARK (CONFIDENTIAL)

1

2

3

4

5

6

7

8

9

10

11          *Confidential Material Redacted*

12
            *Pursuant to April 15, 2008*
13

14          *Agreed Protective Order (Dkt. 28)*

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*Confidential Material Redacted*

*Pursuant to April 15, 2008*

*Agreed Protective Order (Dkt. 28)*