# Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SPSS Inc., <br><br> Plaintiff, <br><br> v. <br><br> Norman H. Nie and C. Hadlai Hull, <br><br> Defendants. <br> _____ <br> Norman H. Nie, <br><br> Counterplaintiff, <br><br> v. <br><br> SPSS, Inc., <br><br> Counterdefendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Case No. 08 C 66 <br><br> Judge John W. Darrah <br><br> Magistrate Judge Arlander Keys |

### PLAINTIFF/COUNTERDEFENDANT SPSS INC.'S
### AMENDED RESPONSE TO INTERROGATORY NO. 1 AND ITS
### SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff/counterdefendant SPSS Inc. ("SPSS" or the "Company") hereby submits its amended response to interrogatory no. 1 and its second supplemental response to Interrogatory No. 5 and of Defendants' First Interrogatories to SPSS Inc without waiver of any of its prior objections.

### INTERROGATORY AND AMENDED RESPONSE

**INTERROGATORY NO. 1:** Identify the owner or owners of the Trademarks "SPSS" and "Statistical Package for the Social Sciences." If you contend SPSS is the owner of the Trademarks "SPSS" or "Statistical Package for the Social Sciences," explain any and all bases for that contention.

**ANSWER:**    SPSS Inc. hereby withdraws its prior responses to interrogatory no. 1 and submits this amended answer.

Based upon the deposition testimony of Norman Nie ("Nie"), C. Haldai Hull ("Hull") and Patrick Bova ("Bova"), SPSS Inc. states that Nie and Hull were never the owners of the Trademarks "SPSS" or "Statistical Package for the Social Sciences" ("Trademarks") and that the Registrations which ultimately issued for the Trademarks are void. Nie and Hull never used the Trademarks themselves in connection with the software and made erroneous statements to the United States Trademark Office when applying to register the Trademarks by incorrectly asserting that the Trademarks were first used by the applicants (Nie and Hull) on the software products at least as early as June, 1968.

Nie, Hull and Dale Bent began developing the software around June of 1966. At this time, Hull was being paid through his employer, Lissner Computer Services, located in Palo Alto, California. The remainder of the research and development funding was provided through a research grant obtained by Nie while he was a graduate student at Stanford University. From June 1966 until late 1968, an entity of Stanford University received all orders and shipped all software products (which were sold under the Trademarks) and received all commercial proceeds from such sales. Accordingly, to the extent that the Trademarks were in use prior to 1969, they were used and owned by Stanford University.

From 1969 until February 1, 1975, Nie and Hull worked on the SPSS software as members of a project team of the National Opinion Research Center ("NORC"), an affiliate of the University of Chicago. In addition to Nie and Hull, the NORC employed a full-time computer programmer to assist Nie and Hull in software development and assigned various other responsibilities in connection with the SPSS project to NORC staff. NORC accepted orders,

shipped the product and provided customer support. Packaging for the product and a newsletter circulated publicly regarding the product indicated that NORC was the source of the product. All aspects of customer service were identified with NORC. NORC was well known among academics and researchers involved with statistical analysis in the social sciences well before it began selling SPSS software. Neither Nie nor Hull represented to customers or the public that they were the owner of the business that sold the product. At all times, the revenue from sales of the software under the Trademarks was paid to NORC. Nie and Hull received no compensation for sales of the SPSS software. Accordingly, from 1969 to February 1, 1975, the Trademarks were owned by NORC, not Nie and Hull.

SPSS, Inc. was incorporated as of February 1, 1975. At that time NORC stopped selling the product using the Trademarks, and SPSS, Inc. began selling the product using the Trademarks. Initially, SPSS, Inc. had two shareholders, Nie and Hull, and several employees. When SPSS, Inc. began selling the product, it represented to the public that the source of the product was SPSS, Inc., not Nie or Hull, individually. SPSS, Inc. requested and received an assignment of all of NORC's rights and interests related to the SPSS product.

Nie and Hull transferred to SPSS, Inc., effective as of February 1, 1975, whatever rights they had in SPSS software, including the right to maintain and enhance the product, thereby relinquishing all control over the quality of the product to SPSS, Inc. From February 1975 to October 2007, over 32 years, Nie and Hull never asserted any rights purportedly as owners or licensors of the Trademarks. The Trademark License Agreement executed in 1976 falsely recited that Nie and Hull were owners of the Trademarks. At the time the Trademark License Agreement was executed by SPSS, Inc., no person considered the best interests of SPSS, Inc., separate from the interests of Nie and Hull. The Company did not have separate counsel, and

3

Nie and Hull considered the Company to have no interests separate from their own. Patrick Bova, who signed on behalf of the Company, did not undertake to consider the separate interests of the Company at the time he signed the Trademark License document. In light of the foregoing facts, from February 1, 1975 to the present, the Trademarks have been owned by SPSS Inc. or its predecessors.

Notwithstanding this newly discovered information, SPSS Inc. will continue to make its products available for inspection by Nie, until such time as the Court enters judgment in this action.

## INTERROGATORY AND SUPPLEMENTAL RESPONSE

**INTERROGATORY NO. 5:**  Identify any and all reasons that you contend that Defendants are not entitled to all rights granted to them under the License Agreement.

**ANSWER:**    In addition to the summary of its contentions set forth in a supplemental answer filed on August 1, 2008, SPSS further supplements its response to interrogatory no. 5 as follows.

At the time of the IPO and follow-on offering, Lawrence Samuels represented SPSS Inc. and Norman Nie personally and advised Nie to carefully review the registrations statements, underwriting agreements and related certificates before signing them. Samuels pointed out that Nie would be required to sign a certificate that, among other things, confirmed the accuracy of the representations and warranties of the Company set forth in the Underwriting Agreements. Samuels further advised Nie that he could be held liable to shareholders for any material misrepresentation or omission in these documents.

Nie signed the certificate, thereby affirming, among other things, the representation and warranty of the Company set forth in the Underwriting Agreement that states as follows:

> The Company and each of its subsidiaries owns, or possesses adequate rights to use, all material patents, patent rights, inventions, trade secrets, know-how, proprietary techniques, including processes and substances, trademarks, service marks, trade names and copyrights described or referred to in the Prospectus as owned or used by it or which

4

are necessary for the conduct of its business as described in the Prospectus, and no such rights as are material to the business and prospects of the Company and its subsidiaries, taken as a whole, expire or are subject to termination at the election of another party without the Company's consent at a time or under circumstances which would have a material adverse effect on the business, operation, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole.

At the time Nie signed the Certificate affirming the truth and accuracy of the representation and warranty quoted above, Nie either knew that he was misrepresenting the Company's right to use the Trademarks, was acknowledging that he had already conferred rights upon the Company to use the Trademarks that could not be terminated without the Company's consent or was granting such rights by the act of signing the Certificate. In any event, it would be inequitable to allow Nie, after having affirmed that no one could terminate the Company's use of the Trademarks without the Company's consent, to exercise such rights to the detriment of the Company and its shareholders, particularly after not having asserted any rights as owner of the Trademark or under the License Agreement for more than 14 years after the Company became a public company. Furthermore, it would be grossly inequitable under these circumstances to award any monetary compensation to Nie, particularly in light of the fact that the Trademark License Agreement, itself, was royalty free and Nie has admitted receiving all the financial benefits he was entitled to receive from the Company under a separate license agreement for the SPSS software that he developed with Hull and Bent.

In addition, Nie should be estopped from exercising any rights under the Trademark License Agreement because he never was the owner of the Trademarks for the reasons set forth above in SPSS's amended response to Interrogatory No. 1.

5

Dated:  August 29, 2008

SPSS Inc.

By: _____
One of Its Attorneys

Robert J. Kriss
Edward H. Williams
Thomas V. Panoff
Daniel K. Storino
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Attorneys for Plaintiff/Counterdefendant SPSS Inc.*

6

# VERIFICATION

I, Anthony Ciro, Associate General Counsel of SPSS Inc., declare that the foregoing **PLAINTIFF/COUNTERDEFENDANT SPSS INC.'S AMENDED RESPONSE TO INTERROGATORY NO. 1 AND ITS SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5** are true and correct to the best of my knowledge, information, and belief, including information within my personal knowledge and information provided to me by others at SPSS Inc., which I believe to be reliable and correct.

Dated: August 29, 2008

_____
Anthony Ciro

## CERTIFICATE OF SERVICE

I, Edward H. Williams, an attorney, certify that I caused a true and correct copy of **PLAINTIFF/COUNTERDEFENDANT SPSS INC.'S AMENDED RESPONSE TO INTERROGATORY NO. 1 AND ITS SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5** to be served on counsel listed below by the method indicated on August 29, 2008:

Peter V. Baugher
William B. Berndt
Jennifer A. Waters
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, Illinois 60606
(via messenger delivery)

Luther Orton
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, California 94104
(via U.S. Mail)

Edward H. Williams

# Exhibit I

8/8/2008 PANZA, RAYMOND H.

