UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SPSS INC., <br><br> Plaintiff, <br><br> v. <br><br> NORMAN H. NIE and C. HADLAI HULL, <br><br> Defendants. <br><br> NORMAN H. NIE, <br><br> Counterplaintiff, <br><br> v. <br><br> SPSS INC., <br><br> Counterdefendant. | No. 08 C 66 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff, SPSS Inc., ("SPSS" or "the Company") brought suit against Defendants Norman H. Nie and C. Hadlai Hull, seeking a declaratory judgment that Defendants are estopped from asserting rights under a trademark licensing agreement between the parties. Defendant Nie filed a counterclaim against SPSS for trademark infringement. Before the Court are the parties' cross-motions for summary judgment.

## BACKGROUND

SPSS is a leading worldwide provider of predicative analytics software. (Pl.'s 56.1(a), ¶ 1.) SPSS is a publicly traded company incorporated under Delaware law and headquartered in Chicago, Illinois. (Pl.'s 56.1(a), ¶ 1.) Defendant Norman H. Nie is a former chairman of the

board of directors of SPSS. (Pl.'s 56.1(a), ¶ 2.) Nie resigned as chairman on January 3, 2008. Defendant C. Hadlai Hull is a former employee of SPSS. (Pl.'s 56.1(a), ¶ 3.)

The origins of SPSS date back to 1966, when Nie, Hull and Dale H. Bent began to collaborate in developing computer software that performed statistical analysis of data (the "SPSS software"). (Pl.'s 56.1(a), ¶ 7.) At the time, Nie and Bent were doctoral candidates at Stanford University; and Hull worked for a private computer company. (Pl.'s 56.1(a), ¶ 7.) In 1967, Hull was hired by Stanford, where he spent a substantial part of his time developing the SPSS software. (Pl.'s 56.1(a), ¶ 7.)

In 1968, Nie left Stanford and went to work for the University of Chicago. (Pl.'s 56.1(a), ¶ 9.) Hull followed in 1969.[1] (Pl.'s 56.1(a), ¶ 9.) Nie and Hull continued to work on the SPSS software at the National Opinion Research Center ("NORC"), an affiliate of the University of Chicago. (Pl.'s 56.1(a), ¶ 10.) Several employees of NORC, in addition to Nie and Hull, were responsible for developing and selling the SPSS software; these included a full-time computer programmer, accounting staff and clerks responsible for order fulfillment and customer support. (Pl.'s 56.1(a), ¶ 11.) Patrick Bova, an employee of NORC, was primarily responsible for administering the sales of the SPSS software. (Pl.'s 56.1(a), ¶ 11.)

On February 1, 1975, Nie and Hull incorporated SPSS, Inc. under the laws of the State of Illinois. (Pl.'s 56.1(a), ¶ 13.) Nie and Hull each owned 50 percent of the stock and were directors of the company. (Pl.'s 56.1(a), ¶ 13.) Bova was named as the third director. (Pl.'s 56.1(a), ¶ 13.) After an assignment of rights from NORC, SPSS, Inc. continued to sell the SPSS

---

[1] Bent left Stanford for the University of Alberta in 1967 and stopped work on the SPSS software at that time. (Pl.'s 56.1(a), ¶ 9.)

software. (Pl.'s 56.1(a), ¶ 14.) In September 1975, Nie and Hull asked their attorney, who also represented SPSS, Inc., to draft a document that purported to licence the SPSS software to SPSS, Inc. and required SPSS, Inc. to pay Nie and Hull a royalty on sales of the software (the "Software License"). The Software License provided that Nie and Hull "permit [SPSS, Inc.] to be the sole and exclusive source of the provision of maintenance of and enhancements to [the SPSS software]." (Pl.'s 56.1(a), ¶ 16.)

In 1976, Nie and Hull asked their attorney to prepare a trademark license agreement (the "Trademark Agreement") by which Nie and Hull, as purported owners of the trademark "SPSS" (the "Trademark"), would grant SPSS, Inc. a license to use the Trademark. (Pl.'s 56.1(a), ¶ 18.) On September 30, 1976, Nie and Hull executed the Trademark Agreement, giving it the retroactive date of February 1, 1975. (Pl.'s 56.1(a), ¶ 18.) Bova signed the Trademark Agreement on behalf of SPSS, Inc. (Pl.'s 56.1(a), ¶ 19). Bova did not consult with an attorney or take any other steps to determine whether the Trademark Agreement was in the best interest of SPSS, Inc. (Pl.'s 56.1(a), ¶ 19.) In October, 1976, Nie and Hull submitted an application to the U.S. Patent and Trademark Office ("PTO") to register the Trademark. (Pl.'s 56.1(a), ¶ 22.) In the application, they requested to be registered as joint and individual owners of the mark. (Pl.'s 56.1(a), ¶ 22.) On September 14, 1977, nearly one year after it was executed, the board of directors of SPSS, Inc. (consisting of Nie, Hull and Bova) purportedly ratified the Trademark Agreement. (Pl.'s 56.1(a), ¶ 20.)