1                    IN THE UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF ILLINOIS

2                           EASTERN DIVISION

3      SPSS INC.,                         )

                                          )

4               Plaintiff/               )

                Counterdefendant,         )

5                                         )

            vs.                           )   No. 08 C 66

6                                         )

       NORMAN H. NIE and HADLAI          )

7      HULL,                              )

                                          )

8               Defendants/              )

                Counterplaintiffs.        )

9

10              The videotaped deposition of RAYMOND H.

11     PANZA, called for examination pursuant to the Rules of

12     Civil Procedure for the United States District Courts

13     pertaining to the taking of depositions, taken before

14     Margaret M. Kruse, Certified Shorthand Reporter for

15     the State of Illinois, at One South Wacker Drive,

16     Suite 2800, Chicago, Illinois, on the 20th day of

17     August, 2008, at the hour of 9:35 a.m.

18

19

20

21

22

23     REPORTED BY:  Margaret M. Kruse, CSR, RPR

24     LICENSE NO:  084-003036

1

1          THE WITNESS:  We engaged Merrill Lynch

2    and through a series of processes with them

3    did an offering combined with a share buyback.

4    BY MR. BERNDT:

5          Q.  Who was Merrill Lynch's counsel in the

6    transaction?

7          A.  I don't recall.

8          Q.  If I could ask you to turn to page

9    SPSS 267.

10          Do you see the paragraph at the top of

11    that page?

12          A.  I do.

13          Q.  Does that refresh your recollection as

14    to who represented Merrill Lynch in this

15    transaction?

16          A.  It does.

17          Q.  And who represented Merrill Lynch in

18    this transaction?

19          A.  Wilson Sonsini & Goodrich.

20          Q.  And who was SPSS's counsel?

21          A.  Mayer Brown.

22          Q.  Did Merrill Lynch perform due

23    diligence in association with this

24    transaction?

1          A.   They did.

2          Q.   What did they do?

3               MR. WILLIAMS:   Objection, overbroad;

4      foundation.

5               THE WITNESS:   A series of interviews

6      with the executives individually and as a

7      group.

8      BY MR. BERNDT:

9          Q.   Who did Merrill Lynch interview?

10         A.   I believe all of the senior

11     executives.

12         Q.   Does that include you?

13         A.   It did.

14         Q.   What else did Merrill Lynch do in

15     connection with due diligence?

16         A.   I'd have to go back and check my

17     notes; I don't recall.

18         Q.   What notes do you have about the

19     Merrill Lynch due diligence?

20         A.   I'd have -- again, I'd have to go look

21     and see what I have.

22         Q.   What typically do you have for a

23     transaction like this?

24         A.   I would typically, you know, have an

**8/8/2008  PANZA, RAYMOND H.**

1    appointment calendar as to what they would

2    need, what they would want.  I'm not sure what

3    I would have saved after the facts, after the

4    offering.

5        Q.  Do you have a separate file with

6    regard to each transaction?

7        A.  I have a file on the offering.

8        Q.  And would that file contain your notes

9    regarding due diligence?

10        A.  Possibly.

11        Q.  Did you search that file in connection

12    with discovery in this case?

13        A.  I did not.

14        Q.  And why not?

15        MR. WILLIAMS:  Objection, foundation.

16        THE WITNESS:  I didn't know there was

17    going to be any reason to.

18    BY MR. BERNDT:

19        Q.  Did Merrill Lynch ask you any

20    questions about the ownership of SPSS's

21    trademarks?

22        A.  They did.

23        Q.  And what questions did they ask?

24        A.  They raised a concern that we didn't

1    own the trademark.

2         Q.  Who raised that concern?

3         A.  The lawyers for Merrill Lynch.

4         Q.  Do you remember the individuals?

5         A.  I do not.

6         Q.  And who did they raise that concern

7    with?

8              MR. WILLIAMS:  Objection, foundation.

9              THE WITNESS:  With myself and

10   Mr. Ciro.

11   BY MR. BERNDT:

12        Q.  When did they raise the issue of the

13   ownership of the trademark with you?

14        A.  In one of the group sessions when they

15   were going through their due diligence

16   checklist.

17        Q.  Who else attended that group session?

18        A.  Representatives of Merrill Lynch, and

19   I don't recall.

20        Q.  Was -- was Mr. Noonan in attendance?

21        A.  I don't believe he was.

22        Q.  Was Mr. Dow in attendance?

23        A.  Very likely.  I don't recall.

24        Q.  Was Mr. Nelson in attendance?

1    A.  I don't recall.

2    Q.  Was Mr. Ciro in attendance?

3    A.  He was.

4    Q.  How about Miss McQuade?

5    A.  Now that you say that, I believe she

6  was.

7    Q.  Who did Merrill Lynch direct the

8  question regard the -- regarding the ownership

9  of the trademark?

10    A.  I don't recall that it was directed to

11  anybody in particular.

12    Q.  Did you respond to the question?

13    A.  I believe I did.

14    Q.  What did you say?

15    A.  I believe I referred it to Mr. Ciro.

16    Q.  What did Mr. Ciro say?

17    A.  I believe he confirmed that we didn't

18  own it.

19    Q.  During the meeting?

20    A.  I believe so.

21    Q.  Did he say anything else?

22    A.  I believe he also pointed out that we

23  had unlimited rights to use the trademark,

24  perpetual, royalty-free, exclusive, and that

1    A.  Later than that, but I don't recall.

2    Q.  Did you talk to Mr. Ciro about the

3  insurance carrier's questions after the

4  meeting?

5    A.  My recollection is we resolved the

6  issue.  They were satisfied and there was

7  nothing further on the matter.

8    Q.  Did you or did you not talk to

9  Mr. Ciro after the meeting with the insurance

10 carrier about the ownership of the trademark?

11   A.  I don't recall.

12   Q.  Let's go back to the meeting with

13 Merrill Lynch.

14       What was the date of the meeting where

15 Merrill Lynch asked you about the ownership of

16 the trademark?

17   A.  I don't recall the exact date, but it

18 would have been in early March of 2007.

19   Q.  Okay.  What was Merrill's response to

20 Mr. Ciro's statements in the meeting?

21   A.  Speaking of verbal response?

22   Q.  Yes.

23   A.  Okay.  I don't recall.  There was

24 discussion.  I don't recall the specifics.

1    Q.   Generally, what was their response to

2    Mr. Ciro's statements at the meeting?

3    A.   They wanted to understand more of what

4    the arrangement was with regard to not owning

5    the trademark and what impact that would have

6    on any disclosures made with regard to the

7    offering.

8    Q.   And are there any disclosures about

9    the ownership of the trademark in that

10   offering?

11   A.   I don't recall.  I'd have to look.

12   Q.   You can go ahead and look.

13       MR. WILLIAMS:  Mr. Berndt, do you want

14   him to read the entire document which is 75

15   pages?

16       MR. BERNDT:  I'd like -- I'd like an

17   answer to the question.

18       MR. WILLIAMS:  Well, you asked him --

19       MR. BERNDT:  If it requires him to

20   read the whole document, I'm going to have to

21   ask him to read the whole document.

22       MR. WILLIAMS:  Well, Mr. Panza,

23   Mr. Berndt has asked you to review this

24   document.  Take as much time as you please to

1    make yourself comfortable that you can answer

2    the question.

3                        (Witness peruses document.)

4            MR. WILLIAMS:  I would just object as

5    the document speaks for itself and the

6    question is overbroad.

7            THE WITNESS:  I see no reference to

8    the trademark.

9    BY MR. BERNDT:

10       Q.  Okay.  Why is there no reference to

11   the trademark in Exhibit 2?

12           MR. WILLIAMS:  Objection, foundation;

13   calls for a legal conclusion.

14           THE WITNESS:  At the conclusion of our

15   discussions with Merrill Lynch, they were

16   satisfied, so there was no disclosure required

17   is what I would presume.

18   BY MR. BERNDT:

19       Q.  How do you know they were satisfied?

20       A.  They told us.

21       Q.  What did they say?

22       A.  I don't remember specifics, but it

23   ceased to be an issue.

24       Q.  And when did it cease to be an issue?

1    During that initial meeting?

2        A.   I believe Mr. Ciro had subsequent

3    discussions with counsel for Merrill Lynch.

4        Q.   Were you present during those

5    discussions?

6        A.   Not all of them.

7        Q.   Did you ever hear from anyone at

8    Merrill Lynch that Merrill Lynch was satisfied

9    with the situation?

10       A.   I don't recall.

11       Q.   So do you have any reason to believe

12   that Merrill Lynch was satisfied other than,

13   as you put it, it ceased to be an issue?

14       A.   I'm sorry.  I don't understand your

15   question.

16       Q.   What's your basis for believing that

17   Merrill Lynch was satisfied with the

18   information you provided?

19       A.   It ceased to be an issue.  It went

20   away.

21       Q.   Anything else?

22       A.   No.

23       Q.   Did you -- after your initial meeting

24   where Merrill Lynch raised the ownership of

1    the trademark, did you have any further

2    meetings with Merrill Lynch on that topic?

3        A.  I did not.

4        Q.  Did you meet or discuss that issue

5    with anyone else?

6        A.  Mr. Ciro.

7        Q.  On how many occasions?

8        A.  I don't recall.

9        Q.  More than five?

10       A.  I don't recall.

11       Q.  More than 100?

12       A.  Definitely not.

13       Q.  Less than 20?

14       A.  Probably.

15       Q.  And did you have any discussions with

16   anyone other than Mr. Ciro in connection with

17   this transaction about the license agreement

18   or the ownership of the trademark?

19       A.  I'm sorry.  I'm confused.  With regard

20   to the trademark or with regard to the

21   offering?

22       Q.  With regard to the trademark in

23   connection with this offering.

24       A.  I don't recall speaking to anyone

1    other than Mr. Ciro regarding that issue.

2        Q.  Did you provide any documents to

3    Merrill Lynch relating to the ownership of the

4    trademark?