In May 1993, SPSS, Inc. incorporated under the laws of the State of Delaware and became known as SPSS Inc. (Pl.'s 56.1(a), ¶ 24.) In August 1993, SPSS made an initial public offering of stock (the "IPO"). (Pl.'s 56.1(a), ¶ 24.) In August 1993, Nie, then-chairman of the

board of directors of the Company, signed an underwriting agreement (the "Underwriting Agreement") and a chairman's certificate (the "Chairman's Certificate"). (Pl.'s 56.1(a), ¶ 25.) The Chairman's Certificate states in part that Nie, as chairman of the board:

> "[C]ertifies that he has carefully reviewed the Company's Registration Statement . . . as well as the prospectus filed with the Securities and Exchange Commission . . . and, based on that review, the following statements are true and correct:
>
>> (i): "the statements made in the Registration Statement and the Prospectus were true and correct and neither the Registration Statement nor the Prospectus omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, respectively, not misleading;" [and]
>>
>> * * *
>>
>> (vii): "the representations and warranties of the Company contained in the Underwriting Agreement are true and correct in all material respects as of the Closing Date."

(Pl.'s 56.1(a), ¶ 25.) Paragraph 2 of the Underwriting Agreement, titled "Representations and Warranties of the Company and the Selling Securityholders," included sub-paragraph 2(a)(vi), which states:

> The Company and each of its subsidiaries owns, or possesses adequate rights to use, all patents, patent rights, inventions, trade secrets, know-how, proprietary techniques, including processes and substances, trademarks, service marks, trade names and copyrights described or referred to in the Prospectus as owned or used by it or which are necessary for the conduct of business as described in the Prospectus, and no such rights as are material to the business and prospects of the Company and its subsidiaries, taken as a whole, expire or are subject to termination at the election of another party without the Company's consent at a time or under circumstances which would have a material adverse effect on the business, operation, properties, condition (financial or otherwise), income, earnings or business prospects of the Company and its subsidiaries, taken as a whole . . . .

4

(Pl.'s 56.1(a), ¶ 26.) The registration statement that the Company filed with the Securities and Exchange Commission for the IPO, which was signed by Nie, contained a prospectus (the "IPO Prospectus"), which states:

> SPSS® and Categories® are registered trademarks of the Company. SPSS/PC+™ and SPSS Real Stats. Real Easy.™ are unregistered trademarks of the Company, and the mark QI Analyst ™ is subject to a pending application for registration. This Prospectus also includes trade names and marks of companies other than SPSS Inc.

(Pl.'s 56.1(a), ¶ 27.) The IPO Prospectus also included sections listing, *inter alia*, (1) all licenses and other agreements with third parties on which the Company relied and (2) all material transactions between Nie and the Company. (Pl.'s 56.1(a), ¶ 28.) The Trademark Agreement was not mentioned in these sections or anywhere else in the IPO Prospectus. (Pl.'s 56.1(a), ¶ 28.)

At the time Nie signed the above documents, Lawrence Samuels was acting as Nie's attorney. (Pl.'s 56.1(a), ¶ 29.) Samuels was also representing the Company during the IPO. (Pl.'s 56.1(a), ¶ 29.) Samuels instructed Nie to carefully read all documents that Nie was asked to sign for the IPO and advised him that if Nie made any misrepresentations or misleading omissions, he might be held liable for them by investors. (Pl.'s 56.1(a), ¶ 30.)

Nie claims that he forgot about the Trademark Agreement shortly after it was signed in 1976 until he was made aware of it in 2007. (Pl.'s 56.1(a), ¶ 40.) However, Nie claims that he always remembered that he and Hull owned the Trademark. (Pl.'s 56.1(a), ¶ 41.) At the time of the IPO, other than Nie and Hull, no other director, officer, or employee of SPSS was aware that the Trademark Agreement existed. (Pl.'s 56.1(a), ¶ 32.) Samuels claims he was also unaware at the time of the IPO that Nie and Hull were the registered owners of the Trademark. (Pl.'s

5

56.1(a), ¶ 32.) The Trademark Agreement was attached to minutes of the meetings of the board of SPSS, Inc., which were contained in the SPSS corporate archives. (Pl.'s 56.1(a), ¶ 31.)

From 1993 through October 2007, Nie did not attempt to assert any rights as owner of the Trademark or as licensor under the Trademark Agreement. (Pl.'s 56.1(a), ¶ 40.)