5        A.  I personally did not.

6        Q.  Do you know if anyone else did?

7        A.  I don't know.

8        Q.  Is there a probability you have notes

9    that relate to these issues?

10        MR. WILLIAMS:  Objection, calls for

11   speculation.

12        THE WITNESS:  I don't know.

13   BY MR. BERNDT:

14       Q.  But you could?

15        MR. WILLIAMS:  Objection, calls for

16   speculation.

17        THE WITNESS:  I could.

18   BY MR. BERNDT:

19       Q.  And you haven't reviewed your file

20   related to this transaction to look for such

21   notes?

22        MR. WILLIAMS:  Objection, asked and

23   answered.

24        THE WITNESS:  I have not.

32

1              (Witness previously duly

2              sworn.)

3         THE VIDEOGRAPHER:  We are back on the

4    record at 1:18 p.m.

5              RAYMOND H. PANZA,

6    having been previously duly sworn, was

7    examined and testified further as follows:

8         DIRECT EXAMINATION (Resumed)

9    BY MR. BERNDT:

10       Q.  Good afternoon, Mr. Panza.

11            How does SPSS track its profits?

12       A.  I'm sorry.  I don't understand your

13   question.

14       Q.  Well, how does SPSS record its

15   profits?

16       A.  In accordance with GAAP.

17       Q.  All right.  And how is that?

18            MR. WILLIAMS:  Objection, overbroad.

19            THE WITNESS:  In accordance with GAAP.

20   BY MR. BERNDT:

21       Q.  Well, how does it disclose its

22   profits?

23       A.  And I'm not trying to be difficult.

24   In accordance with GAAP.  I'm sorry.  I really

1      don't understand the question.

2          Q.  Does it record profits by individual

3      products?

4          A.  No.

5          Q.  Does it ever in any internal documents

6      determine the profitability of individual SPSS

7      products?

8          A.  There is no routine internal reporting

9      that does segment reporting.

10         Q.  How about nonroutine internal

11     reporting?  Have there been internal reports

12     that distinguish the profitability of

13     different profit lines?

14         A.  There are no internal GAAP reports

15     distinguishing between product lines.

16         Q.  What about non-GAAP reports?  Are

17     there non-GAAP internal SPSS reports that

18     disclose the profitability of individual SPSS

19     product lines?

20         A.  From time to time, there have been

21     one-off requests by the board to do

22     allocations between product families, and

23     those have been presented to the board.

24         Q.  When was the latest such request?

1          A.   I believe the last board meeting that

2     was held on July 24th was the last time we did

3     a presentation.

4          Q.   That was July 24, 2008?

5          A.   2008 was the last time that there was

6     a request.

7          Q.   Who made that presentation?

8          A.   Rich Elatta.

9          Q.   And who prepared the presentation?

10         A.   Rich, with the assistance of people

11    who work for me.

12         Q.   Who are those people?

13         A.   The gentleman who heads up that group

14    is Richard Parenti.

15         Q.   What group is that?

16         A.   He's corporate treasurer.

17         Q.   And did you review the presentation

18    before it was presented to the board?

19         A.   On this occasion, I did not.

20         Q.   Why not?

21         A.   It was very routine.  Rick had

22    reviewed it and I just didn't get to it.

23         Q.   Who's Rick?

24         A.   Rick Parenti.  I'm sorry.  Richard is

8/8/2008 PANZA, RAYMOND H.

1      Rick.

2          Q.   How long was the presentation?

3          A.   Five minutes.

4          Q.   And did that presentation disclose the

5      profitability of various product families of

6      SPSS?

7          A.   It did not.

8          Q.   What did it disclose about the

9      profitability of SPSS products?

10         A.   Allocation of R & D expenses.

11         Q.   Anything else?

12         A.   No.

13         Q.   Has there ever been a presentation to

14     the board that discloses the profitability of

15     various SPSS product families?

16             MR. WILLIAMS:   Objection, overbroad;

17     vague.

18             THE WITNESS:   Help me understand what

19     you're asking me when you say profitability.

20     BY MR. BERNDT:

21         Q.   Well, I think you referred before that

22     there had been requests for information about

23     the profitability of the product families,

24     correct?

1          A.  There have been cost allocations, not

2     profitability.  You could conclude a

3     profitability, but I wouldn't from an

4     accounting standpoint refer to it as

5     profitability.

6          Q.  And why not?

7          A.  Because it's non-GAAP.  It's an

8     allocation.

9          Q.  Okay.  And how does the allocation

10    work?

11         A.  Depending on the request, it could

12    vary from involved to not involved.

13         Q.  All right.  Let's talk about the July

14    24, 2008, presentation.

15         You said it was an allocation of R & D

16    expenses; is that correct?

17         A.  Correct.

18         Q.  What other figures did the

19    presentation contain?

20         A.  That was all.

21         Q.  So it was only the expense side?

22         A.  Only the expense side.

23         Q.  And it didn't show revenues?

24         A.  To the best of my recollection, it did

# Exhibit J

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrown.com

August 20, 2008

**BY E-MAIL**

**Thomas V. Panoff**
Direct Tel (312) 701-8821
Direct Fax (312) 706-8297
tpanoff@mayerbrown.com

William B. Berndt
Schopf & Weiss LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606

Re:     *SPSS Inc. v. Nie, et al.*, Case No. 08 C 66 (N.D. Ill.)

Dear Will:

I am writing to confirm several matters from our telephonic discovery conferences held on August 18 and yesterday, and in response to your letter from yesterday.

During yesterday's conference, you indicated that you believe you are entitled to more than the publicly available financial statements SPSS has produced for 2007 and 2008. You stated that additional documents are relevant to the issue of damages, particularly what royalty rates might be appropriate. I reiterated the point we raised on August 18 that the most to which your clients might be entitled, assuming they prevailed on their infringement claim and established the other necessary elements of a right to monetary relief, is a disgorgement of SPSS's profits and that such a calculation can be derived from SPSS's publicly available financial statements. This is true given that the SPSS trademark is used on all of the Company's products. You did not offer any authority refuting our assertion that disgorgement is the only conceivable and potential monetary remedy. Under a disgorgement theory, any royalty analysis is irrelevant. In fact, your clients do not even ask for a royalty in their amended counterclaim. Moreover, any documents prior to 2007 are irrelevant given that Mr. Nie alleges in his amended counterclaim that the purported infringement did not occur until late 2007, at the earliest. You state in your letter from yesterday that the publicly available financial statements for 2007 and 2008 are "plainly inadequate" and that additional documents are "clearly relevant." Notwithstanding these conclusory labels, you have yet to offer any principled reason for requesting additional documents or authority for your apparent theory that some monetary remedy other than disgorgement is a possibility in this case. We again request that your provide any authority that you have so that we can evaluate your relevance claim without resort to motion practice. Otherwise, SPSS stands by is objections made in its responses to your document requests.

We further do not agree to a second deposition of Mr. Panza and object to your statement that you will depose him twice. We believe our objections are well taken, and if sustained by the Court there will be no need for any further depositions. Further, defendants chose to delay issuing their second request for production until July 16, and SPSS timely responded with its

Mayer Brown LLP

August 20 2008
Page 2

objections and responses on August 15, leaving little to no time for discussions and resolution of disputes prior to Mr. Panza's August 20 deposition. Defendants assumed the risk that all document issues would not be resolved, by agreement or motion practice, prior to his deposition and they are not entitled to a second deposition regardless of how our discovery disputes are resolved.

For Request No. 3 of your client's Second Set of Document Requests to SPSS, which seeks "[a]ll documents referring or relating to trademark license agreements or sublicense agreements negotiated or entered into by SPSS," you asked that I confirm that SPSS has provided all of these documents for inspection. I confirm that, to the best of SPSS's knowledge, all license agreements between SPSS and third parties that involve the right to use the Trademark have been made available to you for inspection. On this point, I have asked you repeatedly to confirm whether you intend to complete your review of these documents. As you know, Jennifer Waters arrived at SPSS headquarters for the inspection several weeks ago and never returned after the first day. SPSS has gone to great lengths to make these documents available, such as by establishing a separate viewing room, which has significantly interfered with the ability of Company personnel to use these documents in the ordinary course of business over the past several weeks. My last request to you to confirm your intentions as to these documents was by email to Jennifer Waters on August 12. As with my previous requests, you never responded. Accordingly, I will instruct SPSS that it has fully complied with any obligation that may exist to provide the documents for inspection and that it may return the documents to their normal filing location.

In response to your concern regarding Request No. 19 of your clients' First Set of Document Requests, we interpreted the Court's order on your motion to compel to require us to provide defendants with information sufficient to show customer complaints about quality of SPSS products that the Company has received. The spreadsheets that the Company provided to you are the most comprehensive logging of such complaints. The spreadsheets also contain information rating the severity of the complaints, the number of similar complaints, and the disposition of the complaints. We fail to see how additional documents referring to these same complaints could have any relevance in this litigation, and it would be unreasonably burdensome to search for emails and other documents concerning individual complaints or groups of complaints. Please explain why you believe that the information we have provided is not sufficient for addressing the merits of the issues raised in the complaint and amended counterclaim.