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d

726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## ANALYSIS

In its complaint, SPSS seeks a declaratory judgment that Defendants Nie and Hull are estopped from asserting any rights against SPSS under the Trademark Agreement. Nie filed a counterclaim against SPSS, seeking to enjoin SPSS under 15 U.S.C. § 1116 from using the SPSS trademark and for treble damages under 15 U.S.C. § 1117 for trademark infringement.

Plaintiff/Counterdefendant SPSS has moved for summary judgment with respect to its claim for declaratory relief and with respect to Defendant/Counterplaintiff Nie's counterclaim. Defendants Nie and Hull have moved for summary judgment with respect to SPSS's claim for declaratory relief, and Nie has moved for partial summary judgment with respect to his counterclaim.

*Plaintiff's Claim for Declaratory Relief*

The parties have filed cross-motions for summary judgment with respect to SPSS's claim for declaratory relief. Turning first to Plaintiff's motion, SPSS argues that under both federal trademark law and Illinois common law, Nie should be estopped from enforcing any rights he may have under the Trademark or the Trademark Agreement.

Plaintiff's estoppel argument under Illinois law relies on assertions Nie allegedly made at the time of the IPO. Plaintiff claims that Nie signed documents, stating that the Company had control over the use of the Trademark and that its right to use the Trademark could not be terminated without the Company's consent.

Equitable estoppel applies when "a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct, that person will not be allowed to deny his or her words or acts to the damage of the other party." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill.2d 302, 313 (Ill. 2001) (*Geddes*). The Illinois Supreme Court has set out the standard for estoppel under Illinois law as follows: "the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Geddes*, 196 Ill.2d at 313-14 (Ill. 2001) (*Geddes*). Regarding the first two elements, the Illinois Supreme Court has explained "the representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive. Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from allowing another person to raise a claim inconsistent with his or her former declarations." *Geddes*, 196 Ill.2d at 314 (citations omitted).

8

Genuine issues of material fact prevent resolution of this issue through summary judgment. First, the parties dispute Nie's state of mind at the time of the IPO with respect to his recollection of the Trademark Agreement and his ownership of the Trademark. These questions are relevant to the first, second and fourth elements of estoppel under Illinois law. Furthermore, the parties dispute the extent of SPSS's knowledge of the Trademark Agreement, which is relevant to the third and fifth elements. Thus, summary judgment cannot be granted with respect to SPSS's estoppel argument.

Turning to Plaintiff's argument under federal trademark law, Plaintiff argues that for an extended period of time, Nie failed to assert any rights under the Trademark Agreement, including the right to control the quality of products sold under the Trademarks. Therefore, SPSS asserts, Nie should be estopped from now reasserting those rights.

Nie disputes Plaintiff's assertion that he failed to fulfill his obligation as a trademark licensor to supervise quality and offers the following examples: Nie periodically worked with the Company's staff to review the quality of products; Nie served as Chairman of the Board from 1992 until January 2008 and regularly offered his views on the standards of quality for SPSS products through board meetings and communications with individual employees; Nie offered input on quality through formal consulting agreements from 1997 through 2005; Nie offered his opinions on standards and quality, both orally and in writing; and Nie used a university class he taught as a beta product test site for many years. Nie also points out that Hull worked as an SPSS software developer until October 2008, "personally setting an example of the standard of quality

he expected for the Company's products." In response, SPSS argues that Nie never explicitly asserted any rights under the Trademark Agreement and that, instead, he deferred to SPSS in matters concerning the quality of the products produced.

This disagreement presents a genuine material factual dispute concerning the degree of control Nie exerted over SPSS's products. SPSS cannot prevail on its trademark law estoppel argument without showing such a failure by Nie. Thus, summary judgment cannot be granted on this ground.

### Nie's Counterclaim for Trademark Infringement

Nie filed a counterclaim against SPSS, alleging trademark infringement. SPSS has moved for summary judgment on the counterclaim. Nie has also moved for partial summary judgment on the counterclaim. The presence of unresolved factual disputes also prevents a resolution of these issues through summary judgment. As noted above, there are unresolved factual disputes regarding Nie's conduct during the IPO, the Company's knowledge of the Trademark Agreement and Nie's role in maintaining quality of SPSS's products. Additionally, there is a factual dispute regarding who made the first sales under the SPSS Trademark, which is relevant to Nie's motion for partial summary judgment. Because of these genuine issues of material fact, summary judgment in favor of either party is not appropriate with respect to Nie's Counterclaim.

## CONCLUSION

Therefore, for the foregoing reasons, SPSS's motions for summary judgment on its Complaint and on Nie's Counterclaim are denied. Defendants' motion for summary judgment on SPSS's Complaint and Nie's motion for summary judgment on his Counterclaim are also denied.

Dated: April 2, 2009

JOHN W. DARRAH
United States District Court Judge