In regard to Request Nos. 12 and 15 of SPSS's First Set of Document Requests, you mischaracterize my request as a "threat." I simply asked you to confirm whether you have produced documents in response to these requests, and if so, to identify those documents. Your response to these requests was served on March 24, 2008 and you produced responsive documents in May and June. Surely asking you to confirm whether your production from

Mayer Brown LLP

August 20 2008
Page 3

several months ago is complete is not the "threat" you claim it to be, nor was it intended as such. We are all cognizant of the looming discovery cut-off next week and the burden it places on our schedules. That is why we agreed to your request for a discovery conference on August 18, the next business day after our objections and responses were served, and to your request for a further discovery conference yesterday morning even though it began only forty-five minutes prior to the deposition of Mr. Hull. Given the importance of these categories of documents, if they exist, we maintain our reservation of rights to depose Messrs. Hull and Nie about them if responsive documents are produced after their depositions.

Sincerely,

Thomas V. Panoff

# Exhibit K

MAYER·BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrown.com

**Thomas V. Panoff**
Direct Tel (312) 701-8821
Direct Fax (312) 706-8297
tpanoff@mayerbrown.com

June 27, 2008

**<u>BY U.S. MAIL</u>**

Luther Orton
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104

Re:    *SPSS v. Nie and Hull*,
        Case No. 08 C 66 (N.D. Ill.)

Dear Luther:

Enclosed please find documents from Mayer Brown LLP in response to Request No. 3 of defendants' subpoena to Mayer Brown LLP. The Bates range for these documents is: MB 000001-000010.

Sincerely,

*Thm V Poff*

Thomas V. Panoff

Enclosures

cc:    Fern C. Bomchill (by hand delivery)
        William B. Berndt

Mayer Brown LLP operates in combination with our associated English limited liability partnership and Hong Kong partnership (and its associated entities in Asia).

SPPS, INC.

2006 CONVERTIBLE DEBT OFFERING

SUPPLEMENTAL DUE DILIGENCE REQUEST LIST

As of March 6, 2007

In connection with the proposed transaction, please furnish to Wilson Sonsini Goodrich & Rosati, counsel to Merrill Lynch, Pierce, Fenner & Smith Inc. ("**Merrill Lynch**"), copies of the documents requested below for SPSS, Inc. (the "**Company**").

1.  **Correspondence with SEC**: Please provide un-redacted copies of the letters dated September 1 and November 27, 2006 to the SEC regarding the Company's investigations of its stock options pricing.

2.  **Confidentiality and Invention Assignment Agreement**: In response to our request for employee non-disclosure and assignment agreements you have provided the Company's form of non-disclosure and assignment agreement. Please provide a schedule, if available, of employees that have signed such agreement or alternatively verify that the Company's internal policies dictate that all employees must sign form of non- disclosure and assignment agreement when they are hired.

3.  **Leases**: Please provide copies of leases for the domestic (excluding the Company's Chicago headquarters) and international locations disclosed in the 2006 \ 10-K where the Company has rented space or alternatively provide a schedule, if available, of leases for international locations containing lease location, annual lease amount, square footage, term and termination provisions.

4.  **Loan Waiver:** Please provide an executed copy of the waiver from Wells Fargo Foothill, Inc. of the covenants in the Loan Agreement dated March 31, 2003.

5.  **Research Reports:** Please provide a copy of the following reports published by International Data Corporation (IDC):
    a) Worldwide Business Intelligence Tools 2006-2010 Forecast
    b) Worldwide Business Intelligence Tools 2005 Vendor Shares
    c) Worldwide CRM Analytic Applications 2006-2010 Forecast
    d) Worldwide CRM Analytic Applications 2005 Vendor Shares

6.  **Trademarks**:

    Please provide copies of assignments of trademark ownership of SPSS to the Company in the following jurisdictions:

    USA: U.S. registration No.: 2864243 for the trademark SPSS which according to public registration is owned by Hadlai C. Hull and Norman H. Nie (as Individuals)

    Benelux: Benelux registration No.: 360757 for the trademark SPSS which according to public registration is owned by SPSS, Inc., the Illinois corporation and predecessor to the Company (SPSS, Inc., the Delaware corporation).

    France: French registration No.: 1601551 for the trademark SPSS which according to public registration is owned by SPSS, Inc., the Illinois corporation and predecessor to the Company (SPSS, Inc., the Delaware corporation).

MB 000007

U.K.: U.K. registration No.: B1070417 for the trademark SPSS which according to public registration is owned by SPSS, Inc. Please confirm that the Company (SPSS, Inc., the Delaware Corporation) owns the mark or provide a copy of the trademark assignment.

Germany: German trademark registration No.: 997862 for the trademark **VSPSS (with Design)** trademark which according to public registration is owned by SPSS, Inc. Please confirm that the Company (SPSS, Inc., the Delaware Corporation) owns the mark or provide a copy of the trademark assignment.

Spain: Spanish trademark registration No.: 1120763M9 for the trademark SPSS which according to public registration is owned by SPSS, Inc. Please confirm that the Company (SPSS, Inc., the Delaware Corporation) owns the mark or provide a copy of the trademark assignment. Please confirm that unlike all the other SPSS registrations referenced above (which all include related goods in Class 9--SPSS's technology offerings), this registration only covers goods in Class 16 (paper products), which does not cover SPSS Inc.'s core technology offerings. Please confirm that this registration set to expire on March 4, 2007 was renewed.

We note that the Company owns Community Trademark registration No.: 831115 for the trademark SPSS. Please indicate if trademark assignments were not filed in France, Germany or Spain because the Company was relying on this Community Trademark registration.

B- Please provide trademark registration numbers, trademark applications, and copies of any trademark assignments for all jurisdictions where the following trademarks are registered: Clementine and Predictive and all registered formatives of Predictive.

7.  **Patents:** Please provide a list of the Company's patent and patent application numbers and any assignments for patents not issued to the Company.

8.  **Security Ownership:** Please provide a copy of the Company's stock ledger as of March 13, 2006.

9.  **Employees:** Please provide a list of employees showing the breakdown of employees into the following functions and locations: domestic/international, full-time/part-time, sales, marketing and professional services/ R&D/ general and administrative.

10. **Foreign Currency Forward Contracts:** Please provide copies of all currency hedging contracts between the Japanese Yen and the British Pound.

11. **Subsidiaries:** Please provide a list of subsidiaries in addition to Significant Subsidiaries (as defined in S-X) that are material to the assets, intellectual property, or operations of the Company.

12. **Acquisitions and Divestitures:** Please provide a copy of the divestiture agreement with Systat Software /Craines Software. (A copy of the agreement was provided in the data room but we would like to confirm certain statements made in the Company's disclosure documents that are inconsistent with our notes).

13. **Director and Officer Questionnaires.** Copies of all director and officer questionnaires.

14. **Related Tractions:** Please provide, if applicable, copies of agreements between the Company and Virtela Communications, Inc., copies of agreements between the Company and Persistent Systems, Inc.,

15. **Risk Factors:** Please confirm that proposed risk factors are not applicable to the Company:

*If our competitors introduce new products and pricing strategies, it could decrease our product sales and market share, or could pressure us to reduce our product prices in a manner that reduces our margins.*

MB 000008

We may not be able to compete successfully against our competitors, and this inability could impair our capacity to sell our products. We primarily compete in three distinct markets: statistical tools, data mining tools and predictive analytic applications. Each of these markets is highly competitive, and we expect competition in each market to persist and intensify.

*We may not receive significant revenues from our current research and development efforts for several years, if at all.*

Developing software is expensive and the investment in product development often involves a long payback cycle. We have and expect to continue making significant investments in software research and development and related product opportunities. Accelerated product introductions and short product life cycles require high levels of expenditures for research and development that could adversely affect our operating results if not offset by revenue increases. We believe that we must continue to dedicate a significant amount of resources to our research and development efforts to maintain our competitive position. However, we do not expect to receive significant revenues from these investments for several years if at all.

*We might experience significant errors or security flaws in our products and services.*

Despite testing prior to their release, software products frequently contain errors or security flaws, especially when first introduced or when new versions are released. Errors in our software products could affect the ability of our products to work with other hardware or software products, could delay the development or release of new products or new versions of products and could adversely affect market acceptance of our products. If we experience errors or delays in releasing new products or new versions of products, we could lose revenues. Software product errors and security flaws in our products or services could expose us to product liability, performance and/or warranty claims as well as harm our reputation, which could impact our future sales of products and services. The detection and correction of any security flaws can be time consuming and costly.

*Privacy and security concerns, including evolving government regulation in the area of consumer data privacy, could adversely affect our business and operating results.*

The effectiveness of our software products relies on our customers' storage and use of data concerning their customers, including financial, personally identifying and other sensitive data. Our customers' collection and use of these data for consumer profiling may raise privacy and security concerns and negatively impact the demand for our products and services. We have implemented various features intended to enable our customers to better comply with privacy and security requirements, such as opt out messaging and checking, the use of anonymous identifiers for sensitive data, and restricted data access, but these security measures may not be effective against all potential privacy concerns and security threats. If a breach of customer data security were to occur, our products may be perceived as less desirable, which would negatively affect our business and operating results.

In addition, governments in some jurisdictions have enacted or are considering enacting consumer data privacy legislation, including laws and regulations applying to the solicitation, collection, processing and use of consumer data. This legislation could reduce the demand for our software products if we fail to design or enhance our products to enable our customers to comply with the privacy and security measures.

*SPSS may not maintain effective internal control over financial reporting which could have a material adverse effect on SPSS.*

In the event SPSS does not maintain effective internal control over financial reporting, the Company's financial statements could be inaccurate. If SPSS has inaccurate financial statements, it could have a material adverse effect on the value of the Company's common stock. [Disclose specific circumstances and facts relating to weaknesses in internal financial controls in previous years.]

MB 000009

*We will continue to incur significant increased costs as a result of operating as a public company, and our management will be required to devote substantial time to compliance with applicable regulations.*

We will continue to incur significant legal, accounting and other expenses relates to compliance with the Sarbanes Oxley Act, as well as new rules subsequently implemented by the SEC and The Nasdaq Global Market, that have imposed various new requirements on public companies, including requiring changes in corporate governance practices. Our management and other personnel will need to devote a substantial amount of time to these new compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and will make some activities more time consuming and costly. For example, we expect these new rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to incur substantial costs to maintain the same or similar coverage. In addition, the Sarbanes Oxley Act requires, among other things, that we maintain effective internal controls for financial reporting and disclosure controls and procedures. Our compliance with Section 404 of the Sarbanes Oxley Act will require that we continue to incur substantial accounting expense and expend significant management efforts.

MB 000010

# Exhibit L

8/19/2008 HULL, C. HADLAI

1                    IN THE UNITED STATES DISTRICT COURT

2                     NORTHERN DISTRICT OF ILLINOIS

3                         EASTERN DIVISION

4    SPSS Inc.,                        )

5                    Plaintiff/          )

6                    Counterdefendant,  )

7            vs.                        )  No. 08 CV 0066

8    Norman H. Nie and C. Hadlai Hull,)

9                    Defendants/        )

10                   Counterplaintiffs.)

11

12            The videotaped deposition of C. HADLAI

13   HULL, called for examination, taken pursuant to the

14   Federal Rules of Civil Procedure of the United

15   States District Courts pertaining to the taking of

16   depositions, taken before JULIANA F. ZAJICEK, CSR

17   No. 84-2604, a Notary Public within and for the

18   County of Kane, State of Illinois, and a Certified

19   Shorthand Reporter of said state, at Suite 3200, 71

20   South Wacker Drive, Chicago, Illinois, on the 19th

21   day of August, A.D. 2008, at 9:46 a.m.

22

23

24

1

1      Q.    Do you have any information that Norman
2  Nie ever stated to anybody that he was attempting
3  to assert rights under this License Agreement,
4  Deposition Exhibit 1, between the time it was
5  executed in September 1976 and October of 2007?
6      A.    I have no knowledge of that, no.
7      Q.    Do you have any information as to
8  whether Norman Nie stated to anybody during the
9  period September 30, 1976 to October 2007 that he
10 was attempting to assert rights as the owner of the
11 trademark SPSS?
12     A.    I've never heard anything to that
13 effect.
14     Q.    If you would turn to the second page of
15 Deposition Exhibit 1, Paragraph 4 begins, "Licensor
16 will furnish or direct the licensee and any
17 sublicensee in the standards of quality for each of
18 the goods and services on which the licensed marks
19 are marked, and licensee agrees to meet standards
20 of quality so established by the licensor and to
21 insure that any" license sub -- I'm sorry -- "to
22 insure that any sublicensee meets the same
23 standards of quality."
24             Did you ever furnish or direct SPSS Inc.

1    in the standards of quality for an SPSS product?

2        A.    I was the leader of development for well

3    over a decade.  During that period of time it was

4    my job to make sure that the products had quality

5    in them.  I'm not the sort who leads by fiat.  I

6    lead by example.  And all of the time that I was

7    the administrator, I was also the lead programmer.

8    The diligence I did in my job was an example to the

9    other programmers.  That was the extent of my

10   dictating standards.

11       Q.    Did you ever tell anybody at SPSS that

12   you were establishing a standard under this License

13   Agreement?

14       A.    No.

15       Q.    Do you have any information that Norman

16   Nie ever informed anybody at the company that he

17   was establishing standards of quality under this

18   License Agreement?

19       A.    No.

20       Q.    What was your position at SPSS at the

21   time of the initial public offering in 1993?

22       A.    I believe my title was principal

23   software engineer.  I was not an officer and I had

24   no equity interest in the company.

# Exhibit M

1

1    TRANSCRIBED FROM DIGITAL RECORDING

2                IN THE UNITED STATES DISTRICT COURT
3                   NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
4    SPSS, INC.,
                                        )
5              Plaintiff,               )
                                        )
6         vs.                           )
                                        )  No. 08 C 66
7    NORMAN H. NIE,                     )
                                        )  Chicago, Illinois
8              Defendant.               )  July 25, 2008
                                        )  9:11 A.M.
9                   TRANSCRIPT OF PROCEEDINGS - Hearing
10        BEFORE THE HONORABLE ARLANDER KEYS, Magistrate Judge

     APPEARANCES:
11
     For the Plaintiff:        MAYER BROWN LLP
12                             71 South Wacker Drive
                               Chicago, Illinois  60606
13                             BY:  MR. EDWARD H. WILLIAMS

14   For the Defendant:        SCHOPF & WEISS LLP
                               One South Wacker Drive
15                             28th Floor
                               Chicago, Illinois  60606
16                             BY:  MR. WILLIAM BUTLER BERNDT

17

18
                        PAMELA S. WARREN, CSR, RPR
19                         Official Court Reporter
                          219 South Dearborn Street
20                               Room 1928
                          Chicago, Illinois  60604
21                             (312) 294-8907

22
     NOTE:  Please notify of correct speaker identification.
23

24

25

2

1    (Proceedings held in open court:)

2        THE CLERK:  08 C 66, SPSS versus Nie, motion to compel

3    and motion for protective order.

4        MR. WILLIAMS:  Good morning, your Honor.  Edward

5    Williams on behalf of plaintiff SPSS.

6        THE COURT:  Good morning, Mr. Williams.

7        MR. BERNDT:  Good morning, your Honor.  Will Berndt on

8    behalf of defendant and counter-plaintiff Norman Nie.

9        THE COURT:  Good morning.  Is it Berns?

10       MR. BERNDT:  Berndt.

11       THE COURT:  Berndt, okay.

12       You have several motions here for -- all related

13   basically.  And I have read all of the pleadings that have been

14   filed in the last couple weeks involving these motions for

15   protective order, motions to compel.

16       We have 30(b)(6) topics that should be explored or

17   shouldn't be explored by Mr. Ciro.  Ciro?

18       MR. WILLIAMS:  Mr. Ciro was the SPSS designee, not on

19   those topics, however.

20       THE COURT:  Okay.

21       MR. WILLIAMS:  What happened, your Honor, is that they

22   issued their 30(b)(6) notice.  We objected.  We had some

23   conferences about it.  And at the end of the day, we had stood

24   on our objections with respect to Topics 8, 9, and 13.  And we

25   had designated Mr. Ciro to identify on the remaining topics.

3

1    He went in for the 30(b)(6) deposition, and Mr. Ciro

2    was questioned about those topics, but then he was also

3    questioned about Topics 8, 9, and 13, which we thought was

4    inappropriate and kind of ambushing us with that type of

5    discovery.

6    That being said, we did permit Mr. Ciro to answer

7    questions that didn't invade the attorney -- the linchpin of

8    the objections for those three topics was attorney-client

9    privilege.  And I can get into the details as to each topic and

10    as to why that was directly implicated.  But we let him answer,

11    even though I don't think they should have been asking those

12    questions at all since he wasn't designated on those and we had

13    clarified that the day before the deposition by letter, we let

14    him answer questions that didn't invade the privilege.

15    We let him answer questions about, you know, with

16    respect to the enforceability of the license agreement, Topic

17    Number 8, the who, what, where, the details of that kind of

18    thing, to the extent that Mr. Ciro knew.  Of course I had no

19    obligation to prepare him on that topic because he wasn't

20    designated on it.

21    On the SPSS's decision to ask for a trademark

22    assignment, he again testified about the non-privileged

23    information that he knew with respect to that issue.  And I

24    only drew the line when they started asking the why, the why

25    for the request for the assignment, and that was because it was

4

1    privileged.  It was based entirely on advice of counsel.

2          And I note, your Honor, in this opposition to our

3    motion for protective order that we not be forced to designate

4    a witness on these topics, they have not challenged those

5    assertions of the privilege that I made during the deposition.

6          A similar analysis applies in Topic 13 with respect to

7    the preparation of the 8-Ks.  Yes, SPSS as a public company had

8    an obligation under the federal securities laws to issue 8-Ks

9    that notified the public and the investing community about the

10   dispute that had arisen with Mr. Nie.  I think that what we

11   said about the litigation is just as irrelevant as any press

12   release that someone might issue about litigation.  It doesn't

13   bear on any of the issues in the case, but we had to make these

14   disclosures.

15         And, again, Mr. Ciro, as counsel for the company, had

16   some information about the who, the what, the when as to the

17   time unit of the disclosure, but we -- I didn't let him get

18   into the analysis, the legal analysis of what should and should

19   not be disclosed.

20         THE COURT:  Okay.  You are -- you know, I read the

21   transcript of the -- the transcript that was submitted to me of

22   the deposition of Mr. Ciro, and I think you were -- you were

23   wise in allowing him to answer the questions that he did

24   answer.  Because to stand on the position that you, the

25   plaintiff, can declare a 30(b)(6) -- 30(b)(6) topics off limits

1  on attorney-client or work product issues is not a good

2  position to take.

3          MR. WILLIAMS:  Well, your Honor, you can --

4          THE COURT:  But you didn't take that position --

5          MR. WILLIAMS:  Well, I --

6          THE COURT:  -- and you --

7          MR. WILLIAMS:  And, your Honor, I would also add I

8  timely objected, and they didn't seek any Court relief

9  asking -- you required me to designate a witness on that

10 issue.

11         THE COURT:  Okay.  But --

12         MR. WILLIAMS:  And that's the procedure.  I mean when

13 someone objects to topics, the procedure, is my understanding,

14 is that the party issuing the notice has the obligation to go

15 into court and ask for an order compelling it.

16         Now I did allow him to -- I did not designate Mr. Ciro

17 on those topics.

18         THE COURT:  Right.

19         MR. WILLIAMS:  But I did allow him to answer questions

20 that I viewed as not invading the attorney-client privilege.

21         THE COURT:  Well --

22         MR. WILLIAMS:  I will admit that I --

23         THE COURT:  That's the proper way to do it.

24         MR. WILLIAMS:  Well, I -- thank you.

25     (Laughter.)

6

1    THE COURT:  That's the proper way to do it because to

2    declare that the whole issue of enforceability of a license

3    agreement or the whole decision of the decision to request a

4    trademark assignment and the whole issue of the preparation and

5    filing of the 8-K forms and the license agreement and --

6    concerning the license agreement, to take the position that all

7    of that is attorney-client or work product, that's not going to

8    fly, and you didn't do that.

9        MR. WILLIAMS:  And, your Honor, if they had -- if they

10   had said that they wanted me to designate on the who, what,

11   where, when of those issues --

12       THE COURT:  Okay.  The fact --

13       MR. WILLIAMS:  -- I would have done it.  We never got

14   that far in our Rule 37 conferences.

15       MR. BERNDT:  Your Honor --

16       THE COURT:  All right.  Let's hear from Mr. Berndt.

17       MR. BERNDT:  I think your Honor has correctly

18   summarized our concerns with position as they are -- things are

19   now is that they lodged some objections.  Those objections

20   turned out to be unfounded because there actually were facts.

21   It wasn't entirely privileged, all facts (unintelligible) three

22   topics.

23        They let Mr. Ciro testify in his individual capacity

24   as to those three topics.  But we never have had a 30(b)(6)

25   representative testify as to the company's knowledge about

1  those three topics.

2          And I think that's what really the crux of the issue

3  is, we should be allowed to go forward on a 30(b)(6) with a

4  representative saying, here are the people who reviewed the 8-K

5  forms, here are the people who supplied the facts that went

6  into the 8-K, here are the people who reviewed the trademark

7  assignment, those types of issues.

8          THE COURT:  Well, without getting into the legal

9  analysis --

10          MR. BERNDT:  Exactly, your Honor.

11          THE COURT:  -- of these topics, I mean, you can't just

12  declare all these topics to be off limits.  And

13  (unintelligible) didn't do that.

14          MR. WILLIAMS:  And, your Honor, I --

15          THE COURT:  And what you do in these -- what you do in

16  these depositions, you prepare someone.  You -- and you have

17  them -- you produce them for their depositions, and you make

18  objections on a question-by-question basis.

19          MR. WILLIAMS:  Your Honor, I agree with that.  The

20  only thing that I would say in terms of the procedure that we

21  employed in this case is that we made it -- we stood on those

22  objections.  We had Rule 37 conferences about those

23  objections.  And it was quite clear prior to going into the

24  deposition that we were standing on those objections.

25          The Rule 37 conferences, you know, it was not offered

1   up to me that we just want to ask about the who, what, where,

2   when, and we don't want to get into privileged issues.  I think

3   that we did the right thing by objecting -- timely objecting,

4   confirming the topics on which Mr. Ciro had been designated,

5   and showing up at the deposition.

6          I don't think that it is fair then once -- when you

7   know as a party taking a deposition that a witness has not been

8   designated on certain topics and that objections have been

9   asserted to that, I think it is inappropriate to go into those

10  areas with that witness.  But, at the same time, to the extent

11  that they didn't get into privilege, I'll let him answer.

12          THE COURT:  Okay.  So with what's the problem now?

13          MR. BERNDT:  Your Honor, I think that to the extent

14  we're able to go forward and ask a corporate rep these

15  questions, based on the company's knowledge, not just

16  Mr. Ciro's knowledge, we're in -- there is no problem.  I think

17  we're in a good position.

18          THE COURT:  And that's Topics 8, 9, and 13?

19          MR. BERNDT:  Correct, your Honor.

20          MR. WILLIAMS:  And, your Honor, I would say -- I

21  would -- I don't think we need to have Mr. -- I mean, Mr. Ciro

22  would be the representative on those topics.  He's the one

23  who -- I mean, he is the in-house lawyer at the company.  He's

24  the one with the knowledge.  He's answered those questions.  It

25  is -- and they have the discovery they need.  They know the

1  answers to these questions.

2          MR. BERNDT:  Well, your Honor --

3          THE COURT:  Well, they have taken the position that

4  Mr. Ciro is the company rep with knowledge of these issues that

5  you want to depose him on, and you have already asked him the

6  questions.

7          MR. BERNDT:  Well --

8          THE COURT:  And they objected only when you -- when

9  they -- when in their opinion you were invading or attempting

10  to invade the attorney-client privilege or work product

11  doctrine.

12          Then you have got --

13          MR. BERNDT:  I think it is a little trickier than that

14  because during the deposition they took the position that

15  Mr. Ciro could answer the questions, but only in his personal

16  capacity.  And thus the questioning wasn't directed to the

17  company's knowledge or the company's actions on these --

18  related to these topics, the questioning was directed to

19  Mr. Ciro's knowledge or Mr. Ciro's actions.

20          So those questions in terms of what does the company

21  know?  What did the company do?  Those questions have not been

22  asked and answered.

23          And to -- honestly I think that --

24          THE COURT:  What is the distinction between

25  what -- how can there be a distinction between what the

1   company's knowledge was and that of Mr. Ciro who was the

2   designated 30(b)(6) witness?

3   　　　　MR. BERNDT:  Well, he wasn't the -- he was not the

4   designated 30(b)(6) witness on these topics at the deposition.

5   　　　　THE COURT:  Well, they are not going to try to ambush

6   you at trial by saying that -- by presenting someone else who

7   would then -- who would testify contrary to what

8   Mr. Ciro -- Ciro testified to on the basis that he wasn't

9   properly designated.  They can't do that.

10   　　　　MR. WILLIAMS:  We can --

11   　　　　THE COURT:  It is not your intention, is it?

12   　　　　MR. WILLIAMS:  That certainly is not my intention,

13   your Honor.  I mean, he's a representative of the company.  And

14   he is by far the most knowledgeable with respect to this

15   litigation and to the issues surrounding the Topics 8, 9, and

16   13.

17   　　　　THE COURT:  And are there questions that you would

18   have asked Mr. Ciro had -- had you -- had counsel had not

19   informed you that he was not testifying as to the company's

20   knowledge that you didn't ask him?

21   　　　　MR. BERNDT:  I think there are, your Honor.  It is not

22   a long list, but there are questions.  And I can give you an

23   example.

24   　　　　One of which would be -- one of the topics relates to

25   a trademark assignment.

11

1       THE COURT:  Uh-huh.

2       MR. BERNDT:  Where they gave a trademark assignment to

3   my client and said, why don't you sign this.

4       THE COURT:  Okay.

5       MR. BERNDT:  And that would have taken his rights in

6   this --

7       THE COURT:  That was after the company went -- went

8   public, right?

9       MR. BERNDT:  It was.

10      THE COURT:  Okay.

11      MR. BERNDT:  So, and they would have taken his rights

12  to the trademark.

13      And we know that Mr. Noonan, who is the CEO of the

14  company, reviewed the assignment beforehand.  We're not sure

15  that Mr. Ciro knows all that's on (unintelligible) Mr. Noonan

16  reviewed the trademark assignment and gave it to him, the who,

17  what, why, when as to other people's review of that document.

18      And the same thing for the 8-K.  We know from the

19  deposition now what Mr. Ciro did with regard to the 8-K, but as

20  these other people who are central people to the litigation, we

21  don't know what they did because we didn't get to ask those

22  questions.

23      THE COURT:  But counsel is representing that Mr. Ciro

24  was the person who would have the knowledge of what everybody

25  knew.

12

1  Right?

2  MR. BERNDT:  And so I'm clear, your Honor, is SPSS

3  then willing to designate Mr. Ciro's testimony on these topics

4  as the testimony of the company?

5  MR. WILLIAMS:  Yes.

6  THE COURT:  Is that correct?

7  MR. WILLIAMS:  Yes.  That's that sounds like a fair

8  compromise, your Honor.

9  THE COURT:  All right.

10  Now what does that -- so what is the next problem we

11  have?  This is the protective order, right?

12  MR. WILLIAMS:  Well, you just addressed our motion for

13  protective order with respect to the deposition.

14  The other motion is Mr. Berndt's motion to compel.

15  THE COURT:  Okay.

16  MR. BERNDT:  Correct, your Honor.

17  And our motion to compel relates to objections --

18  THE COURT:  So we're finished with the motion to --

19  MR. WILLIAMS:  I think it is --

20  THE COURT:  -- for protective order, right?

21  MR. BERNDT:  We are, your Honor.

22  THE COURT:  Okay.

23  MR. WILLIAMS:  I think it has been resolved at

24  the -- it is -- how do you want to put it, it is a stipulation

25  that Mr. Ciro's testimony with respect to those issues binds

13

1  the company.  He's already an agent of the company, and I'm
2  very comfortable with that in any event.
3       So I think that -- I don't know procedurally what your
4  order should reflect, but there won't be a further 30(b)(6)
5  deposition on those topics.
6       THE COURT:  Okay.
7       MR. BERNDT:  Okay.
8       THE COURT:  Well, my order will be basically that
9  motion is granted in part, denied in part consistent with the
10 rulings during oral argument.
11      MR. BERNDT:  Fair enough, your Honor.
12      THE COURT:  Pick up a copy of the transcript.  .
13      MR. WILLIAMS:  That should do it, your Honor.
14      THE COURT:  Because for the most part you guys have
15 agreed here.  All right?
16      MR. BERNDT:  That's right.
17      THE COURT:  Now with regard to the motion to compel, I
18 understand that Mr. Nie -- Nie, is it?  -- he was professor at
19 the University of Chicago, and he was the person who had a
20 trademark, got the trademark.
21      MR. BERNDT:  Correct.
22      THE COURT:  And 30 some years ago he assigned some of
23 his -- he assigned -- or he gave a license --
24      MR. BERNDT:  License.  Correct, your Honor.
25      THE COURT:  -- to the company to utilize, to use the

14

1   trademark, and this is when the company was a real small, real

2   small deal at that point.  And for the next 30 years the

3   company grew and grew and grew and became -- and went public.

4          And then the plaintiff came to Mr. Nie and said, you

5   know, there is some loose ends here that need to be worked out

6   here.  We have got a license agreement that we entered into,

7   and you haven't done anything on it for the last 30 years.  And

8   we just want you to sign here and so that we can clear up these

9   loose ends here because of the fact that we have gone public

10  and all that.

11         And Mr. Nie said, well, wait a minute.  And actually

12  (unintelligible) Mr. Nie had forgotten about this whole thing.

13         MR. BERNDT:  He does.  He does.

14      (Laughter.)

15         THE COURT:  He realized how valuable it might be.

16         MR. BERNDT:  Right.

17         THE COURT:  Or he does now.

18         MR. BERNDT:  And there are a couple other intervening

19  events to that summary.

20         THE COURT:  Yes.

21         MR. BERNDT:  One of which is in 2002 the company

22  re-registered the trademark --

23         THE COURT:  Okay.

24         MR. BERNDT:  -- and registered again in Mr. Nie's

25  name.

15

1      And I think that -- I think it is probably correct

2   that the company would say, although they didn't say, you

3   haven't done anything with this for the last 30 years.  But

4   Mr. Nie would disagree with that.  Mr. Nie would suggest that

5   he founded this company, he was really the central figure for

6   decades and was the chairman up until January of this year.

7   And so during that time period he's really looking at the

8   company's resources, looking at the quality of the company's

9   products.  And it is really only just before he is -- he left

10  as chairman that this issue of we need to give -- we need --

11  the company asked that he give them -- give them this asset,

12  the trademark.

13      THE COURT:  Uh-huh.

14      MR. BERNDT:  And so our motion to compel relates to a

15  couple factual issues really, that I think SPSS has deemed

16  contention interrogatories, but we would deem factual issues

17  relate to their theory of the case and that we think should be

18  entered now.

19      Discovery closes, your Honor, in this case in about a

20  month, September 1st.  The two contention interrogatories we're

21  moving on today, the first is simply who is the owner of the

22  trademark.  We think it is very clear that Mr. Nie is the owner

23  of the trademark.  And SPSS has just responded, investigation

24  continues.  They won't (unintelligible).

25      THE COURT:  Well, any arguments regarding contention

1    interrogatories now with only 34 days left, 35 days left of

2    discovery, I'm not going to accept an argument that it is still

3    too early in discovery to answer contention interrogatories.  I

4    know that you cited the Ziemack versus Centel case and the

5    Thomas versus -- the Thomas & Betts versus Panduit.

6        By the way, Ziemack was my first opinion, and it got

7    published.

8        (Laughter.)

9        THE COURT:  I couldn't believe that.  That was my

10   first -- I was sworn in in early 1995, and Judge Duff sent

11   over -- the Wale Ziemack case to me and issued an opinion on

12   that after discovery and during discovery, and it has been out

13   there.  I'm proud of that.

14       MR. WILLIAMS:  It has been widely cited to, your

15   Honor --

16       THE COURT:  Well --

17       MR. WILLIAMS:  -- I can tell you.

18       THE COURT:  Okay.

19       MR. WILLIAMS:  Your Honor, I understand what your

20   Honor is saying.  And I just want to make it clear, we have

21   never said that we would not -- I mean, first of all, I think

22   the two interrogatories are different.  The first interrogatory

23   says who owns the mark.  And we have never made any allegations

24   regarding that.

25       So the notion that we should have, as a plaintiff, in

1   compliance with Rule 11 and done our factual investigation

2   should have had -- been in the position to answer that from day

3   one I disagree with.  The -- and really, your Honor, the only

4   thing that we want to do before we answer that interrogatory is

5   we want to take the depositions of the defendants Nie and

6   Hull.  And those are scheduled -- we have issued notices.  We

7   have scheduled those for August 7th and August 14th.

8       I would be happy to answer that interrogatory on

9   August 21st once we have the depositions.

10      THE COURT:  You don't think that the deposition of

11  Mr. Nie or whomever else -- I mean, Mr. Hull is the other guy?

12  Hull?

13      MR. BERNDT:  Correct, your Honor.

14      THE COURT:  You don't think that that's going to

15  change your contention, do you?  You're not going to --

16      MR. WILLIAMS:  It -- I don't have -- I haven't made a

17  contention.  I don't --

18      THE COURT:  (Unintelligible) contention is --

19      MR. WILLIAMS:  It is not a situation, your Honor,

20  where SPSS possesses all of the relevant facts with relation to

21  the question of whether or not they are the owners.

22      Their -- the problem is that SPSS has transformed into

23  a public company.  It has new management.  And it has had this

24  new management for quite some time.

25      Obviously we're not -- even though Mr. Hull is a

1  current employee -- obviously we're not discussing with him the

2  facts surrounding ownership of the mark.  Mr. Nie we have no

3  access to.

4          We would like to take those depositions.  If -- you

5  know, it is -- I think, your Honor, we're only talking about a

6  very narrow timing question.  You know, they have asked us to

7  answer these interrogatories by August 1st.  I think that's an

8  unfair request.  Number one, you know, the motion was only

9  filed relatively recently.  All I want to do is take the

10  depositions and then answer these interrogatories.

11          We're perfectly happy to take a position once we have

12  all the facts.  But what if we take the depositions?  Then

13  we're just going to have to supplement and revisit the issue at

14  that time?  I don't think that makes sense.  I think that we

15  have the depositions scheduled.  We're willing to answer these

16  interrogatories, both of them, promptly after that time

17  period.

18          It is really just a question -- they are saying August

19  1st; I'm saying August 21st let's get the deps done first.

20  That's all that -- that's the only dispute.

21          THE COURT:  Well, I'm not going to make any

22  suggestions here.  But suppose he had filed a request to admit,

23  request to admit that Nie owns the trademark.  And you would

24  have had to answer that.  The PTO says that he owns it, don't

25  they?

MR. BERNDT:  Your Honor, they are using the mark.  I mean, they have been using it for the entire duration of this litigation.

THE COURT:  Is the objection -- I mean, is the reluctance there the word owns?

MR. WILLIAMS:  The only -- it simply is an issue that we feel like we wanted to take the depositions before we, you know, are required to state our position and to state all facts supporting our position.

THE COURT:  But based on what you have gotten in the last eight months here --

MR. WILLIAMS:  Based on what I know right now?

THE COURT:  -- you have a -- you have a theory or a contention as to whether Mr. Nie owns it or whether you own it.  You're not going to claim -- well, I don't know what you're going to claim there.  They have a right to know that.

MR. WILLIAMS:  All right.  You know, your Honor, I'll tell you, I have -- I don't know what the contention is on that.  I would -- I mean, would I prefer to make a decision about what the contention is once I know the facts.  I mean isn't that the usual way that a lawyer operates, gather the facts and then make a contention with respect to the application of the law to these facts?

That's -- that's all that I am asking for is the appropriate time to answer this.  And I think that after the

20

1    depositions --

2            THE COURT:  Well, after --

3            MR. WILLIAMS:  -- is the appropriate time.

4            THE COURT:  -- eight months of discovery here, you

5    should have formed a theory as to who owns that.  I mean, it is

6    not -- I don't think it is a critical issue here.  I mean,

7    from -- factually it appears that Mr. Nie owns it.  At least

8    the PTO says he owns it.  But you're contending that -- and he

9    agrees that he licensed it to you.

10           MR. WILLIAMS:  Well, there is --

11           THE COURT:  What difference does it make anyway here?

12           MR. WILLIAMS:  There is a lot of facts floating

13    around.  I mean, in the -- in the IPO that Mr. Nie reviewed and

14    approved, it says SPSS is the owner of the mark.  So I -- you

15    know, I'm just saying there is countervailing facts.  I would

16    like to find out from Mr. Nie what went on in connection with

17    the IPO.  I would like to know his thought process and I'd like

18    to give him the opportunity to tell me all of the facts that

19    relate to his position, the position they have taken, not an

20    issue that we have taken a position on, that the -- that he

21    owns the mark.

22           MR. BERNDT:  And, your Honor, to your point that this

23    answer should have come sooner, your Honor, this interrogatory

24    was issued March.  The response, I believe, came in April.  We

25    met and conferred about it several times in May.

1    The deposition they are requiring -- they are

2 asking -- saying they require, the notice didn't come out until

3 after we filed our reply brief on this motion on Tuesday.  So

4 we got that deposition notice for Mr. Hull and Mr. Nie for

5 early next month after we filed the reply brief.

6    MR. WILLIAMS:  Yeah --

7    MR. BERNDT:  So I think that the idea that this

8 discovery is crucial for them to answer this, I just don't see

9 it, your Honor.

10    MR. WILLIAMS:  I --

11    MR. BERNDT:  I mean, to us it is a clear question they

12 should have answered a long time ago.  They shouldn't have to

13 wait another month or take a deposition to answer it now.

14    MR. WILLIAMS:  Your Honor, we always planned on taking

15 these depositions in August.  And the only reason why the

16 notice didn't go out earlier is my partner Bob Kriss, who is

17 going to be taking those depositions, and, unfortunately, his

18 mother passed away two weeks ago, so I didn't know what his

19 schedule was going to be and when would be an appropriate date

20 to notice those depositions.  That's the only reason why the

21 notices weren't issued earlier.

22    August is the appropriate time.  It is after all of

23 the document discovery has been done and all the

24 interrogatories have been answered, and that's when we wanted

25 to take the depositions of the two defendants.

22

1    THE COURT:  Well, I think they are entitled to an

2    answer as to your contention as to who owns that mark now

3    because, depending on what your answer is, they might want to

4    seek more discovery.  Of course they won't be able to do that

5    after -- 30 days before -- before the close of discovery they

6    can't propound new discovery because it can't be answered

7    within that period.

8         But they are entitled to know your -- what your

9    contention is regarding the ownership of that mark.  And I'm

10   going to order you to answer that.

11        I mean, you can explain -- I don't expect you to -- I

12   don't expect you to say the mark is owned by Professor Nie, and

13   -- period.  I mean, if you want to explain that after

14   you -- you know, go ahead.  But he's entitled to that.

15        MR. BERNDT:  And we think that's the right answer,

16   your Honor, just to point that out.

17        But I think the same ruling, your Honor, relates to

18   Interrogatory 5 regarding whether the license agreement should

19   be enforced.  Your Honor, their claim is estoppel and that some

20   facts that they relied on preclude Mr. Nie from enforcing his

21   rights under the license agreement.

22        They have listed in their response brief a list of

23   facts from the complaint, which again was filed in January,

24   your Honor, that complaint and answer, that describe why

25   they -- supposedly the basis.  And at one point they say it is

1   all of the facts that were in there that were the basis for

2   their claims in this case.  If that's true, your Honor, all

3   they need to do is list those facts in their interrogatory

4   response.

5   THE COURT:  Yeah, you're entitled to that.

6   MR. BERNDT:  Yeah.

7   THE COURT:  I have read that.  I have read that.  I

8   have read your response to that motion as well.  And all you

9   have to do is explain to -- list the facts.  Can't rely on the

10  fact, that, well, look at the complaint and if -- it tells you

11  what our position is regarding enforceability and so forth.

12  MR. WILLIAMS:  When I saw the reply brief, when they

13  said all they want us to do is to cut and paste the facts that

14  we had listed in our brief into an interrogatory answer, I came

15  here prepared to say that we are fully prepared to do that.

16  MR. BERNDT:  As long as that's --

17  THE COURT:  If that's what your current position is,

18  do it.  They shouldn't have to search through the whole

19  complaint to just ascertain this position.

20  MR. WILLIAMS:  I'm glad to hear they understand our

21  case.

22  THE COURT:  All right.

23  MR. BERNDT:  Your Honor, the final point relates to

24  two document requests about the quality of SPSS products

25  complaints and complaints about the those, and about complaints

1  about the financial allocation of resources at SPSS, which

2  ultimately relate to whether or not the quality of SPSS

3  products --

4        THE COURT:  Now Mr. Nie, at least -- he says that he

5  is concerned about the quality of his products since

6  his -- since it is his product.

7        MR. BERNDT:  Correct.

8        THE COURT:  And he wants to know if there have been

9  complaints by the public regarding the quality of those

10  products.

11        MR. BERNDT:  That's absolutely correct.

12        And --

13        THE COURT:  And why does he need that?  I mean, I have

14  (unintelligible) seen your answer, but --

15        MR. BERNDT:  Right.  Well, we can go back to our

16  counterclaim discusses not only now after he's out as chairman,

17  but while he was chairman of the company, after, let's say,

18  2002 to the present, he was always a vocal chairman, and he was

19  making -- he was voicing his concerns about the quality of the

20  products, about where the resources of SPSS were going, how

21  that was affecting the quality of the products.  And we allege

22  in our counterclaim that had the company followed his advice,

23  the quality of the SPSS products would be higher now.

24        They, of course, have denied those claims.  And they

25  have denied that his concerns about the quality of the SPSS

1    products were valid.

2        One of the issues in this cases is whether or not

3    Mr. Nie set standards under the license agreement while he was

4    chairman.  I think that that's going to be a factual issue as

5    to whether his role as chairman, he's close to the company,

6    he's looking at the products, he's voicing his concerns,

7    whether that qualifies and whether or not SPSS has followed

8.   those standards and what the reaction of the public was to the

9    quality of these products.

10       So that's why we (unintelligible), your Honor.

11       THE COURT:  Okay.  And we do have to, in ruling on

12   motions, discovery motions we have to acknowledge, regardless

13   of the fact that we have not just a complaint here, but we have

14   a counterclaim --

15       MR. WILLIAMS:  I'm very --

16       THE COURT:  -- and the counterclaim, you have to

17   consider both.  And if any -- if the information that he is

18   seeking is relevant to either the complaint that -- the items

19   that are raised in the complaint or the counterclaim, then

20   you're going to have to produce that information.

21       MR. WILLIAMS:  Well, your Honor --

22       THE COURT:  You might not agree that the quality of

23   the products is relevant here, but it -- I can't say as a

24   matter of law here that it wouldn't be or that it could not

25   lead to admissible evidence.  So --

1    MR. WILLIAMS:  May I briefly respond, your Honor?

2    THE COURT:  Go ahead.

3    MR. WILLIAMS:  I appreciate the opportunity.  And I

4    understand that you have carefully read these pleadings, as you

5    have demonstrated, and I appreciate that.

6    The only thing I would say is that it is obvious that

7    he didn't exercise quality control pursuant to the license

8    agreement.  That's obvious.  He forgot about it.

9    And I think, your Honor, when we talk about, okay,

10   well, what is the quality of the SPSS product?  I think that

11   whether or not there were complaints by, you know, random

12   consumers about the product doesn't really bear on that.

13   But I guess that, you know, what's good for the goose

14   is good for the gander.  So if we want to put on evidence of

15   all of the people who don't complain and who think the product

16   is very good, I guess that that's how we will respond and we'll

17   provide --

18   THE COURT:  But --

19   MR. WILLIAMS:  -- that affirmative testimony.

20   THE COURT:  Right.

21   MR. WILLIAMS:  But I don't think this testimony --

22   THE COURT:  First of all, the fact that I am allowing

23   discovery in a particular area doesn't mean that it is going to

24   be admissible.

25   MR. WILLIAMS:  I understand, your Honor

27

THE COURT:  I mean, the trial judge in this case might well decide that this whole issue of quality control or complaints by the public is irrelevant to this case.  He might decide that.  But I can't make that determination at this point.  He might well keep it out.  But that doesn't mean it is not discoverable.  And I would think that if it is not -- wouldn't be a difficult issue for you to -- wouldn't be difficult to -- with regard to producing discovery in that area shouldn't be overwhelming here.

Hopefully you didn't have any complaints.  Okay?

MR. WILLIAMS:  I --

THE COURT:  What's the next one?

MR. BERNDT:  That's it, your Honor.

MR. WILLIAMS:  That's it, your Honor.

THE COURT:  That's it?

MR. WILLIAMS:  Thank you.

THE COURT:  All right.

MR. WILLIAMS:  I understand your rulings.

THE COURT:  All right.

MR. WILLIAMS:  Thank you very much.  Have a good day.

THE COURT:  Okay.  You too.

Now do we have another status -- do we have a status hearing in this case?

THE CLERK:  No.  This is it.

THE COURT:  Is that what Judge Darrah sent it over,

28

just a ruling on this?

MR. WILLIAMS:  It was for all discovery issues --

THE COURT:  Okay.

MR. WILLIAMS:  -- but nothing more than that.  And right now we don't have any other pending discovery disputes.

THE COURT:  All right.  What I will do, I'll put it out there.  Now discovery ends September 1st.

MR. WILLIAMS:  That's correct, your Honor.

THE COURT:  Let's set it for another status hearing around the mid -- I don't think Judge Darrah is coming back until probably late September maybe.  So I will -- maybe around the mid -- probably the 10th or 12th of September.

THE CLERK:  Closer to that?

THE COURT:  See if there are other -- any other issues.

If there is any discussion -- if there is any dispute between us guys between here and -- between now and then, having a conference and filing your motion.  You should --

THE CLERK:  September 10th at 9:00.

THE COURT:  September 10th.  And so maybe by the time you have had to appear before Judge Darrah discovery might be completed.

MR. WILLIAMS:  Very good, your Honor.

THE COURT:  Hopefully it will.

MR. BERNDT:  Yes.

29

MR. WILLIAMS:  Thank you, your Honor.

THE COURT:  All right.  You're welcome.

(Which concluded the proceedings in the above-entitled matter.)


C E R T I F I C A T E


I hereby certify that the foregoing is a transcript of proceedings before the Honorable Arlander Keys on July 25, 2008.

DATED:  August 4, 2008